J. Preston Stieff (4764)
J. PRESTON STIEFF LAW OFFICES, LLC
311 South State Street, Suite 450
Salt Lake City, Utah 84111
Telephone: (801) 366-6002
Email: JPS@StieffLaw.com

*Attorney for Plaintiff*

| | |
|---|---|
| THE UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION, a federally recognized Indian tribe,<br><br>Plaintiff,<br><br>v.<br><br>GREGORY D. MCKEE, T & L LIVESTOCK, INC., MCKEE FARMS, INC., and G M FERTILIZER, INC.,<br><br>Defendants. | **COMPLAINT FOR DECLARATORY JUDGMENT AND EQUITABLE RELIEF, CANCELLATION OF ILLEGAL CONVEYANCES OF TRIBAL WATERS, AND DAMAGES FOR TRESPASS, THEFT/CONVERSION AND NUISANCE**<br><br>**Civil Case No.**<br><br>**Judge** |

Plaintiff, the Ute Indian Tribe of the Uintah and Ouray Reservation ("Tribe" or "Ute Tribe"), by and through its attorneys, allege and complain as follows:

## PARTIES

1. Plaintiff Ute Indian Tribe of the Uintah and Ouray Reservation ("Tribe" or "Ute Tribe") is a federally recognized Indian tribe[1] which makes its home on the Uintah and Ouray Indian Reservation in northeastern Utah.

2. The Tribe is organized in two ways under the Indian Reorganization Act of 1934 ("IRA"), 25 U.S.C. § 5101-5144. The Tribe is organized as a tribal government

[1] See 88 Fed. Reg. 2112, 2115 (Jan. 12, 2023).

under 25 U.S.C. § 5123, and it is also chartered as a federal corporation under 25 U.S.C. § 5124.[2]

3. The Tribe operates its own tribal government and oversees its tribal lands and resources, including the assignment and leasing of tribal lands.

4. The Tribe brings this cause of action on its own behalf and on behalf of its tribal members as *parens patriae* to protect its members' health, welfare, natural resources, and economic security. The Tribe has *parens patriae* ("parent of the country") standing to bring claims because the Tribe represents the interests of all of its members and it raises claims that affect all of its members. *See, e.g., Miccosulcee Tribe of Indians v. United States*, 680 F. Supp. 2d 1308 (S.D. Fla. 2010); *see also W. Va. v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1089-90 (2d Cir. 1971) (discussing the *parens patriae* theory of standing without deciding its application to the facts of the case); *Assiniboine & Sioux Tribes v. Montana*, 568 F. Supp. 269, 277 (D. Mont. 1983) (discussing the *parens patriae* doctrine).

5. Defendant Gregory D. McKee ("Defendant McKee") is a non-Indian who is the sole, or majority, interest owner of T & L Livestock, Inc., McKee Farms, Inc., and G M Fertilizer, Inc. (hereinafter "McKee business operations").

---

[2] The IRA is "a statute specifically intended to encourage Indian tribes to revitalize their self-government." *Fisher v. District Court*, 424 U.S. 382, 387 (1976). The IRA implements a federal policy of reestablishing tribal governments, reconstituting tribal land bases, and revitalizing tribal economies and cultures. <u>*Cohen's Handbook of Federal Indian Law*</u> §4.04[3][a], p. 256 (Nell Jessup Newton ed., 2012).

6. Defendant T & L Livestock, Inc. is a Utah corporation with its principal place of business located at 8800 North 8651 East, P.O. Box 1485, Roosevelt, Utah, 84066. Defendant McKee is listed as the registered principal of T & L Livestock, Inc. on the Utah Division of Corporations and Commercial Code website.

7. Defendant McKee Farms, Inc. is a Utah corporation with its principal place of business located at 8800 North 8651 East, P.O. Box 1485, Roosevelt, Utah, 84066. Defendant McKee is listed as the registered principal of McKee Farms, Inc. on the Utah Division of Corporations and Commercial Code website.

8. Defendant G M Fertilizer, Inc. is a Utah corporation with its principal place of business located at 8800 North 8651 East, P.O. Box 1485, Roosevelt, Utah, 84066. Defendant McKee is listed as the registered principal of G M Fertilizer, Inc. on the Utah Division of Corporations and Commercial Code website.

## JURISDICTION AND VENUE

9. This is an action "brought by [an] Indian tribe … with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States." This Court thus has jurisdiction over this action under both 28 U.S.C. § 1331 and § 1362.

10. Indian water rights are predicated exclusively on federal law. *Winters v. United States*, 207 U.S. 564, 577 (1908); *see generally* A. Dan Tarlock, *Law of Water Rights & Resources* § 9:38 (2016). The federal treaties and statutes implicated by this suit include, without limitation:

a. The Treaty With The Utah of 1849 (9 Stats. 984); Ute Treaty of 1863 (13 Stat., 673); Ute Treaty of 1868 (15 Stat., 619); and Act of April 29, 1874, Chapter 136 (18 Stat., 36);

b. Executive Order of Oct. 3, 1861;

c. The Act of March 1, 1899 (30 Stat. 941);

d. The Act of June 21, 1906, Pub. L. 59-258, 34 Stat. 325, 375;

e. *Winters v. United States*, 207 U.S. 564 (1908) and its progeny;

f. *Cedarview Irrigation Company*, no. 4427, slip op. (D. Utah 1923) and *Dry Gulch Irrigation Company*, No. 4418, slip op. (D. Utah 1923);

g. The Act of May 28, 1941, 55 Stat. 209.

11. This court also has supplemental jurisdiction under 28 U.S.C. § 1367.

12. Venue lies in the District of Utah because it is the judicial district in which the parties reside and/or have their principal place of business and in which the acts or omissions alleged occurred. 28 U.S.C. § 1402.

## STATEMENT OF FACTS

### A. The Ute Tribe's Reservation and Water Rights

13. The Tribe's reservation is situated at the foot of the Uinta Mountains[3] on an arid and high desert plateau in northeastern Utah.

[3] According to the U.S. Board on Geographic Names, "Uinta" is the proper spelling for natural features, whereas "Uintah" is the spelling applied to political entities; however, the two spellings are often used interchangeably.

14. Under the Ute Treaties of 1849, 1863 and 1868, the Ute Indians reserved the surface and ground waters appurtenant to their Reservation.[4]

15. The present-day Uintah and Ouray Reservation was originally two separate reservations; the first, the Uintah Valley Reservation, was established by Executive Order on October 3, 1861, confirmed by Congress in the Act of May 5, 1864, § 2, 13 Stat. 63; the second reservation, the Uncompahgre Reservation, was established pursuant to the Act of June 15, 1880, ch. 223, 21 Stat. 1999, and the Executive Order of January 5, 1882. Both Reservations were established to provide a permanent homeland for the Ute Indians and to enable the Tribe and its members to become self-sustaining through agricultural and other economic pursuits. Together, the Uintah Valley Reservation and Uncompahgre Reservation are organized under the Indian Reorganization Act to form a single reservation known today as the Uintah and Ouray Reservation (the "Reservation").

16. Under the Act of March 1, 1899, 30 Stat. 941 ("Act of 1899"), the United States Congress statutorily confirmed the Ute Tribe's rights to reservation water resources and provided explicitly that the right of non-Indians "*shall be subject at all times to the paramount rights of the Indians on said reservation to so much of said waters as may have been appropriated, or may hereafter be appropriated or needed by them for agricultural and domestic purposes….*"

---

[4] *See Winters v. United States*, 207 U.S. 564 (1908); *see also United States v. Michigan*, 471 F. Supp. 192, 212 (W.D. Mich. 1979), *aff'd*, 653 F.2d 177 (6th Cir. 1981) ("Western Indian tribes… reserved whatever water they needed to make use of their land….They are not required to show that the United States granted them [that water], but only that they reserved it.") (citing, *e.g.*, *Winters*, *United States v. Winans*, 198 U.S. 371 (1905), *United States v. Wheeler*, 435 U.S. 313 (1978) (superseded by statute)).

17. In 1905, the Commissioner of Indian Affairs described the dire conditions then existing on the Uintah and Ouray Reservation, and warned that:

> [t]he future of these [Ute] Indians depends upon a successful irrigation scheme, for without water their lands are valueless, and starvation or extermination will be their fate.

Report of the Commissioner of Indian Affairs, 1905.[5] The United States Congress responded in 1906 by authorizing the construction of an Indian irrigation project for the reservation, the "Uintah Indian Irrigation Project," or "UIIP." Congress required the Federal Government to use tribal funds to construct the UIIP.[6]

18. By then, conflicts had also arisen between the Ute Indians and their non-Indian neighbors over access to the Green River tributary streams flowing onto the Tribe's reservation. In response to the conflict, the United States and the Secretary of the Interior filed suit in 1916 as "Trustee of the Indians" to adjudicate the Ute Indians' reserved water rights in the tributary streams and rivers and to enjoin the non-Indians' upstream interference. *See* Complaint, *United States and Secretary of the Interior as Trustee of the Indians v. Dry Gulch Irrigation Co., et al.*, No. 4418 (U.S. District Court for the District of Utah, July 10, 1916); Complaint, *United States and Secretary of the Interior as Trustee of the Indians v. Cedarview Irrigation Co., et al.*, No. 4427 (U.S. District Court for the District of Utah, July 17, 1916) (hereinafter "the *Dry Gulch* and *Cedarview* cases").

---

[5] Quoted in *Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 521 F. Supp. at 1127.

[6] *Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 521 F. Supp. 1072, 1126 n.165 (D. Utah 1981) (quoting Floyd A. O'Neil & Kathryn L. Mackay, *A History of the Uintah-Ouray Lands*, at 34 (U. Utah, American West Center 1977).

19. In 1923, the United States District Court for the District of Utah entered decrees in *Dry Gulch* and *Cedarview*, (*i*) adjudicating the Tribe's Indian reserved water rights in the tributary streams and rivers, and (*ii*) permanently enjoining the Tribe's non-Indian neighbors from interfering with the Tribe's decreed water rights. Consistent with the United States' complaints, the United States District Court adjudicated legal title to the Tribe's reserved water rights in the "United States of America" and "the Secretary of the Interior" in their capacity "as Trustees" of the Ute Indians.

20. The dispute in this case involves tribal waters adjudicated to the Ute Indians in the *Cedarview* case. Copies of the *Cedarview* complaint and final decree are attached hereto as Exhibits A and B.

21. Thus, the Tribe's water rights—established at the creation of the Tribe's reservation in 1861 and *before* the allotment of land to individual Indians in 1905—are tribal trust assets held by the United States in trust for the benefit of the Tribe. *Hackford v. Babbitt*, 14 F.3d 1457, 1467 (10th Cir. 1994) ("though the individuals with irrigable land [within the UIIP] may have a right of user [sic] to the water, the water right itself is a tribal right.").

22. As authorized by the Indian Reorganization Act, the Ute Tribe has purchased more than 40,794.4 acres of former Indian allotments on its Reservation, most of which are serviced with irrigation water through the UIIP, and the Ute Tribe, therefore, is now the record owner of these former Indian allotments.

### B. The McKee Property and Actions Giving Rise to the Dispute

23. Defendant McKee's property and cattle feedlot are located on a tract of fee patent land within the exterior boundaries of the Uintah and Ouray Reservation, described as:

> Lot Two (NW/4 NE/4), the SW/4 NE/4, and the NW/4 SE/4 of Section Two, Township One South, Range One East, Uintah Special Meridian, Uintah County, Utah, containing 121.14 acres.

The northern-most parcel, Lot two, contains 41.14 acres, while the SW/4 NE/4 and the NW/4 SE/4 each contain 40 acres (hereinafter "McKee property"). These lots are referred to herein as Tracts 1, 2 and 3 respectively.

24. On August 3, 2012, Defendant McKee's estranged wife, Maggie McKee, informed the Ute Indian Tribe that Defendant McKee was misappropriating tribal waters from a UIIP conveyance canal and ditches to irrigate the McKee property and to provide drinking water to cattle maintained in Defendants' feedlot. Mrs. McKee also described other improprieties, including the (*i*) Defendants' trespass onto tribal lands by virtue of an illegal arrangement between Defendant McKee and one or more Ute Indian tribal members, and (*ii*) Defendants' contamination of tribal waters and adjacent tribal lands by virtue of, *inter alia*, an inadequate, or non-existent, animal waste management system at the Defendants' feedlot, and the Defendants' burial of cattle carcasses on the property, some allegedly infected with disease.

25. The Plaintiff Tribe commenced a lawsuit against the Defendants in the Ute Indian Tribal Court and the Tribal Court awarded judgment in the Tribe's favor on August

3, 2015. *See* Exhibits C and D (Tribal Court's Judgment and Findings of Fact and Conclusions of Law).

26. However, when the Tribe subsequently sought to enforce the Tribal Court judgment, the federal courts ruled that the Ute Indian Tribal Court lacked subject matter jurisdiction over Mr. McKee. *Ute Indian Tribe of the Uintah and Ouray Reservation v. McKee*, 482 F. Supp. 3d 1190 (D. Utah 2020), *aff'd*, 32 F.4th 1003 (10th Cir. 2022).

**C. Timeliness of the Tribe's Suit**

27. There is no statute of limitations on an Indian tribe's federal common law suit to enforce Indian property rights. *Cty. of Oneida, N.Y. v. Oneida Indian Nation of New York*, 470 U.S. 226, 240-41 (1985).

28. Alternatively, the Tenth Circuit decision in *Ute Indian Tribe of the Uintah and Ouray Reservation v. McKee* was issued on April 27, 2022, and the Tribe's federal court suit was timely filed within one year of that date. *See* 28 U.S.C. § 1367(d); UTAH CODE ANN. § 78b-2-111.

**D. Defendants' Misappropriation of Indian Waters**

29. The Uintah Indian Irrigation Project, or UIIP, was established to provide irrigation water to Ute Indian lands. The Deep Creek Canal is a conveyance channel for the UIIP, and the waters conveyed through the Deep Creek Canal were adjudicated to the Ute Indians under the 1923 *Cedarview* Decree.

30. The Defendants and their predecessors in interest have been diverting water to the McKee property from the UIIP conveyance canals and ditches without any legal right to do so.

### a. Goodrich Gulch Water Right

31. Defendant McKee relies on a "Certificate of Appropriation of Water" issued by the State of Utah to Sarah C. Darling in 1926 (hereinafter "state water right") as the basis for his right to divert water from the Deep Creek Canal for application to the lands referred to herein as Tracts 1 and 2 of the McKee property, that is, Lot Two (NW/4 NE/4) and the SW/4 NE/4 of Section Two, Township One South, Range One East, Uintah Special Meridian, Uintah County, Utah, containing 81.14 acres.

32. However, neither the water source, nor the lawful point of diversion, for that state water right is through the Deep Creek Canal; instead, the water source for the state water right is Goodrich Gulch—a water source that is intermittent, and not seasonal like the Deep Creek Canal, according to the testimony of the Tribe's hydrologic expert. Dr. Woldezion Mesghinna, Ph.D., P.E.

33. By Mr. McKee's own admission, the point of diversion and method of diversion for the state water right is through a wooden flume that was built up and over the "pre-existing 'U.S. Govt. Deep Creek Canal'" in 1930—a wooden conveyance flume that no longer exists.

34. According to the Tribe's hydrologic expert. Dr. Mesghinna, the Utah State Engineer has never approved a change in the point of diversion, nor the method of diversion of the water.

35. Furthermore, the Utah State Engineer has no lawful authority to authorize diversions of tribal water—a federal property right—from the federally-constructed and federally-operated Uintah Indian Irrigation Project. Indeed, the UIIP itself is an Indian

trust asset under federal law. *See* The Act of June 21, 1906, Pub. L. 59-258, Stat. 325, 375.

### b. Illegal Transfers of Indian Water to Tract 3

36. Defendant McKee claims the right to divert water from the Deep Creek Canal for application to the land referred to herein as Tract 3 of the McKee property, that is, the NW/4 SE/4 of Section Two, Township One South, Range One East, Uintah Special Meridian, Uintah County, Utah, comprising 40 acres.

37. Yet, Mr. McKee admits that he has no instrument of conveyance, conveying a right to tribal waters from the Deep Creek Canal for application to the 40-acre tract of land that comprises Tract 3 of the McKee property. Instead, Mr. McKee relies on two "Agreements," the first dated March 4, 1943, and the second dated December 23, 1946 (referred to herein as "the 1943 Agreement" and "the 1946 Agreement").

38. The 1943 Agreement was executed by Dewey McConkie, a predecessor in interest of Defendant McKee. Under the 1943 Agreement, E.W. Kronquist, the then-Project Manager of the UIIP—purporting to act on behalf of the United States—agreed to assign "21 acres of water right" appurtenant to lands "within the Uintah Irrigation Project," to Tract 3 of the McKee property—land that is *not* within the Uintah Indian Irrigation Project. The Agreement recites no lawful authority by which E.W. Kronquist was authorized to transfer tribally-adjudicated water rights appurtenant to lands inside the UIIP to lands that were not then—and are not today—lands inside the UIIP. Lacking lawful authority, the purported 1943 transfer is an illegal conveyance of Indian trust property under 25 U.S.C. 177.

39. The 1946 Agreement was also executed by Dewey McConkie, Defendant McKee's predecessor in interest. The 1946 Agreement is signed by C.A. Massie, the then-acting Project Engineer of the UIIP, and Forrest R. Stone, the then-Superintendent of the Uintah and Ouray Indian Agency, purporting to act on behalf of the United States. The 1946 Agreement purports to assign 15.28 acre-feet of water per acre per annum from lands "within the Uintah Irrigation Project" to lands that were not then—and are not today within the UIIP—the land now owned by Mr. McKee referred herein to Tract 3.

40. The 1946 Agreement recites that the transfer was made pursuant to the "authority of the Secretary of the Interior contained in Section 2 of the Act of Congress approved May 28, 1941 (55 Stat. 209), which is attached hereto as Exhibit E. However, Section 2 of 55 Stat. 209 imposes two critical limitations on the Secretary's authority to transfer water rights within the UIIP: (1) first, that such transfers can only be made "with the consent of the interested parties" and secondly, (2) that a transfer of Indian water rights can only be made "to other lands under said [Uintah Indian Irrigation] project."

41. Because the McKee fee lands are not within the project lands of the Uintah Indian Irrigation Project, the transfer purportedly authorized under the 1946 Agreement is invalid because it exceeded the Congressional delegation to the Secretary under Section 2 of 55 Stat. 209. The purported transfer is also invalid because the transfer authority under the 1941 Act is vested solely in the Secretary of the Interior—not lesser officers such as Messrs. Massie and Stone.

42. Furthermore, the Ute Tribe was obviously an "interested party" to the transfer proposed under the Agreement of December 23, 1946. And there is no

evidence—nor any recitation in the Agreement itself—that the Ute Tribe was properly notified of, or consented to, the transfer of its tribal waters to fee lands located outside of the UIIP. Hence, the purported transfer constitutes an illegal conveyance of Indian trust property under 25 U.S.C. 177.

43. Finally, the Final Decrees in *Dry Gulch*, case number 4418 and *Cedarview*, case number 4427, U.S. District Court for the District of Utah, have never been amended to permit the transfer of tribal water to lands outside of the Uintah Indian Irrigation Project.

## II. Trespass and Illegal Farming of Tribal Lands

44. In investigating Maggie McKee's allegations, the Tribe has learned that Defendants have given valuable consideration to one or more tribal members, and in return, those Ute tribal members have allowed Defendants to grow and harvest crops on tribally-owned lands within the Uintah and Ouray Reservation.

45. The arrangement between the McKee Defendants and these Ute tribal members contravene tribal law.

46. Because the arrangement between Defendants and these tribal members is unlawful under tribal law, and because Defendants otherwise lack lawful authority to enter onto the Tribe's Reservation, the Defendants' presence on tribal lands under the illegal farming agreement[s] constitutes a trespass.

## III. Nuisance, Trespass and Environmental Contamination

47. As a sovereign entity the Ute Tribe is a responsible for protecting the health and welfare of its tribal members and for protecting the environmental health of the Uintah and Ouray Reservation.

48. On information and belief, the Defendants are operating their farm and cattle feedlot without regard for public health and welfare. According to Maggie McKee, an average of 200 calves die each year at the feedlot from various unknown diseases. Mrs. McKee also alleges that the Defendants have three large liquid fertilizer tanks that leak and that the Defendants "periodically wash[] out" the fertilizer tanks, allowing the runoff to flow onto surrounding tribal lands.

49. Defendant McKee admits that he buries the carcasses of dead animals on the McKee fee lands, which are adjacent to Ute Indian allotment and tribal trust lands.

50. On information and belief, Defendants have operated a cattle feedlot on the McKee property without securing the requisite state and/or federal law permits for a cattle feedlot operation, and without complying with state and/or federal environmental regulations that govern the operation of a cattle feedlot.

## FIRST CLAIM FOR RELIEF

### Declaratory Judgment and Permanent Injunction – Deep Creek Canal and Defendants' Trespass Onto Tribal Lands

51. The Tribe incorporates each preceding paragraph.

52. A genuine controversy exists between the parties regarding the Defendants' right to divert water from the UIIP canals and ditches for use on the McKee property.

53. The Tribe seeks a declaration that Defendants have no right to divert water from the UIIP irrigation canals and ditches for use on the McKee property.

54. The Tribe seeks a further declaration that Defendants' presence on tribal lands without formal consent of the Ute Tribe—or pursuant to a lease granting access to the specific lands in question—constitutes a trespass.

55. The Tribe seeks entry of a permanent injunction enjoining the Defendants from (*i*) diverting water from the UIIP canals and ditches for use on the McKee property, and (*ii*) from trespassing onto tribal lands in the absence of formal consent of the Ute Tribe, or pursuant to a lease granting access to the specific lands in question. There is no adequate remedy at law to redress these harms because, in the absence of injunctive relief, the Tribe will be required to institute repeated legal actions to redress the Defendants' misappropriation of waters from the UIIP and the Defendants' trespass onto tribal lands without lawful authority.

**<u>SECOND CLAIM FOR RELIEF</u>**

**Damages for Misappropriation, Theft and/or Conversion of Water**

56. The Tribe incorporates each preceding paragraph.

57. As a direct and proximate result of the Defendants' misappropriation and conversion of water from the Deep Creek Canal, the Tribe and its members have suffered damages in an amount to be proven at trial.

**<u>THIRD CLAIM FOR RELIEF</u>**

**Nuisance and/or Environmental Contamination**

58. The Tribe incorporates each preceding paragraph.

59. Defendants have willfully, with reckless and wanton disregard, or negligently operated their farming operations and cattle feedlot in a manner that causes an unreasonable invasion of, interference with, impairment to, inconvenience to, annoyance and/or injury to the Ute Tribe and its members, and to the Tribe's and its member's beneficial use and enjoyment of the Uintah and Ouray Reservation.

60. Defendants have knowingly, intentionally, or negligently created, maintained or contributed to a nuisance and/or a public health hazard that is injurious to the Tribe and its members.

61. Defendants' actions constitute a substantial and unreasonable interference with public rights within the Ute Tribe's jurisdiction, including, *inter alia*, the right to public health and safety and comfort, the right to use and enjoy natural resources, and the right to use and enjoy private and public property.

62. By reason of the foregoing, the Ute Tribe is entitled to equitable relief, including but not limited to an injunction requiring Defendants to comply with applicable environmental law and regulations, and to pay any and all costs associated with such compliance.

63. By reason of the foregoing, the Ute Tribe has also incurred, and may incur in the future, damages, including special and direct damages, costs and expenses, in an amount to be proven at trial for which it is entitled to receive compensation and reimbursement from Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff, the Ute Indian Tribe, respectfully prays that this Court enter judgment against Defendants Gregory D. McKee, T & L Livestock, Inc., McKee Farms, Inc., and G M Fertilizer, Inc. as follows:

A. For appropriate damages, declaratory and/or injunctive relief; and

B. For such other further relief as this Court deems just and proper.

Dated this 25th day of April, 2023.

J. PRESTON STIEFF LAW OFFICES, LLC

*/s/ J. Preston Stieff*

J. Preston Stieff (4764)
311 South State Street, Suite 450
Salt Lake City, Utah 84111
Telephone: (801) 366-6002
Email: jps@StieffLaw.com

*Counsel for Plaintiff*

# EXHIBIT A

Case 2:23-cv-00257-HCN-JCB Document 1 Filed 04/25/23 PageID.19 Page 19 of 109

UNITED STATES DISTRICT COURT, DISTRICT OF UTAH

Central Division Suit over water on Indian lands - Utah

United States of America et al. vs. Cedarview Irrigation Company et al. No. 4427 W. W. Ray & D. S. Cock. Atto.

EQUITY Attorn.

| | | | |
|---|---|---|---|
| July | 17 | 1916 | Complaint in Equity filed, 10 affidavits filed for tempry restraining order |
| | | | Motion for Writ of Injunction filed Order for hearing of Writ fixed for 10:30 A.M. July 26th, Praecipe for subpoenas as of defendants filed Issued orgnl & 78 copies subp. |
| " | 26 | " | Mo. to dismiss & demurrer to bill filed by defts. |
| | | | Defts file two affidavits vs order to show cause. U.S. attny files 6 affidavits |
| | | | Order of Court overruling demurrer, denying motion, ordering injunction, and appointing commissioners to measure & distribute water. E. S. Borgquist |
| | 27 | | Filed return subpoena in equity served. |
| | | | " " order to show cause served. |
| Aug. | 15 | | Deposit of Cedarview Irrigation Co. et al to cost fund |
| Mch | 8 | 1917 | Motion of U.S. Attorney to appoint Water Commissioner filed |
| " | 24 | " | Set on motion Wm W. Ray, Wedgewood and Farnsworth consenting, for |
| " | " | " | hearing to appoint Water Commissioner on April 6, 1917. |
| April | 2 | " | Order signed and filed appointing E. S. Borquist Water Commissioner and fixing duties and pay |
| Oct | 1 | 1918 | Stipulation to continue for term & Order continuing same |

4427

60542

IN THE DISTRICT COURT OF THE UNITED STATES

IN AND FOR THE DISTRICT OF UTAH

IN EQUITY.

DOCKET NO. 4497

THE UNITED STATES OF AMERICA, and FRANKLIN K. LANE, Secretary of the Interior, as Trustee of the Indians of the former Uintah and Ouray Indian Reservation,

Plaintiffs,

v.

CEDARVIEW IRRIGATION COMPANY, COLORADO PARK IRRIGATION COMPANY, DRY GULCH IRRIGATION COMPANY, T. N. DODD IRRIGATION COMPANY, OURAY VALLEY IRRIGATION COMPANY, UINTAH INDEPENDENT DITCH COMPANY, UINTAH RIVER IRRIGATION COMPANY and WHITEROCKS IRRIGATION COMPANY, each and all of the foregoing being corporations; GEORGE Q. ALLRED, TILDEN H. ANDERSON, GEORGE AVERITT, JACOB BADER, ERASTUS S. BASTIAN, JOHN BENNETT, HENRY O. BEST, RAYMOND T. BONNIN, JOHN BURGESS, SAMUEL BARNHURST, JOHN T. CARLSON, JOHN CHASE, WILLIAM CHICHAS, VERNON COLLINS, HUGH COLTHARP, W. HORACE COLTHARP, JOHN W. COOK, JOSEPH B. DOBSON, THOMAS DURIGAN, GEORGE B. ELDER, CHARLES ELMER, DAVID ELMER, MARY A. ELMER, BYRDIE D. FESLER, MARGARET A. FIELD, RUSSELL FORSYTHE, LOU FRAUGHTON, JOHN F. GLINES, THOMAS S. GUNN, HYRUM GURR, JOHN HALL, STEPHEN HALL, JOSEPH H. HARDY, WILLIAM R. HILL, BERTHA E. HUGHEL, CHARLES HUTCHEON, NICK JERFROS, L. O. JOHNSON, WILLIAM KEEL, CHARLES F. KEIL, DANIEL LARSEN, HENRY A. LEE, RACHEL E. LEE, HENRY B. LLOYD, RALPH MARIMON, ROBERT L. MARIMON, JOHN J. NIELSON, EDWARD L. OAKS, HYRUM E. OAKS, CHARLES R. OAKEY, JOHN H. O'DRISCOLL, LESLIE O'DRISCOLL, HENRY P. OLSEN, JOHN A. OLSEN, CULBERT L. OLSON,

GEORGE S. PACE, ODIS PAPPAS, DAVID J. PETERSON, FRANK PETERSON, JAMES H. PETERSON, SAMUEL H. PULLEN, ALBERT RASMUSSEN, ADOLPHUS SESSIONS, NEWTON SHELTON, EDWARD C. SIMS, JOSEPH SIMS, BARBRIA E. SMITHSON, OLIVER B. STOUT, GEORGE THOMAS and ISAAC N. WORKMAN,

Defendants.

BILL OF COMPLAINT.

THE UNITED STATES OF AMERICA and Franklin K. Lane, Secretary of the Interior, as Trustee of the Indians of the former Uintah and Ouray Indian Reservation, by W. W. Ray, United States Attorney for the District of Utah, and John F. Truesdell, Special Assistant to the Attorney General, acting by the direction and authority of the Attorney General, bring this their Bill of Complaint against Cedarview Irrigation Company (Cedarview Ditch); Colorado Park Irrigation Company (Colorado Park Ditch); Dry Gulch Irrigation Company (Bench Ditch, Canal Number One, and Uintah Ditch); T. N. Dodd Irrigation Company (Bonnin Ditch); Ouray Valley Irrigation Company (Whiterocks Irrigation Company's Ditch); Uintah Independent Ditch Company (Uintah Independent Ditch); Uintah River Irrigation Company (Uintah River Ditch); Whiterocks Irrigation Company (Whiterocks Irrigation Company's Ditch); each and all of the foregoing defendants being corporations organized and existing under and by virtue of the laws of the State of Utah and citizens and residents of the State of Utah; John W. Cook, Thomas S. Gunn, Leslie O'Driscoll, Frank Peterson, Samuel H. Pullen and Albert Rasmussen (Big "6" Canal); George Averitt, Raymond T. Bonnin, Samuel Barnhurst, Lou Fraughton,

2

Bertha E. Hughel, Charles Hutcheon, L. O. Johnson, Newton Shelton and Isaac N. Workman (Bonnin Ditch); Barbria E. Smithson (Bonnin Ditch and Uintah Independent Ditch); Vernon Collins (Collins Ditch); Nick Jerfros and Culbert L. Olson (Constantinus Contis Ditch); Thomas Durigan (Durigan Ditch); Stephen Hall (Hall Ditch); John Hall, Henry A. Lee and Rachel E. Lee (Hall and Lee Ditch); Charles F. Keil (Keil Ditch); Russell Forsythe, Ralph Marimon and Robert L. Marimon (Marimon Ditch); George Q. Allred (Allred Ditch); Tilden H. Anderson, Jacob Bader, Erastus S. Bastian, John Bennett, Henry O. Best, John Burgess, John T. Carlson, John Chase, William Chichas, Hugh Coltharp, W. Horace Coltharp, Joseph B. Dobson, George B. Elder, Charles Elmer, David Elmer, Mary A. Elmer, Byrdie D. Fesler, Margaret A. Field, John F. Glines, Hyrum Gurr, Joseph H. Hardy, William R. Hill, William Keel, Daniel Larsen, Henry B. Lloyd, John J. Nielson, Charles R. Oakey, Edward L. Oaks, Hyrum E. Oaks, John H. O'Driscoll, John A. Olsen, Henry P. Olsen, George S. Pace, Odis Pappas, David J. Peterson, James H. Peterson, Adolphus Sessions, Edward C. Sims, Joseph Sims, Oliver B. Stout and George Thomas (Uintah Independent Ditch); each and all being citizens and residents of the State of Utah; and for cause of action against said defendants, the plaintiffs allege:

1. The said Franklin K. Lane is a citizen of the State of California and the Secretary of the Interior of the United States, and, by virtue of an Act of Congress approved June 21, 1906, entitled "An Act Making Appropriations for the Current and Contingent Expenses of the Indian Department, for Fulfilling Treaty Stipulations with Various Indian Tribes, and for Other Purposes, for the Fiscal Year ending June

3

Thirtieth, Nineteen Hundred and Seven," is trustee of the Indians of the former Uintah and Ouray Indian Reservation hereinafter described.

2. The jurisdiction of this Court over this suit depends upon the fact that the United States of America is a party hereto.

3. From before the time of the first explorations by white men of the country lying between the Rocky Mountains and the Sierra Nevada Mountains, until the cession thereof by Mexico to the United States and for many years thereafter, those certain Indians called the Ute or Utah Indians made their homes in, roved over and claimed to own, a vast extent of territory therein, the greater part of which consisted of the country lying between the Great Salt Lake and the main range of the Rocky Mountains, and between lines that mark what are now respectively the southern boundary of Wyoming and the Northern boundaries of New Mexico and Arizona. The lands so occupied and claimed contain mountain ranges, valleys and plains, and many rivers and smaller streams. Much of said land was and is suitable for grazing and much thereof was and is adapted to agriculture, but all was and is arid in character and not capable of raising crops without irrigation. The region so claimed abounded in both large and small game and fish and produced fruits and berries of considerable food value.

The Ute Indians, during their occupancy of the said extended territory, belonged to one great tribe that was in turn made up of numerous sub-tribes, or bands. They were then a warlike, nomadic, nonagricultural and nonpastoral people who lived by hunting and fishing and by gathering the natural

fruits of the region they occupied and which is hereinabove described, and the same sufficiently supplied them with the necessities of their life.

Said Indians have at all times been and now are tribal Indians and wards of the United States.

All of the territory above described as occupied by the Ute Indians, until the cession of parts thereof by them to the United States, as hereinafter mentioned, was Indian country, belonging to said Indians under and by virtue of the so-called Indian title of occupancy and possession.

4. It has at all times been and still is the intent and policy and the duty of the United States in its relation to the Ute Indians, as also in its relation to its Indian wards in general, to protect said Indians in their rights, promote their happiness and their moral and material welfare, and to educate and civilize them; and as a means of accomplishing said several purposes and fulfilling said duty, it also has at all times been and now is the policy of the United States to secure and reserve to said Ute Indians so much of the lands hereinabove described as claimed and occupied by them as might be necessary or useful therefor and to encourage said Indians to farm and cultivate the same; and as to such lands of said Indians as were from time to time not deemed by the United States as necessary or useful for said purposes, it has been its policy to acquire the same from said Indians so that the lands so acquired might be settled upon and otherwise used for the benefit of the United States, but only, however, with the full agreement and consent of said Indians and upon the payment of proper considerations for the lands thus acquired.

5. In order to carry out the aforesaid general plan and policy and to discharge its said duty, the United States, beginning about the year 1859, by treaties and less formal agreements with the various bands of Ute Indians, and by acts of Congress and Executive orders of the President, confirmed, set off and reserved to the Ute Indians for their exclusive and perpetual use and established as Indian Reservations certain comparatively small areas of the territory above described as originally occupied by the Ute Indians, and received from said Indians the cession of and extinguished their title to the lands theretofore occupied by them outside of said reservations. The Ute Indians, in thus ceding their lands outside of said reservations to the United States, or in otherwise consenting to the extinguishing of their title thereto, in addition to other motives including their desire for education and civilization were actuated by the wish to be protected from the intrusions of the whites and the desire to hold the smaller quantities of lands comprised in their said reservations by a higher and more indefeasible title than that under which they had formerly held their whole vast territory above described. The land comprised in each reservation so established was at the time of its establishment and ever since has been and now is of less value than certain areas of equal extent within the lands ceded by the Ute Indians to the United States.

6. Among the reservations so established was that certain one known as the Uintah and Ouray Indian Reservation. The same was created by Executive order of the President on, to-wit, the third day of October, 1861, and its creation was thereafter ratified, acknowledged and confirmed by acts of

the Congress of the United States. Said reservation throughout its existence as a whole, until the allotment of parts thereof to individual Indians and the throwing open of parts thereof to settlement as hereinafter described, comprised about 2,039,040 acres of land and occupied the whole Uintah Basin, so-called, in what was at the time of the creation of said reservation the territory of Utah, and is now the State of Utah. The said reservation was enclosed on all sides by mountains and on the north and west extended to the tops of the mountains which formed its boundary, and said mountains are of great height and the source of many streams that flow down into the floor of the basin and through the flat lands of what was the reservation. The slopes of the higher mountains within the said reservation were and are well timbered and the reservation did and does contain great tracts of land suitable for agriculture. The said agricultural land, however, and also all of said reservation except the high slopes of the mountains which have too great an altitude to be susceptible of cultivation, are arid in character and will not produce crops without irrigation and unless irrigated are comparatively valueless.

7. The Green River formed the southeast boundary of said reservation for a distance of about ten miles, but owing to the elevation of the irrigable lands of said reservation in relation to said river, only a small part of said lands is susceptible of irrigation therefrom. Except as to that part of said former reservation which is watered by the Green River or susceptible of irrigation therefrom as aforesaid, the said reservation is watered and is capable of being irrigated only from the Duchesne River and the numerous lakes and

streams that form its sources and tributaries.

The main stream of said reservation is, as aforesaid, now called the Duchesne River, and into it from the north flow two great branches thereof called respectively, the Uintah River and the Lake Fork River. At the time of the establishment of the said reservation, that certain stream that is now called the Uintah River was called the North Fork of the Uintah River, and the stream that is now called the Duchesne River, except for the head waters thereof, was called the Uintah River, and then later that part of the Duchesne River that flows between the junction of the said river with the Uintah River and the Green River was, and to a certain extent it still is, called variously the Duchesne River and the Uintah River.

During the existence of said reservation the rivers and streams, lakes and water courses thereof, except the Green River, from their sources which are upon what was said reservation to the point where the principal stream thereof, the Duchesne River, into which all of the others flow as aforesaid, leaves said reservation, were entirely under the control of the United States and of the Indians of said reservation and available for their use without let or hindrance of others. At all times the said waters have given and they now give the said reservation lands their chief value and they have made and make said lands available for agriculture and for the pasturing of stock and without said waters the said lands and all of them could not be used for said purposes or either of them and they would be comparatively valueless. Said waters were used at all times during the existence of said reservation and they were indispensably necessary for

the domestic purposes of the Indians and of the agents and employes and soldiers of the United States on said reservation and were used also for the watering of stock and for irrigation, and after the allotments were made as hereinafter stated and at all times since, the said waters have been used and they are now being used upon the lands of said former reservation which still belong to the United States or said Indians for all of said purposes. The use of said water for irrigation increased as the Indians grew in civilization and industry and, so far as diversions from the Uintah River are concerned, the same is hereinafter particularly described.

8. The Uintah band of the Ute Indians had, from the earliest times, roamed and hunted over the said Uintah Basin and claimed to own it and soon after the establishment of said reservation they took up their permanent residence thereon. Said Uintah Ute Indians, by various treaties and agreements with the United States, in consideration of said reservation and the resources thereof being confirmed to them and to the Ute Indians in general, and in consideration of the policy and intent of the United States with regard to their civilization and welfare, and in consideration of the setting aside for their benefit of certain sums of money by the United States, ceded and released to the United States their interest in vast areas of other lands theretofore held and claimed by the Ute Indians as above described. 'The Uncompahgre band of Ute Indians and the White River band of Ute Indians, for like considerations and with a like purpose and by like agreements, also ceded and released to the United States their interest in vast areas of valuable lands owned and claimed by them and by the Ute Indians in general, and also took up their per-

manent residence upon said reservation.

During the existence of said reservation the United States, in order to carry out its policy with respect to the said Indians as above described, and to educate said Indians and civilize them and make them self-supporting and independent by inducing them to become stock owners and farmers, established, maintained and operated agencies and schools upon said reservation for the said Indians upon said reservation, which agency and school establishments consisted and consist in part of many costly buildings and of irrigated farms and gardens, and the same ever since have been and are still maintained and operated by the United States for the benefit of said Indians.

9. The Indians of said reservation during the existence of the reservation lived in part as they had before, by hunting and fishing, but under the influence of the United States, and, being induced thereto by their confinement to the comparatively narrow limits of the reservation, they also became in part a pastoral people and farmers of irrigable land upon said reservation. They also during said period leased certain of their lands on said reservation for pasture, and received and were supported in part by issues of rations and payments of money by the United States, all of which rations and payments coming however, from tribal funds of said Indians that had been created and held by the United States under treaties with them and which were the consideration in part for the cessions of land made by said Indians and of their acceptance of and confinement to said reservation as above described.

10. By an executive order of the President of date,

to-wit, the third day of September, 1887, a tract of land on the Uintah River and within said reservation, comprising six square miles, was temporarily devoted to military uses and was used therefor until by an executive order of, to-wit, August 19, 1912, the same with the exception of 150 acres thereof was entirely restored to the said reservation. During said period from 1887 to 1912, extensive military posts, with buildings, grounds and all other usual equipments, were established and for many years maintained upon said 150 acres and now the said buildings and grounds are used by the Indian Service of the United States as the headquarters of the agency that that Service maintains in the said Uintah Basin for the aid, control and education of said Indians and said lands still form a part of said Indian Reservation and are under the control of the Secretary of the Interior.

11. In the year 1902 and thereafter, the United States, being then and at all times herein mentioned and now the owner in fee of all of the lands of said reservation, with the exception of such thereof as it has disposed of to white persons since the throwing open of said reservation as hereinafter described, by various statutes and various informal agreements with the Indians of said reservation, in order to further the civilization of said Indians and to carry out as to them its allotment policy concerning its Indian wards, in general, which was adopted prior to the year 1887 and which is to induce the Indians, for their own welfare and for the welfare of the United States, to abandon their tribal relations and their ancient habits and to take in severalty and to become the owners of and to work and develop separate tracts of land sufficient for their support and happiness in

a civilized and prosperous station in life, provided for the allotment of lands in said reservation in severalty to each Indian thereof. In the years 1904 and 1905 said allotments were made and they ever since have remained and now are in full force and effect, except that in certain instances where the allotments originally made have turned out to be, for some reason undesirable, new allotments of land theretofore unallotted have been made in lieu thereof, and similar lieu allotments probably will be made under like circumstances in the future. The lands so alloted to Indians as aforesaid were intended to be and are, with minor exceptions, the best and most desirable lands upon what was the said reservation, and the lands thereof best adapted to irrigation from the various streams of said reservation along which they lie.

12. At about the time that the allotments on said reservation were made the United States, looking to the opening of certain of the reservation lands to settlement by white persons, set apart certain of the lands of said reservation at the head-waters of the streams thereof as forest reserve lands, so that, among other things, the water supply for said streams and for said Indians would be maintained, and the United States also set apart large tracts of said reservation lands to be held by the United States for the common use of said Indians for pasture lands, and reserved also certain tracts of land for Indian agency and school purposes and for reservoir sites and for other purposes, and thereafter provision was made for the throwing open to settlement by white persons of the rest of said lands and for the payment of the Indians therefor. It has been at all times and is the intention of the United States and of said Indians that only the

lands and the water of said reservation that would not and will not be in any way needed for said allotments, pasture lands, Indian school and agency lands or for any purpose or need of said Indians or of the United States, should or shall be subject to disposal in any way and that all the remainder of said lands and waters should and shall be reserved to and for said Indians and the United States.

13. The diversion and use of water for irrigation and other purposes upon said reservation prior to the making of said allotments was made by and through numerous ditches constructed by the United States and said Indians. Since the making of said allotments certain of said ditches have been and still are used for the irrigation of and the supplying of water for domestic and other uses in connection with said allotments and other United States and Indian lands reserved for special purposes as hereinabove stated, and certain other of said ditches have been superseded and their water is being carried by newer ditches and canals that have been constructed by the United States as hereinafter described. Said old ditches and canals are also hereinafter described and are referred to hereinafter as the "old irrigation system."

During all of the period of arranging for the making of said allotments and the opening of said reservation to settlement as hereinafter mentioned, and for a long time prior thereto, the United States in order more extensively than had already been done, to irrigate with the waters of said reservation the said allotments and other lands reserved or to be reserved for Government or Indian purposes, planned and arranged for the building of a large irrigation system, and in the month of July, 1905, the construction of the sys-

tem so planned and hereafter more particularly described was begun, surveys therefor already having been made. The irrigation system so planned and begun is hereinafter called the "new irrigation system."

14. By proclamation of the President of the United States made, on to-wit, July 14, 1905, the lands of said reservation that were then unallotted and unreserved in any way were thrown open to settlement on to-wit, August 28, 1905. On to-wit, June 21, 1906, a large sum of money was appropriated and provision for the further construction of said new irrigation system was made by the Act of Congress of the United States.

15. Said old and new irrigation systems together consist of diversion dams, canals, ditches, drops, gates, measuring devices and other structures and divert and use the waters of many of the streams of what was the said reservation, and the same are designed to carry water to each Indian allotment lying thereunder, and to the lands reserved for Indian agencies and schools and other special purposes. Said new system has cost upwards of $800,000 and the construction of all of its main features was completed in 1911. The construction of certain of the smaller main ditches and canals and of certain of the lateral ditches belonging to said new system has been continued since said last mentioned date and to some small extent has not yet been fully completed.

That part of said old and new irrigation systems which diverts water from the said Uintah River consists of diversion dams, ditches, canals and other structures, and together with the lands irrigated and to be irrigated thereunder and thereby and the water rights used and to be used in connection

therewith, is more particularly described as follows:

WHITEROCKS DITCH: The head of said ditch is on the left bank of the Whiterocks River which is a tributary of the Uintah River at a point which bears approximately S. 49° 30' W. 2427 feet from the quarter corner common to Sections 19 and 20, Township 2 North, Range 1 East, U. S. B. & M. Said ditch runs in a southeasterly direction, has a capacity of 75 second feet of water, covers and is designed to irrigate 4720 acres of land, all of which have been alloted to Indians as aforesaid. Of said 4720 acres, 1750 acres already have been cultivated and irrigated and have had crops raised thereon by irrigation with water from said river diverted and carried by said ditch. Of said 1750 acres of land not less than 420 acres were from not later than the year 1892 until the construction of the said Whiterocks Ditch irrigated from said river by means of a certain ditch that was built and used by certain of said Indians or the United States and was one of the ditches which constituted the said old irrigation system above mentioned and not less than 130 acres were from not later than the year 1892 until the construction of the said Whiterocks Ditch irrigated from the said river by means of a certain ditch known as the Copperfield Ditch that was built and used by certain of said Indians or the United States and was also one of said old irrigation system ditches. Not less than 489 acres of land that never had been allotted and are not included in any of the lands hereinabove and in this paragraph mentioned and 90 acres of allotted lands not included in said 1750 acres, during all of the time of use of said old ditches in this paragraph named were irrigated through the same from said river. The use of said old ditches from

the Whiterocks River was discontinued upon the construction of the said Whiterocks ditch and the points of diversion of the waters thereof carried by said old ditches were then changed to said Whiterocks ditch and said water ever since has been and now is carried by said Whiterocks ditch.

FARM CREEK DITCH: The head thereof is on the right bank of the Whiterocks River at a point which bears approximately N. 48° 08' E. 921 feet from the north quarter corner of Section 30, Township 2 North, Range 1 East, U. S. B. & M. Said ditch runs in a southwesterly direction, has a capacity of 32 second feet of water, covers and is designed to irrigate 1920 acres of land, all of which have been allotted to Indians as aforesaid. Of the said 1920 acres of allotted lands 755 acres have been cultivated and irrigated and have had crops raised thereon with water from said river diverted and carried by said ditch. Of said 755 acres of land not less than 63 acres were from not later than the year 1892 irrigated from Farm Creek which is a tributary of the Uintah River, by means of certain ditches which were built and used by certain of said Indians or the United States, and not less than 150 acres thereof were from not later than the year 1896 until the year 1914 irrigated from the Uintah River by means of the old Ridley Ditch, so-called, which was built and used by certain of said Indians or the United States. All of the ditches in this paragraph referred to, with the exception of said Farm Creek Ditch, were ditches which formed a part of the old irrigation system hereinabove mentioned. Not less than 45 acres of land that never have been allotted and are not included in any of the land hereinabove in this paragraph mentioned were, during all of the

time of use of said old ditches, irrigated through one or more of the same from said Whiterocks River or the Uintah River or both. The use of all of the said old ditches was discontinued upon the construction of the said Farm Creek Ditch, and the points of diversion of the water theretofore carried by said old ditches were then changed to said Farm Creek Ditch and said water has ever since been diverted from the Whiterocks River and carried by said last named ditch.

WHITE ROCKS AGENCY DITCH NO. 1: The head of said ditch is in the Whiterocks River at a point near those certain lands belonging to and used by the United States and known as the Whiterocks agency lands. Said ditch forms a part of said old irrigation system and ever since not later than the year 1884 has irrigated and it now irrigates with water from said river not less than 100 acres of the farms, lawns and gardens of said agency.

WHITE ROCKS AGENCY DITCH NO. 2: The head of said ditch is in the Whiterocks River near the lands of the Whiterocks agency above described. Said ditch forms a part of said old irrigation system and ever since not later than the year 1884 has irrigated and it now irrigates with water from said river not less than 78 acres of the farms, lawns and gardens of said agency.

SPRINGS DITCHES: Said ditches belong to said old irrigation system and are small and have their heads in and derive their water supply from certain springs that are situate in the Northeast Quarter of Section 5, Township 1 South, Range 1 East, U. S. B. & M., and are tributary to the Whiterocks River. Said ditches have irrigated with water from said springs since not later than the year 1892

and they now irrigate not less than 80 acres of land that have been reserved by the United States as aforesaid and during all of said time have had crops raised thereon by means of said irrigation.

<u>DEEP CREEK DITCH</u>: The head of said ditch is on the left bank of the said Whiterocks River at a point which bears S. 68° 15' W, 1450 feet from the southwest corner of the Northeast Quarter of the Northeast Quarter of Section 5, Township 1 South, Range 1 East, U. S. B. & M. Said ditch runs in a southeasterly direction, has a capacity of 105 second feet of water, covers and is designed to irrigate 7120 acres of land, all of which have been allotted to Indians as aforesaid. Of said 7120 acres not less than 1818 acres already have been cultivated and irrigated and have had crops raised thereon by irrigation with water from said river diverted and carried by said ditch. Of said 1818 acres of land not less than 232 acres were from not later than the year 1892 irrigated from said river by means of several certain small ditches that were built and used by certain of the said Indians or the United States and which belonged to the said old irrigation system above mentioned. Not less than 200 acres of land that never have been allotted and are not included in any of the lands hereinabove in this paragraph mentioned, during all of the time of the use of said old ditches in this paragraph named, were irrigated through the same from said river. The points of diversion of the water that was carried by the said old ditches just described were, upon the building of said Deep Creek Ditch, changed to the point of diversion of the said Deep Creek Ditch and said water has ever since that time been diverted and car-

ried by said last named ditch.

COLORADO PARK DITCH: The head of said ditch is on the left bank of the Whiterocks River at a point which bears approximately N. 35° W. 600 feet from the southeast corner of Section 27, Township 1 South, Range 1 East, U. S. B. & M. Said ditch, as it now exists, is an enlargement and extension of one of the ditches that belonged to the said old irrigation system hereinabove mentioned. Said enlargement was made by the Colorado Park Irrigation Company, a corporation, one of the defendants herein, was completed by the first day of April, 1907 and the United States has at all times prior to the construction of said enlargement and since owned and now owns the right to divert from said Whiterocks River and carry through and by said ditch to the lands of the United States and said Indians lying under the same, so much of the water of said river to which they may be entitled, as they wish so to carry, not exceeding, however, 8 second feet of water. Said ditch runs in a southeasterly direction, has a capacity of more than 8 second feet of water, covers and is designed to irrigate of the lands of the United States and said Indians, 560 acres, all of which have been allotted to Indians as aforesaid. Of said 560 acres of land, 480 acres have been and are now being cultivated and irrigated and have had crops raised thereon by irrigation with water from said river diverted and carried by said ditch. Of said 560 acres of land, 480 acres were, from not later than the year 1892, until the enlargement of said ditch as aforesaid, irrigated from said ditch before it was enlarged, the same having been as aforesaid built and used by the said Indians and the United States.

UINTAH DITCH: The head of said ditch is on the right

bank of the Uintah River at a point which approximately bears N. 76° 07' E. 574 feet from the quarter corner common to Sections 9 and 10, Township 1 North, Range 1 West, U. S. B. & M. Said ditch runs in a southwesterly direction, has a capacity of 142.5 second feet of water, covers and is designed to irrigate 10,120 acres of land all of which have been allotted to Indians as aforesaid. Of said 10,120 acres of land not less than 3456 acres already have been cultivated and irrigated and have had crops raised thereon by irrigation with water from said river diverted and carried by said ditch and by that certain ditch known as Canal Number One, hereinafter described. Of said lands 3800 acres are under said Canal Number One, as well as under said Uintah Ditch, and of the said lands that have already been irrigated as aforesaid 1545 acres have been and are being irrigated by and through said Uintah Ditch and 1911 acres by and through said Canal Number One. It is the intention of the United States to discontinue the use of Canal Number One and to divert the water thereof through the Uintah Ditch if and when it shall be throught advantageous so to do.

CANAL NUMBER ONE: The head of said ditch is on the right bank of the main channel of the Uintah River at a point which bears approximately S. 76° 30' East 780 feet from the northwest corner of Section 25, Township 1 North, Range 1 West, U. S. B. & M. Said ditch runs in a southwesterly direction, has a capacity of 140 second feet of water, covers and is designed to irrigate 3800 acres of land all of which have been allotted to Indians as aforesaid. Of said 3800 acres of land not less than 2536 acres already have been cultivated and irrigated and have had crops

raised thereon by irrigation with water from said river diverted and carried by said ditch. Said ditch as originally constructed was built by certain of said Indians or the United States not later than the year 1896 and from that time until the year 1905, 345 acres of said 2536 acres were cultivated and irrigated and crops were raised thereon by irrigation with waters of the Uintah River diverted and carried by said ditch and since the said year 1905 the irrigated area of lands now allotted as aforesaid under said original ditch has been increased to 1911 acres of land. In the year 1898 certain of said Indians or the United States extended said ditch and since said time the rest of said 2536 acres of land, or 625 acres thereof, has been cultivated and irrigated with water from said river diverted and carried by said Canal Number One and its said extension.

HARMES DITCH: The head of said ditch is on the left bank of the Uintah River at a point which bears approximately N. 26° oo' West 900 feet from the center of Section 6, Township 1 South, Range 1 East, U. S. B. & M. Said ditch runs in a southerly direction, has a capacity of 10 second feet of water, covers and is designed to irrigate 500 acres of land all of which have been allotted to Indians as aforesaid. Of said 500 acres of land not less than 160 acres have been cultivated and irrigated and have had crops raised thereon by irrigation with water from said river diverted and carried by said ditch.

BENCH DITCH: The head of said ditch is on the right bank of the Uintah River at a point which bears approximately N. 9° 30' West 1856 feet from the northeast corner of the Southeast Quarter of the Southeast Quarter of Section 18,

Township 1 South, Range 1 East, U. S. B. & M. Said ditch runs in a southerly direction, has a capacity of 80 second feet of water, covers and is designed to irrigate 5540 acres of land of which 5480 acres have been allotted to Indians as aforesaid and 60 acres are comprised in the farm lands of the Indian Agency at Fort Duchesne. All of said 60 acres of land, and of said 5480 acres not less than 3674 acres, or a total of not less than 3734 acres have been cultivated and irrigated and have had crops raised thereon by irrigation with water from said river diverted and carried by said ditch. Said ditch was first constructed by certain of said Indians or by the United States not later than the first day of May in the year 1896, and thereafter and before it was enlarged to its present size in the year 1906, and within a reasonable time from its construction as aforesaid, not less than 1460 acres of said 3674 acres now irrigated by said ditch were and ever since have been irrigated from said river by means of said ditch, and crops were and ever since have been raised thereon by irrigation with said water.

The said four ditches last named, to-wit: The Uintah Ditch, Canal Number One, the Farmes Ditch and the Bench Ditch, all divert water from the Uintah River at points above the confluence of the Whiterocks River with the Uintah River.

<u>POST DITCH</u>: The head of said ditch is on the right bank of the Uintah River in the Northeast Quarter of the Northwest Quarter of Section 14, Township 2 South, Range 1 East, U. S. B. & M. Said ditch forms a part of said old irrigation system, covers and is designed to irrigate not less than 130 acres of the 150 acres of land that comprise the Indian Agency lands at Fort Duchesne and which have been

described in paragraph 10 hereof. Of said 130 acres of land 50 acres have been cultivated and irrigated and have had crops raised or lawns maintained thereon by irrigation with water from said river diverted and carried by said ditch, and of said 50 acres of land not less than 40 acres have been irrigated from said ditch since not later than the beginning of the irrigation season of the year 1887, and the rest of said land or about 10 acres thereof, has been irrigated from said ditch since the beginning of the irrigation season of the year 1915.

HENRY JIM DITCH: The head of said ditch is on the left bank of the Uintah River at a point which bears approximately N. 47° 13' West 591 feet from the north quarter corner of Section 35, Township 2 South, Range 1 East, U. S. B. & M. Said ditch runs in a southeasterly direction, has a capacity of 70 second feet of water, covers and is designed to irrigate not less than 6252 acres of land, of which 6240 acres have been allotted to Indians as aforesaid, and about 12 acres are comprised in the Mission Reservation, so-called, belonging to the United States, at Randlett, of which said allotted and Mission lands not less than 650 acres already have been cultivated and irrigated and have had crops raised thereon by irrigation with water from said river diverted and carried by said ditch. The said Henry Jim Ditch originally diverted water from said river at a point about 700 feet below its present head as above described and said ditch was originally built not later than the year 1893 and from said time until its first enlargement as hereinafter mentioned, not less than 140 acres of said 630 acres herein last above described were cultivated and irrigated and had crops

raised thereon by irrigation with water diverted from said river by and through said ditch. The said ditch was first enlarged not later than the first day of May, 1898, to a capacity of 20 second feet of water and from the time of the said enlargement until the head thereof was changed to its present situation above described and it was enlarged to its present capacity in the year 1908, 345 acres of said 630 acres of land were cultivated and irrigated with water from said river diverted and carried by said ditch. Said ditch was originally built and all enlargements and changes thereof have been made by the United States or the said Indians.

FORT DUCHESNE DITCH: The head of said ditch is on the right bank of the Uintah River at a point which bears approximately S. 71° 25' East 1532 feet from the west quarter corner of Section 35, Township 2 South, Range 1 East, U. S. B. & M. Said ditch runs in a southwesterly direction, has a capacity of 15 second feet of water, covers and is designed to irrigate 1280 acres of land all of which have been allotted to Indians as aforesaid. Of said 1280 acres of land a total of 182 acres already have been cultivated and irrigated and had crops raised thereon by irrigation with water from said river diverted and carried by said ditch.

16. The said Uintah River at various places throughout its course above the point of diversion of the said Fort Duchesne Ditch divides into and flows in two or more channels and then lower down unites in one channel. Whenever the said ditches of the United States divert from said river at a point where all of the water thereof is not flowing in one channel, said ditches divert in each instance from the

main channel of said river and in all such instances the United States, in order to insure there being sufficient water in said main channels to fully supply the said ditches has, from the time of the first construction thereof until the present, and it is its intention so to do in the future, by dams, at the points where the said side or secondary channels divert from the said main channels of said river above said ditches and each of them, caused to flow in said main channels whenever there is need, so much of the water that would otherwise flow in said side or secondary channels as is, has been or may be necessary there to flow to fully supply its said ditches and each of them.

17. Applications to the State Engineer of the State of Utah, in accordance with the laws of the said State, were duly made by Chalmers G. Hall, the then acting agent of the said reservation, on behalf of the Indians of said reservation and of the United States, to appropriate from the Uintah River and its branches and tributaries for use by and through certain of said ditches the respective quantities of water hereinafter set opposite the names of the said ditches and said applications were made and filed respectively as follows, to-wit:

| NAME OF DITCH | APPLICATION FILED | SEC. FEET OF WATER |
|---|---|---|
| White Rocks Ditch | June 12, 1905 | 75 |
| Farm Creek Ditch | June 12, 1905 | 32 |
| Post Ditch | July 26, 1905 | 1-6/7 |
| Deep Creek Ditch | June 13, 1905 | 105 |
| Uintah Ditch | June 12, 1905 | 142.5 |
| Bench Ditch | June 12, 1905 | 80 |
| Henry Jim Ditch | June 27, 1905 | 70 |
| Fort Duchesne Ditch | June 27, 1905 | 15 |

All of the acts and things required by the laws of the State of Utah to be done to make an appropriation of water have been duly and fully done by the United States and by the proper officials of the State of Utah under and with respect to said application and each of them to make appropriations of the full amount of water applied for with respect to each of said ditches, except that the United States has not yet applied all of said water to a beneficial use. The said State Engineer has, in accordance with the laws of the State, by orders made from time to time, duly fixed as the time for the completion of the application of the water to be diverted by said respective ditches to a beneficial use, 14 years from the respective dates of filing of said applications as aforesaid.

The United States, in order to comply with and conform to the said State law and in order to bring into full use said irrigation systems and in order to develop said allotments as soon as possible, has, through its officials and agents, endeavored, and is endeavoring to put into cultivation and under irrigation all of the allotments and the other lands it intends to irrigate under the said ditches hereinabove just mentioned and the allotments and other lands under the said two Agency ditches, Harmes Ditch, Springs Ditches, Canal Number One and Colorado Park Ditch, as soon as possible, and especially within the time fixed as aforesaid for the completion of the application of the waters of the said ditches to a beneficial use.

18. The Indians who are the allottees of the said allotments, and the other Indians who reside upon the lands that were contained in said reservation at all times have

retained and still retain their tribal relations and at all times have been and still are in a state of pupilage and the United States at all times has acted and still acts as their guardian and in discharging its duty as such guardian it maintains for said Indians an agent, under whose charge they are, and maintains farmers to teach and assist them in their agricultural work and physicians to keep them in health and schools for the education of their children, and in all respects seeks to promote their welfare as a dependent people and to lead them to civilization and independence.

In order to accomplish its purpose as aforesaid of civilizing said Indians, and as a part of its general plan to that end, hereinabove described, the United States through its agents in that regard has endeavored and is now endeavoring to have the preparation of the said allotments for irrigation and the irrigation of the same and the application of said waters to the beneficial use of accomplishing said irrigation made as far as possible by the said Indians themselves, but they have as yet become only imperfect farmers and workmen and are therefore unequal to the task of reducing to cultivation and irrigation more than a small part of said allotments within the time fixed, on which account the United States, through its agents as aforesaid, is endeavoring to have that part of said work which they cannot perform, which is the greater part thereof, done by leasing said allotments and parts of allotments that need to be put into condition for irrigation, to white men who will obligate themselves to clear said land and put it under irrigation. Such leases, involving in the aggregate 33,520 acres of allotted land under said ditches that take water from the Uintah River have

already been made.

Certain of the said Indians who were allotted lands as above described have died and in many instances when that has been the case the Secretary of the Interior has, at the request of the heirs so to do, made sales of said lands to white men, and in each such instance he has intended thereby to transfer to said grantees, together with said lands, such water rights and only such as could be beneficially used upon the lands purchased and as were appurtenant to said lands while held by the deceased Indian allottees and their heirs. The purchasers of such lands are clearing the same and endeavoring to apply to such parts thereof as are susceptible, irrigation water from said Government and Indian ditches for that purpose and are endeavoring to do so within the limit of time fixed as aforesaid. The number of acres of allotments so sold under the aforesaid ditches is as follows for each ditch:

| NAME OF DITCH | NUMBER OF ACRES |
|---|---|
| White Rocks Ditch | 680 |
| Farm Creek Ditch | 200 |
| White Rocks Agency Ditch No. 1 | 0 |
| White Rocks Agency Ditch No. 2 | 0 |
| Springs Ditches | 0 |
| Deep Creek Ditch | 1120 |
| Colorado Park Ditch | 160 |
| Uintah Ditch | 1280 |
| Canal Number One | 720 |
| Harmes Ditch | 0 |
| Post Ditch | 0 |
| Bench Ditch | 1120 |
| Henry Jim Ditch | 720 |
| Fort Duchesne Ditch | 720 |

19. The number of acres of land already irrigated by and through said Government and Indian ditches, and the whole number of acres of land that the United States now intends, by itself or through said Indians or through said lessees as aforesaid, or otherwise, to put under irrigation ultimately and within the time set as aforesaid, are, for said ditches taking from the Uintah River, respectively as follows, to-wit:

| NAME OF DITCH | LAND IRRIGATED | TOTAL CONTEMPLATED |
|---|---|---|
| White Rocks Ditch | 1934 | 4720 |
| Farm Creek Ditch | 740 | 1920 |
| White Rocks Agency Ditch No. 1 | 100 | 100 |
| White Rocks Agency Ditch No. 2 | 78 | 78 |
| Springs Ditches | 80 | 80 |
| Deep Creek Ditch | 1818 | 7120 |
| Colorado Park Ditch | 480 | 560 |
| Uintah Ditch | 1545 | 6320 |
| Canal Number One | 2536 | 3800 |
| Harmes Ditch | 160 | 500 |
| Post Ditch | 50 | 130 |
| Bench Ditch | 3734 | 5540 |
| Henry Jim Ditch | 630 | 6240 |
| Fort Duchesne Ditch | 182 | 1280 |

20. The lessees of the allotments aforesaid and the said Indian allottees are, for the most part, poor men and their farming of the said allotments in the future and the farming of said allotments by other lessees and by Indians who as yet have not been induced to farm their allotments, and the success of the endeavors of the United States, through its agents, to apply said waters to a beneficial use

within the time set as aforesaid, or at all, are to a large extent dependent upon there being an abundant supply of water in the Uintah River at the heads of said Government and Indian ditches during the irrigation season of each year, that the same may be diverted by them to said lands, and a failure of the supply of said water at said points, or at any of them, would cause the loss of valuable crops and great and irreparable damage to said Indians, said lessees and the United States.

21. There has been beneficially used upon such of the lands lying under the said Government and said Indian ditches as have been irrigated since they were first put under irrigation and there is needed and at all times has been needed for use upon said lands and there is needed for use upon all of the irrigable portions of the rest of the lands lying under said ditches, as fast as they are made ready for irrigation, for the proper irrigation thereof and the raising of crops thereon and for domestic uses upon said lands and for carrying out the policy and duty of the United States with regard to said Indians as aforesaid, of the waters of said river diverted and to be diverted by said ditches throughout the irrigation season of each year, one cubic foot of water per second for each seventy acres of said lands.

22. The United States, in and by its treaties and agreements with said Indians as aforesaid, by creating said Uintah Reservation and by all of the acts and things hereinabove set forth, did confirm in said Indians and reserve to them and to itself for the purposes aforesaid, and did appropriate to them and to itself and did withhold from appro-

priation by others, of the waters of said Uintah River, to be taken therefrom by said above described ditches and used by the United States and said Indians and said lessees and grantees thereof for the irrigation of the lands hereinabove described, and for all other proper purposes, with a priority the first in said river and antedating the establishment of said reservation as aforesaid, for each of said ditches, as follows:

| NAME OF DITCH | SECOND FEET |
|---|---|
| White Rocks Ditch | 68 |
| Farm Creek Ditch | 25 |
| White Rocks Agency Ditch No. 1 | 2 |
| White Rocks Agency Ditch No. 2 | 2 |
| Springs Ditches | 2 |
| Deep Creek Ditch | 102 |
| Colorado Park Ditch | 8 |
| Uintah Ditch | 91 |
| Canal Number One | 55 |
| Harmes Ditch | 8 |
| Post Ditch | 2.5 |
| Bench Ditch | 80 |
| Henry Jim Ditch | 89 |
| Fort Duchesne Ditch | 19 |

Of said quantities of water there is now needed by the said Government and Indian lands under said ditches for the proper irrigation thereof, quantities of water to be taken from said river by each of said ditches, as follows:

priation by others, of the waters of said Uintah River, to be taken therefrom by said above described ditches and used by the United States and said Indians and said lessees and grantees thereof for the irrigation of the lands hereinabove described, and for all other proper purposes, with a priority the first in said river and antedating the establishment of said reservation as aforesaid, for each of said ditches, as follows:

| NAME OF DITCH | SECOND FEET |
|---|---|
| White Rocks Ditch | 68 |
| Farm Creek Ditch | 25 |
| White Rocks Agency Ditch No. 1 | 2 |
| White Rocks Agency Ditch No. 2 | 2 |
| Springs Ditches | 2 |
| Deep Creek Ditch | 102 |
| Colorado Park Ditch | 8 |
| Uintah Ditch | 91 |
| Canal Number One | 55 |
| Harmes Ditch | 8 |
| Post Ditch | 2.5 |
| Bench Ditch | 80 |
| Henry Jim Ditch | 89 |
| Fort Duchesne Ditch | 19 |

Of said quantities of water there is now needed by the said Government and Indian lands under said ditches for the proper irrigation thereof, quantities of water to be taken from said river by each of said ditches, as follows:

| NAME OF DITCH | SECOND FEET NOW NEEDED |
|---|---|
| White Rocks Ditch | 27.8 |
| Farm Creek Ditch | 10.4 |
| White Rocks Agency Ditch No. 1 | 2 |
| White Rocks Agency Ditch No. 2 | 2 |
| Springs Ditches | 2 |
| Deep Creek Ditch | 26.0 |
| Colorado Park Ditch | 7.0 |
| Uintah Ditch | 22.1 |
| Canal Number One | 27.3 |
| Harmes Ditch | 2.3 |
| Post Ditch | 1.5 |
| Bench Ditch | 53.3 |
| Henry Jim Ditch | 9.0 |
| Fort Duchesne Ditch | 2.6 |

25. Each of the defendants herein is or claims to be the owner or a part owner of one or more of certain ditches and canals that take water for irrigation purposes from the Uintah River at points above one or more of the points of diversion of the above described Government and Indian ditches or has or claims to have the right to divert from said river by and carry through one or more of said ditches or by and through one or more of said Government and Indian ditches, water appropriated by him independently of the United States and said Indians, and each of said defendants is, either by himself or together with his co-owners or co-claimants, in control or in part control of one or more of said non-Government ditches or canals or in control or in part control of the right to divert and carry water through one or more of said Government ditches as aforesaid. Whatever water rights be-

long to or are attached to or are carried by said non-Government ditches or are carried by said Government ditches by virtue of appropriations not made by or on behalf of the United States or said Indians, are and at all times have been junior and inferior to all of the water rights of the United States and said Indians as above set forth and each and every one of the water rights of the said defendants and of the said non-Government ditches was initiated under and is based upon an application to the State Engineer of the State of Utah, or was attempted to be initiated under and is based upon the actual diversion or use of water, and upon no other right or title whatsoever, and each and every one of said applications, with the exception of the application made by the above named defendant, Uintah River Irrigation Company, was filed with the said State Engineer later than the twenty-sixth day of July, 1905. No diversion or use of water was made from said Uintah River or its tributaries, or any of them, by said defendants or any of them, or by their said ditches or any of them, prior to the first day of April, 1906. The said application of Uintah Irrigation Company, according to such information as the plaintiffs have, was filed on to-wit, the 17th day of April, 1905, but all rights, if any, gained thereby or by said company or for the ditch or canal of said company are, with the rights of the other defendants and their several ditches, inferior and junior to the rights of the United States and said Indians and their ditches as above described.

The water supply of said Uintah River, except when said river is at stages of high flow, is and at all times has been insufficient to supply the needs of the United

States and said Indians for the irrigation of the irrigated lands lying under its and their said ditches above described that are and have been ready for irrigation and which the United States and said Indians desire to and have desired to irrigate through said ditches and at the same time to supply the claimed needs of the said defendants and their said ditches. The United States and said Indians are, as above set forth, engaged in rapidly putting a great area of new land in cultivation and in getting the same ready for irrigation under its and their said ditches, and many of the said defendants are doing likewise, with the consequence that the waters of said river, unless conserved by storage, will become progressively less able to supply the needs of the United States and of said Indians and the claimed needs of said defendants. The said defendants and each of them frequently in the past, without the license or permission of the United States or of said Indians, and unlawfully and without right, and against the protest and objection of the officers and agents of the United States, have taken large quantities of water from the said river that was needed by the United States and said Indians for use upon and for the irrigation of its and their said lands that were in great need of irrigation and which water of right belonged to the United States and said Indians and should have been allowed to remain in said river and flow down to the ditches of the United States and said Indians above described, and the defendants have thereby caused the United States and said Indians to suffer the damage of and to lose large and valuable agricultural crops, and thereby and by interfering with the plans of the United States for the putting in cultivation and under irri-

gation of said allotments for the purpose of carrying out its policy with regard to said Indians as herein described, have caused the United States and said Indians great and irreparable damage and injury. The said defendants, unless restrained by the order of this Honorable Court, will continue so to take said water and to cause said injury, and said injury, on account of the progressively larger amount of land needing irrigation as aforesaid, will in the future be progressively greater.

The said Indians, on account of their lack of development in civilization and their dependent condition, are unable to cope with white men in the scramble for water, and are without those resources of self help in the protection of their rights enjoyed by white men generally and by these defendants, and unless their rights in and to the waters of said river are protected from the acts of said defendants as aforesaid by the injunction of this Court, the said Indians will become discouraged in their efforts to become farmers and will desist therefrom and the task of the United States to bring them to habits of industry and thrift and to civilize them will be made more difficult than it otherwise would be. And also, without the relief herein prayed for, the efforts of the United States, through its agents and by the means adopted as aforesaid to bring the said allotments under cultivation and irrigation and to apply the waters of said river owned by the United States and said Indians and all of it to such beneficial use within the time limited as aforesaid, will fail. The United States is without an adequate remedy at law in the premises. Stop

WHEREFORE, the United States prays:

1. For the decree of this Court establishing and declaring the rights of the United States and of said Indians to the waters of the Uintah River to be used in and through said ditches of the United States, as hereinabove set forth, for irrigation and domestic and other proper uses during the irrigation season of each year, and that the same are prior, senior and superior to any and all rights of the said defendants or any of them or of their ditches or any of them, and that the said rights of the United States and of said Indians are of first and immemorial priority.

2. That the defendants and each of them, their officers, agents and attorneys and employes, and all persons acting by, through or under them or any of them, be perpetually enjoined and restrained from diverting the waters of the Uintah River, its sources or tributaries or of any of them, to the injury of said rights or any of them, and from interfering in any manner with the water of said river appertaining thereto.

3. That immediately, and pending the determination of this cause, there issue from this Court a temporary injunction enjoining said defendants and each of them, their officers, agents and attorneys and employes, and all persons acting by, through or under them or any of them, from diverting the waters of the Uintah River, its sources or tributaries or any of them, to the injury of said rights or any of them, and from interfering in any manner with the water of said river appertaining thereto, and also from in any way interfering with the flow of the water in said river so that at the heads of the said ditches belonging to the United

38

States and said Indians there will be at all times during the irrigation season of 1916 at least the following quantities of water available for the use of the United States and said Indians through their said ditches respectively, as follows, to-wit:

For the said White Rocks Ditch 27.8 cubic feet of water per second;

For the said Farm Creek Ditch 10.4 cubic feet of water per second;

For the said White Rocks Agency Ditch No. 1, 2 cubic feet of water per second;

For the said White Rocks Agency Ditch No. 2, 2 cubic feet of water per second;

For the Springs Ditches 2 cubic feet of water per second;

For the said Deep Creek Ditch 26.0 cubic feet of water per second;

For the said Colorado Park Ditch 7.0 cubic feet of water per second;

For the said Uintah Ditch 22.1 cubic feet of water per second;

For the said Canal No. One, 27.3 cubic feet of water per second;

For the said Harmes Ditch 2.5 cubic feet of water per second;

For the said Post Ditch 1.5 cubic feet of water per second;

For the said Bench Ditch 53.3 cubic feet of water per second;

For the said Henry Jim Ditch 9.0 cubic feet of water

per second;

For the said Fort Duchesne Ditch 2.6 cubic feet of water per second.

And if and to the extent that the United States or said Indians shall increase the acreage of land under said respective ditches needing water for irrigation during the year 1916 over and above the quantities of land hereinabove stated as already irrigated, that said defendants and each of them, their officers, agents and attorneys and employes, and all persons acting by, through or under them or any of them, be also restrained from interfering with the flow of water in said river in the respective amounts of water over and above those just above stated as already needed, in the proportion of one second foot of water to each 70 acres of additional land so needing irrigation.

4. That, if it shall seem meet to the Court upon final decree herein, or upon the granting of the temporary injunction order herein prayed, if the same shall be granted, the Court appoint a commissioner or other officer of this Court, together with such assistants as he may need, to carry out the orders and decrees of this Court herein and to distribute the waters of said Uintah River, and of its sources and tributaries, between the ditches on said river in accordance with the respective needs of the parties to this action and in the order of their priorities.

5. And for such other and further relief as to the Court may seem meet in the premises, and for costs.

William W. Ray
United States Attorney

John F. Truesdell
Special Assistant to the Attorney General

Attorneys for the Plaintiff.

Filed July 17, 1916
John W. Christy
Clerk

STATE OF UTAH )
) ss.
COUNTY OF DUCHESNE )

JOSEPH M. BRYANT, of lawful age, first duly sworn, on his oath says that he is the Engineer and Special Disbursing Agent of the United States Indian Service in charge of irrigation, and the operation of the irrigation system of the United States, on the former Uintah and Ouray Indian Reservation in the State of Utah; that he has read the above and foregoing Bill of Complaint by the United States et al. against the Cedarview Irrigation Company et al. and knows the contents thereof, and that the same and all parts thereof are true to the best of his knowledge, information and belief, and that he has knowledge of the facts upon which is stated the special relief prayed for in said bill, and that as to those facts the said bill is true of his own knowledge.

Joseph M. Bryant

Subscribed and sworn to before me this third day of July, 1916. Witness my hand and official seal.

My commission expires on the 6th day of January 1919

H. C. Williams
NOTARY PUBLIC.

Filed July 17, 1916
John W. Christy
Clerk

# EXHIBIT B

1

Uintah River

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF UTAH.

- - - - - - -

No. 4427, In Equity

THE UNITED STATES OF AMERICA, and HUBERT WORK, Secretary of the Interior, as Trustee of the Indians of the former Uintah and Ouray Indian Reservation,

Plaintiffs,

v.

CEDARVIEW IRRIGATION COMPANY, COLORADO PARK IRRIGATION COMPANY, DRY GULCH IRRIGATION COMPANY, T. N. DODD IRRIGATION COMPANY, OURAY VALLEY IRRIGATION COMPANY, UINTAH INDEPENDENT DITCH COMPANY, UINTAH RIVER IRRIGATION COMPANY and WHITEROCKS IRRIGATION COMPANY, each and all of the foregoing being corporations; GEORGE Q. ALLRED, GEORGE AVERITT, ERASTUS S. BASTIAN, JOHN BENNETT, RAYMOND T. BONNIN, JOHN BURGESS, WILLIAM CHICHAS, VERNON COLLINS, HUGH COLTHARP, W. HORACE COLTHARP, JOHN W. COOK, THOMAS DURIGAN, CHARLES ELMER, DAVID ELMER, MARY A. ELMER, RUSSELL FORSYTHE, LOU FRAUGHTON, THOMAS S. GUNN, HYRUM GURR, JOHN HALL, HAROLD F. HALL, JOSEPH H. HARDY, BERTHA E. HUGHEL, CHARLES HUTCHEON, WILLIAM KEEL, DANIEL LARSEN, HENRY B. LLOYD, RALPH MARIMON, ROBERT L. MARIMON, JOHN J. NIELSON, EDWARD L. OAKS, HYRUM E. OAKS, CHARLES R. OAKEY, JOHN H. O'DRISCOLL, LESLIE O'DRISCOLL, HENRY P. OLSEN, JOHN A. OLSEN, CULBERT L. OLSON, GEORGE S. PACE, FRANK PETERSON, SAMUEL H. PULLEN, ALBERT RASMUSSEN, ADOLPHUS SESSIONS, NEWTON SHELTON, EDWARD C. SIMS, BARBRIA E. SMITHSON, GEORGE THOMAS and ISAAC N. WORKMAN,

Defendants.

D E C R E E

This cause having come on to be heard at this term upon the complaint of the plaintiffs, the defaults and answers of the defendants, and the stipulations herein between the plaintiffs and certain of the defendants, and thereupon, upon

consideration thereof, it is ORDERED, ADJUDGED AND DECREED as follows:

1. The Plaintiffs, (the United States, and the Secretary of the Interior as Trustee of the Indians on the former Uintah and Ouray Indian Reservation, and also the owners by grant of the allotments of deceased Indians on said Reservation,) as against (the Cedarview Irrigation Company, Colorado Park Irrigation Company, Dry Gulch Irrigation Company, T. N. Dodd Irrigation Company, Ouray Valley Irrigation Company, Uintah Independent Ditch Company, Uintah River Irrigation Company and Whiterocks Irrigation Company, each and all of the foregoing being corporations; George Q. Allred, George Averitt, Erastus S. Bastian, John Bennett, Raymond T. Bonnin, John Burgess, William Chichas, Vernon Collins, Hugh Coltharp, W. Horace Coltharp, John W. Cook, Thomas Durigan, Charles Elmer, David Elmer, Mary A. Elmer, Russell Forsythe, Lou Fraughton, Thomas S. Gunn, Hyrum Gurr, John Hall, Harold F. Hall, Joseph H. Hardy, Bertha E. Hughel, Charles Hutcheon, William Keel, Daniel Larsen, Henry B. Lloyd, Ralph Marimon, Robert L. Marimon, John J. Nielson, Edward L. Oaks, Hyrum E. Oaks, Charles R. Oakey, John H. O'Driscoll, Leslie O'Driscoll, Henry P. Olsen, John A. Olsen, Culbert L. Olson, George S. Pace, Frank Peterson, Samuel H. Pullen, Albert Rasmussen, Adolphus Sessions, Newton Shelton, Edward C. Sims, Barbria E. Smithson, George Thomas and Isaac N. Workman,) defendants herein, (or any of them, and as against any demand or use whatever of them, or any of them, or of any diversion or use of water by or through the ditches belonging to them or any of them,) have the first and an exclusive right under a priority that antedates the third day of October, 1861, at all times to divert from the Uintah River and its tributaries by certain ditches and canals water in certain quantities at certain times and under certain conditions for the irrigation of certain lands and for certain domestic, culinary and stock-raising uses — all as described and fixed by the following

schedule and other parts of this decree.

| Name of Ditch or Canal. | Acres Irrigated under Each Ditch. | Water permitted to divert each season in Acre Feet. | Water permitted to divert each season in Second Fe |
|---|---|---|---|
| Uintah Canal } Canal No. 1 } | 9374.62 | 28123.86 | 133.9 |
| Harmes | 827.88 | 2483.64 | 11.83 |
| Bench | 6836.85 | 20510.55 | 97.67 |
| Bench | Town of Fort Duchesne | | .85 |
| Henry Jim | 1612.4 | 4837.2 | 23.03 |
| Henry Jim | Town of Randlett | | 1.50 |
| Fort Duchesne | 533.61 | 1600.83 | 7.62 |
| Wissiup | 325.70 | 977.10 | 4.65 |
| A (Martha Washington) | 73.47 | 220.41 | 1.05 |
| B (Meadows) | 180.2 | 540.60 | 2.57 |
| C (Princess Pat) | 82.70 | 248.10 | 1.18 |
| D (New) | 185.80 | 557.4 | 2.66 |
| Whiterocks | 4454.47 | 13363.41 | 63.63 |
| Farm Creek | 1550.35 | 4651.05 | 22.15 |
| School Ditch No. 1 | 365.88 | 1097.64 | 5.23 |
| School Ditch No. 2 | 12.60 | 37.80 | .18 |
| Springs | 80.00 | 240.00 | 1.14 |
| Deep Creek | 6895.52 | 20686.56 | 98.51 |
| Colorado Park | 425.14 | 1275.42 | 6.07 |
| Big Six | 244.70 | 734.10 | 3.50 |
| Daniels | 151.00 | 453.00 | 2.15 |
| Duncan | 115.90 | 347.70 | 1.66 |
| Farm Creek Proper | 135.84 | 407.52 | 1.94 |
| Tabby White | 235.46 | 706.38 | 3.36 |
| Whiterocks School } Pipe Line } | Domestic, etc. | | .85 |
| Totals - - - | 34700.09 | 104100.27 | 496.88 |

The said 34700.09 acres of land to be irrigated and the other uses under said ditches and canals are as more particularly described in the final certificates of appropriation for the several said named ditches and canals as the same appear upon the records of the office of the State Engineer of the State of Utah, and which are numbered, to wit: 1172, 1173, 1174, 1176, 1177, 1208, 1211, 1212, 1219, 1223, 1224, 1232, 1233, 1234, 12-C, and 1235, and the final certificate yet to be issued under Plaintiff's filing No. 357.

The location of the head or intake of each of said ditches or canals is as follows:

The head of the Uintah Canal is on the right bank of the Uintah River and bears N. 76° 7' E. 574 ft. from the quarter corner common to Secs. 9 and 10, Tp. 1 N., R. 1 W. U.S.M.;

The head of Canal No. 1 is on the right bank of the

Uintah River and bears S. 76° 30' E. 700 ft. from the North West Corner of Sec. 25, Tp. 1 N., R. 1 W. U.S.M.;

The head of the Hamnes Canal is on the left bank of the Uintah River and bears N. 46° 32' W. 3000 ft. from the center one-sixteenth corner of the S.E. ¼ of Sec. 6, Tp. 1 S., R. 1 E., U.S.M.;

The head of the Bench Canal is on the right bank of the Uintah River and bears N. 29° 10' W. 637 ft. from the East quarter corner of Sec. 16, Tp. 1 S., R. 1 E. U.S.M.:

The head of the Henry Jim Canal is on the left bank of the Uintah River and bears N. 47° 13' W. 591 ft. from the North quarter corner of Sec. 35, Tp. 2 S., R. 1 E. U.S.M.;

The head of the Fort Duchesne Canal is on the right bank of the Uintah River and bears S. 70° 7' E. 1553 ft. from the West quarter corner of Sec. 35, Tp. 2 S., R. 1 E. U.S.M.

The head of the Wissiup ditch, appropriating water from the Uintah River, is on the left bank of the Duchesne River below its junction with the Uintah river and bears S. 77°57' W. 1207 ft. from the North one-sixteenth corner of the SW¼ Sec. 35, Tp. 3 S., R. 2 E., U.S.M.;

The head of Ditch A is on the left bank of the Uintah River and bears N. 53°5' W. 1616 ft. from the South quarter corner of Sec. 31, Tp. 1 N., R. 1 E., U.S.M.;

The head of Ditch B is on the left bank of the Uintah River and bears N. 28°17' W. 1825 ft. from the North one-sixteenth corner of the SE¼ Sec. 7, Tp. 1 S., R. 1 E., U.S.M.;

The head of Ditch C is on the right bank of the Uintah River and bears S. 5°10' W. 1575 ft. from the North one-sixteenth corner of the SE¼ Sec. 7, Tp. 1 S., R. 1 E., U.S.M.;

The head of Ditch D is on the right bank of the Uintah River and bears S. 0° 5' E. 730 ft. from the North quarter corner of Sec. 7, Tp. 1 S., R. 1 E., U.S.M.;

The head of the Whiterocks Canal is on the left bank of the Whiterocks River, a tributary of the Uintah River

and bears N. 64° 54' W. 2528 ft. from the East one-sixteenth corner of the SE¼, Sec. 19, Tp. 2 N., R. 1 E., U.S.M.;

The head of the Farm Creek Canal is on the right bank of the Whiterocks River, a tributary of the Uintah River, and bears N. 46° 8' E. 921 ft. from the North quarter corner of Sec. 30, Tp. 2 N., R. 1 E., U.S.M.;

The head of School Ditch No. 1 is on the right bank of the Whiterocks River, a tributary of the Uintah River, and bears N. 38° 30' E. 2335 ft. from the West one-sixteenth corner of the SW¼, Sec. 18, Tp. 1 N., R. 1 E., U.S.M.;

The head of School Ditch No. 2 is on the left bank of the Whiterocks River, a tributary of the Uintah River, and bears N. 16° 18' E. 1465 ft. from the South one-sixteenth corner of the SW¼ Sec. 18, Tp. 1 N., R. 1 E., U.S.M.;

The heads of the Springs ditches are in Secs. 4 and 5, Tp. 1 S., R. 1 E., U.S.M.;

The head of the Deep Creek Canal is on the left bank of the Whiterocks River, a tributary of the Uintah River, and bears N. 78° 8' W. 1550 ft. from the center one-sixteenth corner of the NE¼ Sec. 5, Tp. 1 S., R. 1 E., U.S.M.;

The head of the Colorado ParkCanal is on the left bank of the Uintah River and bears N. 78° 57' W. 2250 ft. from the South quarter corner of Sec. 26, Tp. 1 S., R. 1 E., U.S.M.;

The head of the Big Six Canal is on the right bank of the Uintah River and bears N. 57° 52' E. 1417 ft. from the Southwest corner of Sec. 31, Tp. 1 N., R. 1 E., U.S.M.;

The head of the Daniels Ditch is on the right bank of the Uintah River and bears N. 50° 18' W. 731 ft. from the East one-sixteenth corner of the SW¼, Sec. 22, Tp. 1 S., R. 1 E., U.S.M.;

The head of the Duncan ditch is on the right bank of the Whiterocks River, a tributary of the Uintah River, and bears N. 23° 13' E. 5500 ft. from the Southwest corner of Sec. 7, T. 1 N., R. 1 E., U.S.M.;

The three heads of the Farm Creek Proper ditches diverting water from Farm Creek, a tributary of the Uintah River, are in Sec. 23, Tp. 2 N., R. 1 W., U.S.M.;

The head of the Tabby White ditch is on the left bank of the Uintah River and bears N. 68° 33' W. 1195 ft. from the South one-sixteenth corner of the SW¼, Sec. 26, Tp. 1 S., R. 1 E., U.S.M.;

The head of the Whiterocks School Pipe Line is on the right bank of the Whiterocks River, a tributary of the Uintah River, in Sec. 16, Tp. 1 N., R. 1 E., U.S.M.

2. The water permitted to be diverted by said ditches and canals for irrigation shall be diverted only during the irrigation season of each year, and said season shall not begin before the first day of March or end later than the first day of November; but water may be diverted for domestic, culinary and stock-watering purposes, throughout the entire year.

3. The number of acre feet of water permitted to be diverted by each of the ditches and canals above listed, on account of the rights determined in this decree as shown in paragraph one hereof, is the amount of water which may be diverted for irrigation by each of said ditches during the said irrigation season, and in no case shall said amount be exceeded; and the number of second feet of water permitted to be diverted by each of said ditches and canals on account of said rights as shown in said paragraph one shall be the maximum amount of water each of said ditches may divert at any time on account of said rights.

4. No water shall be diverted by said ditches and canals or any of them for irrigation purposes except that which is needed for economical and beneficial use in the irrigation of crops, and no water shall be diverted for other purposes except as hereinabove in paragraph two allowed, and only such quantities thereof shall be diverted as shall be needed for economical use for said purposes. Said diversions for

domestic, culinary and stock-watering uses shall be permitted as needed throughout the year.

5. The defendants herein all divert water from the Uintah River or from one or more of its tributaries, or from supporting waters of said stream through the ditches which they respectively claim to own.

6. The said defendants and their agents and employees, officers, successors and assigns, and all persons diverting or using water through or under their ditches or any of them, they and each of them, are hereby perpetually enjoined from in any way hindering, preventing or interfering with the diversions or uses of the waters of said river herein decreed to the plaintiffs or their assigns.

7. For the protection of the water rights herein decreed, a Water Commissioner shall be appointed from time to time, and assistants shall be given him if necessary, and his and their compensation shall be fixed and allowed, and arrangements for the payment thereof by those who benefit thereby, parties hereunto, shall be made, and said Water Commissioner shall be further directed as to his duties, all by separate orders of this Court.

8. In order further to protect the prior rights of the plaintiffs herein decreed, and to do so in the way best suited to conserve the rights and interests of the defendants, who are all junior appropriators, collectively as against the plaintiff, and as against each other, and to insure the most economical use of the waters of said stream, the Water Commissioner shall not only see that the priorities of the plaintiffs are satisfied, but shall also distribute the waters of the stream among the various defendants according to their priorities and rights as they may be ascertained from time to time by agreement between said parties or in some other proper manner. The rights and priorities of said defendants as against the plaintiffs or as among themselves are founded upon appropriations of water by application to the State Engineer of the

State of Utah and are subject in their exercise and are conditioned upon compliance with the provisions of the laws of the State of Utah relating to the appropriation of water and such rights and priorities are not hereby determined, except that they are all junior to those of the plaintiffs herein decreed, and except further that it is hereby decreed that said defendants shall be permitted to divert from said stream during the irrigation season of each year for direct irrigation, which shall not begin before the first day of March or end later than the first day of November, three acre feet of water for each acre of land irrigated and no more, and shall at no time divert more than one seventieth of a second foot of water for each said acre, and that no water shall be diverted for irrigation except that which is needed for economical and beneficial use in irrigating crops. Water may be diverted for domestic, culinary and stock-watering purposes during the entire year. No water shall be diverted for any purpose in excess of that actually needed for such purpose.

9. This decree determines the rights of the plaintiffs to divert water from the Uintah River and its tributaries as against the defendants but it does not determine any rights the plaintiffs or the defendants may have to the waters of said rivers on account of rights in the waters of the Duchesne River or any stream or streams into which the waters of said Duchesne River flow either mediately or immediately. This decree furthermore does not determine the right, if any, that the purchaser of any allotment of an Indian, who made such purchase prior to the entry hereof, may have to irrigate a greater acreage than that allowed by this decree.

10. Jurisdiction of this cause is retained to enable this Court, for good cause and as occasion may require, to administer this decree through a Water Commissioner or otherwise; to alter any administrative provisions hereof; and to make other necessary charges herein except to increase the total seasonal amount of water that may be diverted or to change the

priority herein fixed or to increase the acreage which may be irrigated under said priority.

11. That each party hereto bear its own costs incurred herein.

Done in open Court this 16th day of March, A.D. 1923.

TILLMAN D. JOHNSON,

Judge.

FILED in United States District
Court, District of Utah
Mar 16, 1923
John W. Christy, Clerk

CERTIFIED COPY D. C. Form No.

United States of America } ss:
DISTRICT OF UTAH

I, W. B. Wilson, Clerk of the United States District Court in and for the District of Utah, do hereby certify that the annexed and foregoing is a true and full copy of the original

Decree signed by Judge Tillman D. Johnson on March 16, 1923

Order signed by Judge Johnson on February 17, 1931,

in Case No. 4427

UNITED STATES OF AMERICA, etc.

vs.

CLEARVIEW IRRIGATION COMPANY, et al

now remaining among the records of the said Court in my office.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the seal of the aforesaid Court at Salt Lake City this 10th day of April A. D. 1935

W. B. Wilson
Clerk.

By [signature]
Deputy Clerk.

# EXHIBIT C

BY [signature]

SEP 29 2015

UTE INDIAN TRIBAL COURT
FT. DUCHESNE, UTAH 84026

**THE UTE INDIAN TRIBAL COURT OF THE UINTAH AND OURAY RESERVATION**

**FORT DUCHESNE, UTAH**

| | |
|---|---|
| UTE INDIAN TRIBE,<br><br>Plaintiff,<br><br>v.<br><br>GREGORY D. MCKEE, T & L LIVESTOCK, INC., MCKEE FARMS, INC., and GM FERTILIZER, INC.,<br><br>Defendants. | **DECREE OF JUDGMENT (Corrected) ENTERED NUNC PRO TUNC TO AUGUST 3, 2015**<br><br>**Case No. CV12-285** |

**FINAL JUDGMENT FOR DAMAGES AND PERMANENT INJUNCTION**

This matter came before the Court on July 13-14, 2015 for trial on the Plaintiff's First Amended Complaint for Declaratory Judgment, Theft/Conversion/Misappropriation, Trespass, Conspiracy and Injunctive Relief. The Court's findings of fact and conclusions of law are filed together with the Final Judgment. The Court has granted Plaintiff's motion for discovery sanctions, including attorney fees and costs in the amount of $7,027.73. In addition, the Court has granted Plaintiff's motion to dismiss Counts Three and Four of the First Amended Complaint without prejudice.

NOW, THEREFORE, it is accordingly ORDERED, ADJUDGED AND DECREED that:

1. The Court has personal jurisdiction over Defendants under the Tribe's Law and Order Code, Section 1-2-3. The Court has subject matter jurisdiction under the Tribe's Law and Order Code, Section 1-2-2, subsections (1)(g) and (2), as well as the Tribe's inherent jurisdiction as a sovereign.

2. Under 25 U.S.C. § 194, the burden of proof was on the Defendants to establish their right to divert tribal waters from the Deep Creek Canal, and their right to entry upon tribal lands that are under assignment to Frank Arrowchis. Defendants have not met this burden. Accordingly, the Court declares that Defendants have no right to divert water from the Deep Creek Canal of the Uintah Indian Irrigation Project for use on the McKee Property which is described as 121.14 acres, consisting of Lot 2, SW/4 NE/4, and NW/4 SE/4 of Section 2, Township 1 South, Range 1 East, Uinta Special Meridian (USM), Uintah County, Utah. The Court further declares that Defendants have no right to enter upon the tribal lands under assignment to Frank Arrowchis and that any sublease or other agreement between Defendants and Mr. Arrowchis that purports to allow Defendants access to tribal lands is declared null and void.

3. It is further ORDERED, ADJUDGED AND DECREED that Gregory D. McKee, individually and doing business as or through any other entity, T&L Livestock, Inc., McKee Farms, Inc., and GM Fertilizer, Inc., and anyone acting in concert with Defendants, is permanently enjoined and restrained from, directly or indirectly, by the use of any means or instrumentalities, from diverting water from the Deep Creek Canal and Lateral No. 9 for use on the McKee Property, described above.

4. It is further ORDERED, ADJUDGED AND DECREED that Gregory D. McKee, individually and doing business as or through any other entity, T&L Livestock, Inc., McKee Farms, Inc., and GM Fertilizer, Inc., and anyone acting in concert with them, is permanently enjoined and restrained from, directly or indirectly, by the use of any means or instrumentalities, and from entering upon the tribal lands under assignment to Frank Arrowchis for any purpose.

5. It is further ORDERED, ADJUDGED AND DECREED that the Plaintiff Tribe is entitled to damages of $142,718.00 for the Defendants' conversion of tribal waters, which damages are assigned as follows: $8,854.50 against T&L Livestock, Inc.; $7,636.00 against T&L Livestock and McKee Farms, Inc., jointly and severally; and $126,227.50 against Gregory D. McKee. In addition, the Tribe is awarded attorney fees and costs in the amount of $7,027.73, as a sanction for the Defendants' violations of the Court ordered discovery. The Tribe is awarded post-judgment interest at the rate of 1.5 percent per annum.

6. It is further ORDERED, ADJUDGED AND DECREED that the Plaintiff is permitted to engage in post-judgment discovery to ensure compliance with the permanent injunction.

7. It is further ORDERED, ADJUDGED AND DECREED that the Court shall retain jurisdiction of this action for the purpose of implementing and enforcing the Final Judgment.

8. It is further ORDERED, ADJUDGED AND DECREED that Counts 3 and 4 of the First Amended Complaint are dismissed without prejudice.

9. It is further ORDERED, ADJUDGED AND DECREED that the DECREE OF JUDGMENT (Corrected) is entered nunc pro tunc to August 3, 2015.

There being no just reason for delay, the Clerk is directed to enter this Final Judgment forthwith.

SO ORDERED this 29th day of September 2015.

BY THE COURT:

Judge Terry L. Pechota
Ute Indian Tribal Court

CERTIFICATION
I CERTIFY THAT THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE ORIGINAL
CLERK

## CERTIFICATE OF SERVICE

Copies of the foregoing **DECREE OF JUDGMENT (Corrected) ENTERED NUNC PRO TUNC TO AUGUST 3, 2015** were sent to:

Frances C. Bassett
Jeremy J. Patterson
Todd K. Gravelle
Alvina L. Earnhart
Fredericks Peebles & Morgan LLP
1900 Plaza Drive
Louisville, CO 80027
Facsimile: (303) 673-9839
*Attorney for Plaintiff*

Gregory D. McKee
T & L Livestock, Inc.
McKee Farms, Inc.
GM Fertilizer, Inc.
P.O. Box 1485
Roosevelt, UT 84066
*Pro Se Defendants*

# EXHIBIT D

FILED - Civil Division
BY [signature]
AUG 03 2015

UTE INDIAN TRIBAL COURT
FT. DUCHESNE, UTAH 84026

**THE UTE INDIAN TRIBAL COURT OF THE UINTAH AND OURAY RESERVATION**
**FORT DUCHESNE, UTAH**

| | |
|---|---|
| UTE INDIAN TRIBE,<br><br>Plaintiff,<br><br>v.<br><br>GREGORY D. MCKEE,<br>T & L LIVESTOCK, INC., MCKEE FARMS, INC., and<br>GM FERTILIZER, INC.<br><br>Defendants. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>CASE NO. CV12-285 |

This matter came before the Court on July 13, 2015, for trial on the merits of the claims under the Plaintiff Tribe's First Amended Complaint for Declaratory Judgment, Theft/Conversion/Misappropriation, Trespass, Conspiracy and Injunctive Relief. As discussed more fully below, the Court has personal jurisdiction over Defendants under the Tribe's Law and Order Code, Section 1-2-3, captioned "Personal Jurisdiction and Long Arm Civil Jurisdiction." The Court has subject matter jurisdiction under the Tribe's Law and Order Code, Section 1-2-2, subsections (1)(g) and (2),[1] as well as the Tribe's inherent jurisdiction as a sovereign, which is discussed in more detail below. At trial the Tribe was represented by Attorneys Frances Bassett

[1] As amended by Ordinance 13-010, on March 27, 2013.

and Jeffrey Rasmussen. Defendants did not appear for trial. The Tribe presented documentary and testimonial evidence, and at the conclusion of trial the Court took the matter under advisement.

## PROCEDURAL HISTORY

The Tribe's original complaint was filed on September 6, 2012, together with a verified motion for issuance of a temporary restraining order and request for expedited hearing. Process was served on Mr. Gregory (Greg) McKee the following day, and counsel for both parties attended a telephonic hearing on September 20, 2012, after which the Court issued a temporary restraining order. Because of the unavailability of a court reporter, the September 20th hearing was continued to September 25, 2015, and in the interim both parties submitted briefs with attached affidavits and evidentiary materials. Following the hearing on September 25th, the Court issued a second temporary restraining order dated October 1, 2012. A preliminary injunction hearing was scheduled for November 15, 2012.

On October 25, 2012, Defendant McKee, through counsel, filed an Answer to the Complaint, and the next day Mr. McKee's attorney filed a Notice of Withdrawal of Counsel.

On November 14, 2012, the day before the scheduled preliminary injunction hearing, Mr. McKee's newly-retained counsel, the John D. Hancock Law Group, requested a continuance of the preliminary injunction hearing. The Court granted the continuance on the condition that the restraining order entered on October 1, 2012 "shall continue in force pending the rescheduled hearing."

A rescheduled hearing was held on March 26, 2013, beginning at 1 p.m. At the hearing both parties submitted documentary evidence and Mr. McKee was examined by counsel for both

parties. In addition, the Tribe presented the testimony of its expert, Dr. Woldezion Mesghinna, P.E., of Natural Resources Consulting Engineers, Inc. ("NRCE"), the company that functions as the Tribe's Water Engineer.[2] During a break in the hearing, Mr. McKee's attorney advised the Court that he was unavailable to continue the hearing the next day. Attorney Hancock also requested leave of the Court in order to secure an expert witness on Mr. McKee's behalf.[3]

On April 15, 2013, the Defendant filed a motion to dismiss the Tribal Court suit, challenging the subject matter jurisdiction of the Tribal Court, and alternatively alleging that the United States was a necessary and indispensable party to the suit. The Tribe opposed the motion through a memorandum filed on May 16, 2013. The Tribe concurrently filed a motion to amend its complaint to allege, *inter alia*, claims against Defendant McKee's business entities as additional defendants, T & L Livestock, Inc., McKee Farms, Inc., and GM Fertilizer, Inc.

The Tribe's motion to amend its complaint was granted on August 8, 2013, and the amended complaint was filed on September 4, 2013. The McKee business entities were served with process on October 22, 2013, and the Defendants filed an answer to the First Amended Complaint on November 5, 2013.

On June 2, 2014, the Court denied the Defendants' motion to dismiss for lack of jurisdiction. In addition, the Court ruled that the United States was not a necessary and indispensable party to the suit.

---

[2] Transcript of Preliminary Injunction March 26, 2013.
[3] *Id.*, pp. 104:6 – 109:25; 186:23 – 192.

Pursuant to a scheduling order issued on January 15, 2015, trial was scheduled to begin on July 13, 2015. Deadlines for completing discovery were set and subsequently modified under an Amended Scheduling Order entered on April 15, 2015.

On June 5, 2015, the Tribe filed an expedited motion requesting a court order to compel Defendants to respond to the Tribe's written discovery and to compel Defendant Greg McKee to appear for a deposition.

On June 6, 2015, the Court ordered Defendants to respond to the Tribe's written discovery by Wednesday, June 10, 2015.

Defendants did not respond to the Tribe's written discovery as ordered, and instead, on June 10, 2015, the due date for Defendants' discovery responses, Defendants' counsel, John D. Hancock Law Group, PLLC, filed a motion to withdraw as Defendants' counsel.

The Tribe did not object to the motion to withdraw, but did press the Tribe's pending motion to compel, observing that simply because "Defendants are apparently asking their attorney to withdraw does not provide a basis for delaying the entry of the motion to compel."

The Court agreed. By order issued on June 12, 2015, the Court granted defense counsel's motion to withdraw, and at the same time directed Defendants to respond to Plaintiff's written discovery by June 25, 2015, and for Defendant Greg McKee to appear for a deposition "on or before July 1, 2015."

Defendants never responded to the Tribe's written discovery and Mr. McKee never appeared for a deposition as ordered by the Court.

On July 31, 2015, the Tribe filed a motion for discovery sanctions in the form of attorney fees and costs, negative inferences, and deemed admissions based on the Defendants' failure to respond to the Tribe's Request for Admissions.

On July 31, 2015, the Tribe submitted its proposed Findings of Fact and Conclusions of Law. The Tribe concurrently filed a motion seeking to dismiss without prejudice Counts Three and Four of the First Amended Complaint, which alleged claims for nuisance and civil conspiracy. The Court has granted the motion to dismiss Counts Three and Four without prejudice.

## FINDINGS OF FACT

### JURISDICTIONAL FACTS

1. Plaintiff Ute Tribe is a federally recognized Indian Tribe, organized with a Constitution approved by the Secretary of Interior under the Indian Reorganization Act of 1934, 26 U.S.C. § 476. At all times relevant, the Tribe has occupied the Uintah and Ouray ("U&O") Reservation in northeastern Utah. The Tribe commenced this action on its own behalf and as *parens patriae* on behalf of its tribal members.[4]

2. Defendant Greg McKee is a non-Indian with business offices in Lapoint, Uintah County, Utah. Defendants T&L Livestock, Inc., McKee Farms, Inc., and GM Fertilizer, Inc., are Utah corporations, and Defendant McKee is the registered agent for each corporation.

3. The U&O Reservation is a union of two reservations, the Uintah Valley Reservation, established by Executive Order and Congressional action,[5] and the Uncompahgre

[4] First Amended Complaint, ¶3.
[5] Reprinted in I C. Kappler, Indian Affairs: Laws and Treaties 900 (2d ed. 1904), 13 Stat. 63.

Reservation, established through Executive Order on January 5, 1882.[6]

4. In litigation to determine the reservation boundaries, the Tenth Circuit ruled that neither the Uintah Valley Reservation nor the Uncompahgre Reservation was diminished as a result of allotment acts that opened the reservations to non-Indian settlement in 1905. *Ute Indian Tribe v. State of Utah*, 773 F.2d 1087, 1093 (10th Cir. 1985) (*en banc*) (hereinafter "*Ute III*").

5. Nine years later, however, in a state court criminal prosecution initiated by the State of Utah, the U.S. Supreme Court ruled—contrary to the *Ute III* holding—that the Uintah Valley Reservation was diminished (though not disestablished) under the 1905 allotment legislation. *Hagen v. Utah*, 510 U.S. 399 (1994).

6. *Hagen*, however, did not delineate the scope of the diminishment. That question was left for the Tenth Circuit to resolve when the State of Utah and Ute Tribe subsequently filed competing motions to uphold, or conversely, to recall the *Ute III* mandate. The Tenth Circuit refused to withdraw its prior mandate; the Court said it would modify the mandate but only to the extent necessary to conform to the narrow decision in Hagen. *Ute Indian Tribe v. State of Utah*, 114 F.3d 1513, 1519 (10th Cir. 1997) ("*Ute V*"). The Court concluded that the Reservation was diminished but only to the extent of "lands that passed from trust to fee status pursuant to non-Indian settlement under the 1902-1905 allotment legislation." *Id.* at 1529-31.

7. The Tenth Circuit emphasized that "*Hagen* did not erase the [exterior] boundaries of the Uintah Valley Reservation," relying on the *Hagen* Court's own language that the Uintah Valley Reservation was "'diminished'—not 'disestablished,' 'eliminated,' or 'terminated.'" *Id.* (quoting *Hagen v. Utah*, 510 U.S. at 414). The Court acknowledged that the *Hagen* ruling

---

[6] Reprinted in I C. Kappler, Indian Affairs: Laws and Treaties 901 (2d ed. 1904).

resulted in a checker-boarded boundary. *Id.* at 1530.

8. On remand to the district court, two separate maps were produced, the first map showing land ownership inside the original exterior boundary of the Uintah Valley Reservation, and the second map showing jurisdictional boundaries within the same area (hereinafter "*Jurisdiction Map*" or "*Ownership Map*"). On the *Jurisdiction Map*, Indian Country within the original exterior reservation boundary of the Uintah Valley Reservation is depicted in yellow and non-Indian lands are depicted in blue.[7] The State of Utah, Duchesne County, Uintah County, and the Ute Indian Tribe filed a stipulation with the Court related to the maps, and based on the parties' stipulation, the federal district court entered an order on November 20, 1998, which states in pertinent part that, "[t]here will hereafter exist a rebuttable presumption that the maps accurately depict the [ownership and jurisdictional] status of the land." *Ute Indian Tribe v. State of Utah*, case no. 75-CV-408, *Dkt.* 100 (D.Utah Nov. 20, 1998).[8]

9. The property owned by Gregory D. McKee (hereinafter referred to as the "McKee Property") was conveyed to Mr. McKee's predecessor in interest, Constant L. Darling, on November 3, 1910, under Patent No. 159817.[9] The McKee Property is described as 121.14 acres, consisting of Lot 2, SW/4 NE/4, and NW/4 SE/4 of Township 1 South, Range 1 East, Uinta Special Meridian (USM), Utah. For reference purposes on demonstrative exhibits at the preliminary injunction hearing and at trial, Lot 2 was referred to as "Tract 1," the SW/4 NE/4 was referred to as "Tract 2," and the NW/4 SE/4 was referred to as "Tract 3."[10]

[7] Plaintiff's Exhibit 49.
[8] Plaintiff's Exhibit 50.
[9] Plaintiff's Exhibit 3-1.
[10] Preliminary Hearing Transcript, 3-26-2013, p. 45:14-25.

10. The McKee Property is land that was diminished from the Uintah Valley Reservation, i.e., "lands that passed from trust to fee status." However, the McKee Property is situated in a checker-board area of the Reservation and is immediately adjacent to tribal trust lands to the east and south. The McKee Property is depicted as essentially surrounded by Indian Country on the *Jurisdictional Map* approved by the U.S. District Court in *Ute Tribe v. Utah*, case no. 75-CV-408.[11]

11. Greg McKee's parents, Larry Dean McKee and Deborah McKee, acquired full ownership in the McKee Property when Larry McKee's brother Rex McKee quit claimed his interest to Larry and Deborah McKee under a Quit Claim Deed dated August 3, 1999.[12]

12. The evidence establishes that Larry Dean McKee and Deborah McKee and their son Greg McKee have used the property for a cattle feedlot and associated pasture land. Although Defendants failed to produce evidence in response to the Tribe's Interrogatories, Requests for Production, and Requests for Admission relating to the McKee family business entities, public records maintained by the Utah Secretary of State, Division of Corporations, were admitted into evidence as Plaintiff's Exhibits 40, 41, and 42. The Court finds that T&L Livestock, Inc. was registered as a Utah corporation on February 3, 1993; that McKee Farms, Inc. and G M Fertilizer, Inc. were registered as Utah corporations on March 25, 2002, and that Defendant Greg McKee is listed as the registered agent for all three corporations.

13. The McKee Property is traversed by the Deep Creek Canal and Lateral No. 9, both of which are conveyance channels for the Uintah Indian Irrigation Project ("UIIP"). The

---

[11] Plaintiff's Exhibit 51.
[12] Plaintiff's Exhibits 26 and 27.

UIIP was established to provide irrigation water to Ute tribal trust and Indian allotment lands.[13] The Ute Tribe is the beneficial owner of the Indian reserved waters conveyed through the Deep Creek Canal and Lateral No. 9 as described in a 1905 Certificate of Appropriation of Water, No. 1234 (Water Right No. 43-3004), and subsequently recognized in a federal court decree dated March 16, 1923, copies of which were admitted into evidence as Plaintiff's Exhibits 5 and 6.[14]

14. The 1905 Certificate of Appropriation contains a lengthy legal description of Indian lands (some of which are now former allotment lands) that are entitled to tribal water from the Deep Creek Canal and the Canal's associated lateral ditches. The Tribe's Water Engineers, Dr. Woldezion Mesghinna, PhD., P.E., and Chad Hall, P.E., both testified that the McKee property is not identified as land entitled to receive water through the Deep Creek Canal under the 1905 Certificate of Appropriation of Water.[15] Further, the Tribe's Request for Admission No. 1 asked Defendants to admit that "the McKee property is not identified as land entitled to irrigation water from the U. S. Deep Creek Canal or the Tabby White Canal under the State Certificate of Appropriation of Water, No. 1234 (Water Right No. 43-3004), issued on June 15, 1905." By failing to respond to Plaintiff's Request No. 1, the Court finds that Defendants

---

[13] See Act of June 21, 1906, ch. 3504, 34 Stat 325, 375-376, LD 127.

[14] In 1916 the United States, as trustee for the Ute Indians, filed two actions to enjoin various irrigation companies from interfering with the Indians' prior use of waters of the Lake Fork, Whiterocks, and Uintah Rivers which flowed through the Project area. *U. S. v. Dry Gulch Irrigation Co.*, No. 4418, slip op. (D. Utah 1923), and *U.S. v. Cedarview Irrigation Co.*, No. 4427, slip op. (D. Utah 1923). The *Cedarview* Decree was admitted as Plaintiff's Exhibit 6. *See generally Hackford v. Babbitt*, 14 F.3d 1457 n.2 (10th Cir. 1994) ("Today, more than one-third of the land served by the [UIIP] Project is held in fee by non-Indian successors to Indian allottees.") (citing *Ute Indian Tribe v. Utah*, 521 F. Supp. 1072, 1126 n.165 (D. Utah 1981), *aff'd in part, rev'd in part*, *Ute Indian Tribe v. Utah*, 773 F.2d 1087 (10th Cir. 1985).

[15] Trial Transcript, 7-13-2015, p. 51:11-24; Preliminary Injunction Hearing, 3-26-2015, pp. 130:16 - 131:7.

have admitted the McKee Property is not identified under the 1905 Certificate as land entitled to water from the Deep Creek Canal.

15. The 1910 Patent conveyed title to the McKee Property subject to

> . . . any vested and accrued water rights . . . and rights to ditches and reservoirs used in connection with such water rights . . . and there is reserved from the lands hereby granted, a right of way thereon for ditches or canals constructed by the authority of the United States . . . .

Section 203(f)(2) of the Central Utah Project Completion Act (CUPCA) provides:

> Title to Uintah Indian Irrigation Project rights-of-ways and facilities shall remain in the United States. The Secretary shall retain any trust responsibilities to the Uintah Indian Irrigation project.

(Titles II through VI of P. L. 102-575, 106 Stat. 4605, Oct. 30, 1992).

16. The Ute Tribe has established by clear and convincing evidence that Defendants have misappropriated tribal waters from Deep Creek Canal and Lateral No. 9 for application to the McKee Property since at least August 3, 1999. Defendants have used tribal waters to flood irrigate the McKee Property and to supply water to the cattle feedlot on the property.

17. The extent of the flood irrigation is documented in photographs taken by Chad Hall, P.E. on September 6, 2012. Those photographs, admitted as Plaintiff's Exhibit 10, show, *inter alia*, bulldozer tracks near an illegal diversion from the Deep Creek Canal; standing water in the McKee pastures; irrigation infrastructures including concrete culverts, earthen dams and illegal ditches for diverting water from Lateral No. 9; perforated PVC pipe, and housing for water pipeline valves.

18. A "Utah AFO [Animal Feeding Operation] Assessment Form" completed for the cattle feedlot on the McKee Property on June 23, 2010, contains a hand-written observation that there is an "irrigation induced wetland' near the feedlot.[16]

19. Engineer Chad Hall and Brent Searle, McKee's former father-in-law, testified that McKee diverts water illegally from Deep Creek Canal above the weir that is located at Lateral No. 9. The purpose of the weir is to monitor the amount of water that is diverted into the lateral. By illegally diverting water from Deep Creek Canal above the weir for Lateral No. 9, Hall and Searle testified that McKee is able to conceal the actual amount of water that is diverted from Deep Creek Canal onto the McKee Property.[17] Engineer Hall testified that vegetation around the illegal diversions structures is mature, and the concrete diversion culverts are old and rusted, suggesting to him that the illegal diversions have occurred for some time.[18]

20. Mr. Searle testified that the McKee Property is located at the upper end of the Deep Creek Canal, meaning that when water from the Canal is diverted illegally onto the McKee Property, there is less water to flow down the Canal to other irrigators.[19] The 1923 Decree in *U.S. v. Cedarville*, admitted as Plaintiff's Exhibit 3, locates the "head or intake" of the Deep Creek Canal in Section 5, Township 1 South, Range 1 East, USM, approximately 2.5 miles west of the McKee Property in Section 2 of that same Township and Range.[20]

21. The Court heard testimony from Jack Horner, who worked for Greg McKee's father, Larry McKee for a period of three years, from approximately 1999 to 2001. Mr. Horner

[16] Plaintiff's Exhibit 35, Attachment 3.
[17] Trial Transcript, 7-13-2015, pp. 53:10-56:15; 68:16 – 69:7.
[18] *Id.*, pp. 54:23 – 55:25.
[19] *Id.*, p. 72:1-23.
[20] See Plaintiff's Exhibit 3, p. 5, ¶1 and Plaintiff's Exhibit 2 (BLM Master Title Plat for T1S, R1E, USM).

described an underground pipeline that Larry McKee installed to supply water to the cattle feedlot on the McKee Property.[21] Brent Searle testified that the underground pipeline diverts water directly from the Deep Creek Canal, and that he was present on two occasions when maintenance work was performed on the pipeline.[22]

22. Janet Cuch and her children live on tribal land that adjoins the McKee Property to the east. Her children are enrolled members of the Ute Tribe and the tribal land where they live is also irrigated with water from the Deep Creek Canal. Ms. Cuch has lived there for thirty-five years, and during the entirety of that time, she says the McKee property has been "very, very green," while the tribal lands on which she lives and other tribal lands have been "very dry."[23] Ms. Cuch described McKee's use of tribal water as "uncontrolled and unregulated."[24] She testified that the ditch rider on the Deep Creek Canal is Rex McKee—Greg McKee's uncle—and she said that while Rex McKee holds her family to "an exacting small amount of water," Greg McKee "never has any trouble getting water delivered to his property."[25] She testified that she has seen Deep Creek water on the 121.14 acre McKee Property "continually" during the 35 years she has lived adjacent to the McKee Property, and she said "You can climb up on the bluffs," in the area "and look down on the countryside and you know what land he is moving water to."[26]

23. Also testifying was Tim Ignacio, a tribal member who farms 180 acres of tribal land and irrigates with water from Deep Creek Canal at a location approximately 5 to 6 miles

---

[21] *Id.*, pp. 151:10 – 156:25; Plaintiff's Exhibit 46.
[22] *Id.*, pp. 64:25 – 65:20.
[23] *Id.*, pp. 99-102.
[24] *Id.*, p. 105:10-12.
[25] *Id.*, pp. 103-104.
[26] *Id.*, pp. 108:1-3; 117:9-12.

south (down-stream or down-Canal) from the McKee Property. Ignacio said he is the last irrigator on the Deep Creek Canal. He would prefer to flood irrigate his property, but he was required to install a sprinkler system 10 to 12 years ago.[27] Before then, when he still flood irrigated, before his 8-hour ditch run began he would have to "go up and shut all the head gates all the way up to Lapoint," in order to insure that water would be flowing in the Canal when his diversion run began. He testified that Greg McKee's father, Larry McKee, would just "go back over and kick the gate(s) open again." When Ignacio complained to his ditch rider, the ditch rider had Ignacio accompany him to the McKee Property where the ditch rider implored Mr. McKee to allow Ignacio to have his water.[28] Ignacio agreed with Janet Cuch's testimony that the "McKee Property is always green when everything around it is brown" particularly in dry years.[29] Ignacio testified that even with the installation of a pipeline and sprinkler systems, irrigators in the lower section of the Deep Creek Canal "are still hurting" because of insufficient water reaching the lower reaches of the Canal."[30] Ignacio testified that when water is short, his alfalfa cuttings are significantly reduced, and he is lucky to recover production costs, including the cost of fertilizer.[31]

<u>DEFENDANTS' MISAPPROPRIATION OF WATER FROM DEEP CREEK CANAL AND LATERAL NO. 9 FOR APPLICATION TO THE LOT 2 AND SW/4 NE/4 OF SECTION 2, TOWNSHIP 1 SOUTH, RANGE 1 EAST, USM</u>

24. In this lawsuit Greg McKee has defended the Defendants' right to divert water from Deep Creek Canal for application to the upper 81.14 acres of the McKee Property based on

---

[27] *Id.*, pp. 175:17 – 15.
[28] *Id.*, pp. 176:17 – 178-12.
[29] *Id.*, pp. 179:16 – 180:1.
[30] *Id.*, pp. 182-11-18.
[31] *Id.*, pp. 182:8 – 184:21.

a State of Utah Certificate of Appropriation of Water No. 1962, Utah State Water Right 43-3202, which was introduced in evidence as Plaintiff's Exhibit 23.[32]

25. At the Preliminary Injunction hearing on March 26, 2013, Greg McKee testified that the State water right is identified as a "44 acre water right in Goodrich Gulch," in the Personal Representative's Deed dated September 22, 2005, that conveyed his father Larry McKee's interest to him.[33] The Deed was introduced as Plaintiff's Exhibit 22.

26. However, the source of water and point of diversion for the Utah State Water Right 43-3202 is not the Deep Creek Canal but, rather, the Goodrich Gulch, and the Engineer's Certificate attached to the Certificate includes engineer drawings which show that water from Goodrich Gulch is to be conveyed via a wooden flume "over and across the U.S. Deep Creek Canal." The Engineer's Certificate was introduced in evidence as Plaintiff's Exhibit 23-1.

27. The Tribe's Water Engineer, Dr. Woldezion Mesghinna, P.E., of NRCE, testified on March 26, 2013, that there is no infrastructure, i.e., wooden flume, for transporting Goodrich Gulch Water over the Deep Creek Canal, and that the original diversion point for Utah State Water Right 43-3202 has never been transferred from the Goodrich Gulch to the Deep Creek Canal.[34] Dr. Mesghinna also testified that Defendants theoretically could transport the Goodrich Gulch water through the Deep Creek Canal if Defendants had a Carriage Agreement with the UIIP, but he testified there is no Carriage Agreement.[35]

---

[32] See Defendant's Memorandum of Law in Opposition to Motion for Emergency Temporary Restraining Order, submitted September 21, 2012; Transcript of 3-26-2013 Hearing, p. 99:14-22.

[33] Transcript of 3-26-2013 Hearing, pp. 19:11 – 22:19.

[34] Transcript of 3-26-2013 Hearing, pp. 123:23 – 126:25; see also Plaintiff's Exhibit 11, pp. 3, 10, 13.

[35] Transcript of 3-26-2013 Hearing, p. 121:1-18; see also Plaintiff's Exhibit 11, pp. 3, 10, 13.

28. Dr. Mesghinna testified that surface water flows through Goodrich Gulch only intermittently,[36] and at trial Brent Searle, who has lived in the area for almost 60 years, said the Goodrich Gulch has not flowed sufficient water for surface diversion in "years."[37]

DEFENDANTS' MISAPPROPRIATION OF WATER FROM DEEP CREEK CANAL FOR APPLICATION TO THE NW/4 SE/4 OF SECTION 2 TOWNSHIP 1 SOUTH, RANGE 1 EAST, USM

29. In 1941 Congress authorized the Secretary of the Interior to "transfer water rights" within the Uintah Indian Irrigation Project, subject to two specified conditions: first, any such transfers had to be with "the consent of the interested parties" and secondly, such transfers could only be made "to other lands under said project."[38]

30. Defendants claim the right to divert water from Deep Creek Canal to the bottom 40 acres of the McKee Property—i.e., the NW/4 SE/4 of Section 2, referred to in this case as Tract 3—based upon water rights purportedly transferred onto Tract 3 pursuant to the Secretary's delegated authority under the 1941 Act.

31. Plaintiff's Exhibit 29 is an Agreement dated March 4, 1943 between the United States and Dewey McConkie, one of Greg McKee's predecessor's in interest to the McKee Property (1943 Agreement). The 1943 Agreement purports to transfer "21 acres of water right appurtenant" to land in Section 34, Township 1 North, Range 1 East, USM, "which land is situated within the Uintah Irrigation Project" to the NW/4 SE/4 of Section 2, Township 1 South, Range 1 East, USM, that is, to Tract 3 of the McKee Property. The 1943 Agreement contains no

---

[36] Transcript of 3-26-2013 Hearing, pp. 150:14 – 151:3.

[37] Trial Transcript, p. 64:17-24.

[38] See Act of May 28, 1941, ch. 142, 55 Stat. 209, Section 2, Reprinted in VI C. Kappler, Indian Affairs: Laws and Treaties 112 (2d ed. 1904).

recitation that the McKee Property—the land to which the water right is being transferred—is within the UIIP, and as testified by both Dr. Dr. Mesghinna and Engineer Hall, and as admitted by Defendants—the McKee Property is located outside the lands designated as UIIP project lands under the State Certificate of Appropriation of Water, No. 1234 (Water Right No. 43-3004).[39]

32. As the beneficial owner of the water in the UIIP, the Ute Tribe would have been an "interested party" to the transfer of water purportedly made under the 1943 Agreement; however the Agreement contains no recitation that the Tribe was informed of, and consented to, the transfer, and the Tribe is not a signatory to the Agreement.

33. Plaintiff's Exhibit 30 is an Agreement dated December 23, 1946, again between the United States and Dewey McConkie (1946 Agreement). The 1946 Agreement purports to transfer water from 15.28 acres of land described as Lot 2 (SW/4 NW/4) of Section 18, Township 1 South, Range 2 East, "within the Uintah Irrigation Project," to Tract 3 of the McKee Property, i.e., the NW/4 SE/4 of Section 2, Township 1 South, Range 1 East, USM. As with the 1943 Agreement, the 1946 Agreement contains no recitation that the McKee Property—the land to which the water right was being transferred—is within the UIIP, and as testified by both Dr. Mesghinna and Engineer Hall, and as admitted by Defendants—the McKee Property is located outside the lands designated as UIIP project lands under the State Certificate of Appropriation of Water, No. 1234 (Water Right No. 43-3004).[40]

---

[39] See Finding No. 14 above.
[40] *Id.*

34. As the beneficial owner of the water in the UIIP, the Ute Tribe would have been an "interested party" in the transfer of water purportedly made under the 1946 Agreement; however the Agreement contains no recitation that the Tribe was informed of, and consented to, the transfer, and the Tribe is not a signatory to the Agreement.

35. By a warranty deed dated May 15, 1961, Dewey McConkie and his wife Thora conveyed the 121.14 acre McKee Property to Reed H. McKee and Thelma McKee, husband and wife, as joint tenants. Included in the deed by specific reference were:

> . . . all water and water rights held and used in connection therewith, and in particular 36.28 shares of water in U.S. Deep Creek canal, and 44 acre water right in Goodrich Gulch. . . . (emphasis added)[41]

36. The specific reference to "36.18 shares of water in U.S. Deep Creek canal" is never repeated in any subsequent conveyance of the McKee property.[42]

37. By warranty deed dated March 23, 1978, Reed H. McKee and Thelma W. McKee conveyed undivided half interests in the 121.14 acre McKee Property to Rex McKee, a single man, and Larry Dean McKee and Deborah McKee, husband and wife, "including a 44 acre water right in Goodrich Gulch." There is no mention of conveyance of "36.18 shares of water in U.S. Deep Creek canal."[43]

---

[41] *See* Plaintiff's Exhibit 31.

[42] *See* Plaintiff's Exhibit 27, a summary of the chain of title for realty and water rights for the McKee Property.

[43] *See* Plaintiff's Exhibits 27 and 32.

38. Two subsequent quit claim deeds to the 121.14 acre McKee Property, dated August 12, 1980 and August 3, 1999, make no mention of conveyance of "36.18 shares of water in U.S. Deep Creek canal."[44]

39. On July 10, 2001, Deborah J. McKee quit claimed her interest in the 121.14 acre McKee Property to Larry Dean McKee making no mention of conveyance of "36.18 shares of water in U.S. Deep Creek canal." At the same time, however, in that same Quit Claim Deed, Deborah J. McKee also quit claimed her interest in a second tract of land in a different township and range—the W/2 SW/4 of Section 19, Township 1 South, Range 2 East, USM—and as to that second property, Deborah J. McKee did specifically quit claim her interest in "39 shares of Indian Irrigation Rights."[45]

40. The very next day, July 11, 2001, Larry Dean McKee quit claimed an undivided one-half interest in the 121.14 acre McKee Property to Defendant Greg McKee, again making no mention of conveyance of "36.18 shares of water in U.S. Deep Creek canal." At the same time, however, in that same Quit Claim Deed, Larry Dean McKee also quit claimed to Greg McKee an undivided one-half interest in that second tract of land in a different township and range—the W/2 SW/4 of Section 19, Township 1 South, Range 2 East, USM—and as to that second property, Larry Dean McKee did specifically quit claim an undivided one-half interest in "39 shares of Indian Irrigation Rights."[46]

41. Finally, on September 22, 2005, Deborah Jean McKee, as Personal Representative of the Estate of Larry Dean McKee, conveyed by Personal Representative's Deed all of Larry

[44] *See* Plaintiff's Exhibits 27, 33 and 26.
[45] *See* Plaintiff's Exhibits 27 and 25.
[46] *See* Plaintiff's Exhibits 27 and 24.

Dean McKee's interest in the 121.14 acre McKee Property. The conveyance contains no mention of conveyance of "36.18 shares of water in U.S. Deep Creek canal." At the same time, however, in the same Personal Representative's Deed, Deborah Jean McKee conveyed to Greg McKee all of Larry Dean McKee's interest in that second tract of land in a different township and range—the W/2 SW/4 of Section 19, Township 1 South, Range 2 East, USM—and as to that second property, the conveyance expressly includes all of Larry Dean McKee's interest in the "39 shares of Indian Irrigation Rights" in that second property.

42. In summary, the most recent instruments of conveyance in the chain of title for the McKee Property—six separate instruments of conveyance from March 23, 1978 to September 22, 2005——contain no reference to "36.18 shares of water in U.S. Deep Creek canal." Of these instruments of conveyance, the last five instruments are noteworthy for what they do include—they expressly convey by specific reference "39 shares of Indian Irrigation Rights"—however this conveyance is made in relation to an entirely different property in an entirely different Township and Range—Section 19, Township 1 South, Range 2 East, USM.

43. At the preliminary injunction hearing, Defendant Greg McKee admitted that he has no instrument of conveyance or other legal document that entitles Defendants to use tribal waters on the NW/4 SE/4 of Section 2 (Tract 3 of the McKee property).[47]

44. The only evidence Defendants presented in support of their asserted right to use tribal water on Tract 3 were annual operation and maintenance billing invoices from the Department of Interior, Bureau of Indian Affairs ("BIA"). While the Court admitted Defendants' Exhibits I, J, L, M and N into evidence, Defendants did not call any witness from

[47] Preliminary Injunction Hearing Transcript, 3-26-2013, pp. 87:25 – 88:9.

the BIA to explain the basis for O&M assessments on a tract by tract basis. There is no dispute that in addition to the 121.14 acre McKee Property, Greg McKee also leases tribal land through the BIA, and McKee is assessed O&M charges for water delivered to those tribal leased lands. For this reason the Court finds that the billing invoices are not particularly probative; by themselves, invoices for O&M charges do not establish the Defendants' legal right to divert water from Deep Creek Canal for irrigation of the NW/4 SE/4 of Section 2 (Tract 3 of the McKee property). Moreover, it is entirely possible that the 1941 statute that was cited as authority for the 1943 and 1946 transfer of tribal waters onto the McKee Property was later employed to transfer those same water rights *off* the McKee Property, particularly, if it was discovered that the McKee Property is not within the designated lands of the UIIP.

45. The Tribe propounded written discovery to Defendants related to Defendants' legal right, if any, to divert water from Deep Creek Canal for application to Tract 3. Plaintiff's Interrogatory No. 1 asked Defendants whether the 36.28 acre feet of tribal water purportedly transferred to Tract 3 of the McKee Property under the 1943 and 1946 Agreements were "listed as assets of the Estate of Larry Dean McKee in the federal Estate Tax Return that was filed by the Estate of Larry Dean McKee, and if so, [to] identify the value that was assigned to those assets in the federal Estate Tax Return."[48] Request for Production No. 5 asked Defendants to produce "that portion of the federal Estate Tax Return filed by the Estate of Larry Dean McKee which shows that the [UIIP] Project waters which Gregory McKee claims to own … were listed as an asset of the Estate on the Estate Tax Return, including the value attributable to the asset."[49]

---

[48] *See* Plaintiff's Exhibit 47.
[49] *Id.*

Requests for Admission Nos. 18 and 19 asked Defendants to admit that the tribal waters purportedly transferred to the McKee Property under the 1943 and 1946 Agreements "were not listed as assets of the Estate of Larry Dean McKee in the federal Estate Tax Return that was filed by the Estate of Larry Dean McKee," and that those same assets "were not listed under any federal Gift Tax Return filed by Deborah Jean McKee."[50]

46. The Court has granted the Tribe's motion to sanction Defendants for their failure to respond to the Tribe's discovery requests by drawing negative inference against the Defendants and in deeming the Defendants to have admitted the substance of the Tribe's Requests for Admission. Accordingly, the Court finds that Defendants have failed to establish their asserted right to the use of tribal water for the NW/4 SE/4 of Section 2 (Tract 3 of the McKee property). In addition, Defendants are deemed to have admitted that purported water rights were not listed in any Estate Tax Return filed by the Estate of Larry Dean McKee, or in any Gift Tax Return filed by Deborah Jean McKee.

TRESPASS ON TRIBAL LANDS ASSIGNED TO FRANK ARROWCHIS

47. The Court adopts by incorporation the language contained in the Court's Temporary Restraining Order of October 1, 2012:

> There is no dispute that Frank Arrowchis has received 160 acres of assignments of tribal lands from the Ute Indian Tribe. The Tribe in making assignments of its own trust lands can impose any conditions on the use of such lands as it deems appropriate. The Assignment Committee Ordinance No. 94-001 (January 24, 1994), at Article X, Section 5 specifically proscribes leasing of such assignments or their "use by any person other than the assignee's immediate family." Defendant does not dispute that he farms all or part of the Arrowchis assignments but contends that where he simply bills Arrowchis a specified hourly rate for farming services, harvests the crops and stores them at defendant's feedlot, and receives payment from Arrowchis in crops rather than case, such

[50] *See* Plaintiff's Exhibit 48.

arrangement does not violate Ordinance 94-001. The language of the Ordinance is broad and the arrangement between Arrowchis and defendant constitutes use by any person other than the family of Arrowchis.

48. Janet Cuch and her daughter Janel Cuch testified at trial that Defendants had continued through the date of trial to continue farming the Arrowchis assignments.[51]

DAMAGES AND INJUNCTIVE RELIEF

49. NRCE has quantified the amount of water the Tribe contends the Defendants have illegally misappropriated from Deep Creek Canal for watering livestock in the feedlot and for flood irrigating the McKee Property. The quantification is from August 3, 1999, when Mr. McKee's father obtained full ownership of the McKee Property, through the end of calendar year 2014.[52] Engineer Chad Hall testified that NRCE used the documented amount of water diverted annually through the Deep Creek Canal and the total amount of acreage irrigated from the Deep Creek Canal to arrive at a unit diversion rate equating to acre foot/per acre. NRCE then applied that unit rate to the acreage irrigated by Mr. McKee to arrive at a total volumetric use.[53] NRCE quantified the water used for livestock based upon the Utah AFO Assessment Form, which indicates a maximum animal capacity for the feedlot of 4,000 animals, and an assumed confinement period of 120 days.[54] The Court notes, parenthetically, that Brent Searle testified based on personal knowledge that Defendants have confined as many as 7,500 to 10,000 animals per year at the feedlot.[55]

[51] Trial Transcript, pp. 113:3-115:25; 119:20-120:7.

[52] *See* Plaintiff's Exhibit 35. NRCE Supplemental Report dated March 23, 2015, Section 3, Quantification of Water Diversions, pp. 8-11.

[53] Trial Transcript, p. 50:11-15.

[54] *See* Plaintiff's Exhibit 35, p. 11.

[55] Trial Transcript, p. 64:5-9.

50. NRCE segregated the water diversion quantifications by (*i*) year, (*ii*) Tracts 1 and 2, (*iii*) Tract 3, and (*iv*) Livestock Water Use. NRCE estimates a total misappropriation of water for Tracts 1, 2 and 3 of 3,368 acre feet of water from August 3, 1999 through the end of calendar year 2014. According to the *Cedarview* Decree, irrigation waters may be diverted from March 1st through October 31st, and "[w]ater may be diverted for domestic, culinary and stock-watering purposes during the entire year."[56]

51. Janet Cuch testified that Defendants were continuing to divert Deep Creek Canal water onto the McKee property even as of the time of trial.[57]

52. Jason Matthew Bass is a certified public accountant who holds credentials as a financial analyst.[58] The Tribe qualified Mr. Bass as an expert on the economic losses to the Tribe and its members resulting from Defendants' conversion of tribal waters from Deep Creek Canal. Relying on the NRCE diversion quantifications, Mr. Bass arrived at a monetary amount equivalent to lost productivity to the Ute Tribe and tribal members resulting from the misappropriation of waters not being available to the Tribe and tribal members to grow alfalfa. That amount is $136,218.00. Like NRCE, Mr. Bass determined damages from August 3, 1999, when Mr. McKee's father obtained full ownership of the McKee Property, through the end of calendar year 2014.[59]

53. The Court finds that the Tribe has prevailed on the merits on its claims under Counts 1 (declaratory and injunctive relief) and 2 (damages) of the First Amended Complaint.

---

[56] Plaintiff's Exhibit 6, p. 7 ¶ 1.

[57] Trial Transcript, p. 112:9-24.

[58] Plaintiff's Exhibit 38.

[59] *See* Plaintiff's Exhibit 35, NRCE Supplemental Report dated March 23, 2015, Section 3, Quantification of Water Diversions, pp. 8-11.

Notwithstanding the Court's interim injunction order, the evidence establishes that Defendants have continued to convert tribal water from Deep Creek Canal for use on the McKee Property and have continued to sublease and farm the Arrowchis assignments. Because the Tribe should not be required to institute repeated lawsuits in order to remedy these ongoing wrongs, the Court finds that permanent injunctive relief is appropriate as well as the recovery of damages for past wrongs. The Court finds that without permanent injunctive relief, the Tribe will suffer irreparable harm and finds that the harm to the Tribe outweighs the harm that permanent injunctive relief may cause the Defendants. Finally, the Court finds that issuance of the injunction will not adversely affect the public interest.

## CONCLUSIONS OF LAW

1. Indian water rights are vested property rights predicated on federal law. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976); *Winters v. United States*, 207 U.S. 664, 577 (1908). Indian water rights are "reserved rights" because they are deemed an essential part of the tribe's reservation." *Arizona v. California*, 373 U.S. 546, 600, (1963).

2. The importance of water to the survival of the Ute Indians is beyond dispute.[60] Before the U&O Reservation was opened to non-Indian settlement, the Commissioner of Indian

[60] Before the Uintah Valley Reservation was established by Executive Order in 1861, Brigham Young, Territorial Governor of the Territory of Utah and President of the Mormon Church, dispatched a survey term to determine whether the proposed reservation lands would instead be suitable for Mormon settlement.[60] The team's "unanimous and firm" verdict was that the proposed reservation lands were "one vast 'contiguity of waste,' and measurably valueless, except for nomadic purposes, hunting grounds for Indians and to hold the world together." Charles Wilkinson, *Fire on the Plateau*, 150 (Island Press 2004).

Affairs cautioned that "[t]he future of these Indians depends upon a successful irrigation scheme, for without water their lands are valueless, and starvation or extermination will be their fate."[61]

3. On March 27, 2013, the Tribe adopted Ordinance 13-010, which amended Chapter 2 of the Tribe's Law and Order Code (UTE LOC) governing jurisdiction.[62] As pertinent here, the Tribe's territorial jurisdiction extends to "all waters, water storage facilities and irrigation works owned by or held in trust for the Ute Tribe and Ute Indian allottees." UTE LOC, §1-2-2(1)(g). The Uintah Indian Irrigation Project is held by the United States in trust for the Tribe. Accordingly, the Tribe's territorial jurisdiction extends to the Deep Creek Canal and Lateral Ditch No. 9 and to the tribal waters within the Canal and Ditch even when, as here, the Ditch and Canal cross fee property such as the McKee Property. Because the Tribe's territorial jurisdiction extends to the Deep Creek Canal and Lateral Ditch No. 9, and the tribal waters therein, the Tribal Court has adjudicatory jurisdiction to "determine the ownership thereof or rights therein." UTE LOC, §1-2-4. The Tribe's long-arm jurisdiction extends to any person who "causes a tortious injury to the Tribe, tribal members, or to any trust land, allotted land, fee land, or any other property within the Tribe's territorial jurisdiction," and any action "outside the

---

[61] *Ute Indian Tribe v. Utah*, 521 F. Supp. at 1126 (quoting Rept. of the Comm. of Ind. Aff., 1905, JX 328 at 1893).

[62] The Court finds no barriers to retroactive application of the amendments under the facts of this case: the amendments were adopted after the filing of the Tribe's original complaint on September 6, 2012, but before the Tribe's First Amended Complaint was filed on September 4, 2013. The amendments were adopted, *inter alia*, to take into account (*i*) the delineation of the U&O Reservation boundaries under the decision in *Ute Tribe v. Utah*, 114 F.3d 1513 (10th Cir. 1997), (*ii*) the return of certain federally-held lands to tribal ownership, and (*iii*) to specifically address the Tribe's "jurisdictional authority over the Tribe's water, air, environment and other natural resources." Because the amendments are justified by rational legislative purposes, the amendments may be applied retroactively without violating due process. *See, e.g., Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717 (1983) (retroactive application of legislation does not violate due process if retroactive application is justified by a rational legislative purpose).

Tribe's territorial jurisdiction which causes actual injury or damage inside the Tribe's territorial jurisdiction, where such injury or damage was reasonably foreseeable." UTE LOC, § 1-2-3(2)(E) and (G). In addition, the Tribe's Law and Order Code includes an implied consent provision under which any person "entering the territorial jurisdiction of the Ute Tribe as defined in Section 1-2-2 shall be automatically subject to the jurisdiction of the Courts of the Ute Indian Tribe." UTE LOC § 1-2-3(4).

4. The Court has subject matter jurisdiction pursuant to the Ute Tribe's inherent sovereign right to regulate activities of all non-Indians who willingly enter into a consensual relationship with the Tribe or whose conduct imperils the Tribe's political integrity, economic security, or health and welfare. *See Montana v. United States*, 450 U.S. 544 (1981). The Court also has subject matter jurisdiction pursuant to the Tribe's inherent sovereign right to (*i*) manage the use of its territory and natural resources by both members and nonmembers, *see New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 335-36 (1983), and (*ii*) to exclude nonmembers from the Tribe's lands and waters, including the irrigation ditches and canals that transport tribal waters. *See Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802, 811-14 (9th Cir. 2011).

5. Under 25 U.S.C. § 194, the burden of proof was on the Defendants to establish their right to divert tribal waters from the Deep Creek Canal and Lateral No. 9, and their right to continued entry upon the tribal lands under assignment to Frank Arrowchis. Defendants have not met this burden.

6. The Tribe established damages of $136,218.00 for the Defendants' misappropriation and conversion of tribal waters from August 3, 1999, when Greg McKee's

father Larry Dean McKee gained full ownership of the McKee Property, through the end of calendar year 2014. In light of testimony that Defendants have continued to divert water from the Deep Creek Canal through the date of trial, the Court awards additional damages of $6,500.00 as the value of tribal water misappropriated from January 1, 2015 through the date of trial, noting that this amount represents less than half the damage amounts assigned by Jason Bass for the two most recent calendar years, 2013 and 2014. Total damages awarded are $142,718.00.

7. Although the Estate of Larry Dean McKee is not a named defendant, Defendant T&L Livestock, Inc. has been in existence since February 3, 1993, and Defendants McKee Farms, Inc. and G M Fertilizer, Inc. have been in existence since March 25, 2002. Defendant Greg McKee obtained an undivided one-half interest in the property on July 11, 2001, and gained full ownership of the property on September 22, 2005. Accordingly, the Court apportions the damages as follows: $8,854.50 against T&L Livestock, Inc. for 1999 through July 11, 2001; $7,636.00 against T&L Livestock and McKee Farms, Inc., jointly and severally, for July 11, 2001 through September 22, 2005, and $126,227.50 against Gregory McKee from July 11, 2001 through the date of trial on July 13, 2015.

8. As discussed under Finding No. 53 above, the Tribe is entitled to a permanent injunction to prevent Defendants from continuing to divert and convert tribal water from Deep Creek Canal for use on the McKee Property and from continuing to trespass upon the tribal lands under assignment to Frank Arrowchis.

9. The Court grants the Tribe's motion for the recovery of costs and attorney fees as a discovery sanction in the amount of $7,027.73.

10. The Tribe is entitled to post-judgment interest at the rate one and one-half percent (1.5%) per annum.

11. The Court grants the Tribe's motion to dismiss Counts 3 and 4 of the First Amended Complaint without prejudice.

ORDERED AND SIGNED this 30 day of August, 2015

By The Court:

Terry L. Pechota, Presiding Judge

CERTIFICATION
I CERTIFY THAT THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE ORIGINAL
CLERK

ATTEST:

Clerk of Court

[SEAL]

# EXHIBIT E

# INDIAN AFFAIRS: LAWS AND TREATIES

**Vol. VI, Laws (Compiled from February 10, 1939 to January 13, 1971)**

Washington : Government Printing Office

Home | Disclaimer & Usage | Table of Contents | Index

## PUBLIC LAWS OF THE SEVENTY-SEVENTH CONGRESS, FIRST SESSION, 1941-1942

Chap. 32 | Chap. 40 | Chap. 41 | Chap. 137 | Chap. 138 | Chap. 139 | Chap. 140 | Chap. 142 | Chap. 259 | Chap. 266 | Chap. 267 | Chap. 268 | Chap. 273 | Chap. 299 | Chap. 301 | Chap. 334 | Chap. 356 | Chap. 368 | Chap. 419 | Chap. 470 | Chap. 472 | Chap. 474 | Chap. 591

Page Images

### Chapter 142
### May 28, 1941 [H. R. 3987] | [Public Law 83] 55 Stat. 209

**AN ACT**
**To provide relief for, and to promote the interests of, the landowners on the Uintah Indian irrigation project, Utah, and for other purposes.**
**Section** 2 | 3 | 4 | 5

| Margin Notes | |
|---|---|
| Chap. 142 | Uintah Indian irrigation project, Utah. Cancelation, etc., of certain charges.<br>25 U. S. C. §§ 389-389e. |
| Chap. 142 | Proviso. |
| Sec. 2 | Transfer of water rights. |
| Sec. 3 | Transfer of operation, etc., of canal systems. |
| Sec. 4 | Appropriation authorized. |
| Sec. 4 | Operation and maintenance assessments. |
| Sec. 4 | *Proviso.* Payment of owner's share. |
| Sec. 4 | Reimbursements. |
| | |

| | |
|---|---|
| Sec. 4 | 48 Stat. 1227.<br>31 U. S. C. § 725c. |
| Sec. 5 | 210 |
| Sec. 5 | Liquidation of delinquent charges. |

Page 112

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the action of the Secretary of the Interior, pursuant to the authority contained in the Act of June 22, 1936 (49 Stat. 1803), in the cancelation, deferment, and adjustment of irrigation charges against lands within the Unitah Indian irrigation project, Utah, is hereby confirmed as follows:

(a) The cancelation of $283,170.73 of unpaid construction assessment obligations and $28,875.37 of unpaid operation and maintenance assessment obligations carried on the books of the project: *Provided,* That such cancelations applying to lands, the owners of which are indebted to the United States for operation and maintenance costs, shall become effective only upon the payment of the indebtedness dealt with in subsection (c) of this section.

(b) The deferment until December 1, 1943, of the collection of $61,983.16 expended in drainage operations on said project; and

(c) The requirement for contracts with landowners covering $19,230.72 accrued operation and maintenance assessments, such contracts to provide for the payment of these assessments over a period of years.

**SEC. 2.**

The Secretary of the Interior is hereby authorized to transfer water rights, with the consent of the interested parties, to other lands under said project and to make necessary contracts to effectuate such transfers.

**SEC. 3.**

The Secretary of the Interior is hereby authorized to make contracts transferring the operation and maintenance of any canal system or systems under the said project to an irrigation district, or districts, formed pursuant to State law.

**SEC. 4.**

There is hereby authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, the sum of $5,682.59 for the following purposes:

(a) To pay, for a period of not to exceed five years following the passage of this Act (not to exceed $1,000 in any one year), 34 per centum of the regular annual operation and maintenance assessments for class 4 lands in non-Indian ownership under the Redcap, Leland,

Page 113

and Henry Jim Canals, and 90 per centum of such charges for class 5 lands in non-Indian ownership under said canals, $5,000: *Provided,* That no part of any money appropriated pursuant to this authorization shall be expended unless and until the owners of such lands shall have paid in full their respective shares of such assessments and shall have entered into an agreement with the Secretary of the Interior for the execution of soil rehabilitation programs on such lands; and

(b) To reimburse certain individuals, or their heirs, for payments made covering lands erroneously assessed for irrigation purposes, $682.59, which amount shall be payable from collections made from water users on this project and covered into the Treasury pursuant to section 4 of the Permanent Appropriation Repeal Act of 1934.

**SEC. 5.**

In order to prevent the accumulation of delinquent project assessments or other charges against the non-Indian owned lands of the Uintah Indian irrigation project, the Secretary of the Interior is hereby authorized and directed to cause liquidation of all delinquent assessments or charges by taking such action as may be necessary, including the foreclosure of the Government's lien covering any such delinquent charges or by initiating such other procedure as may be legally available, which action may be taken by him at any time when in his judgment the best interests of the project would be served.

Approved, May 28, 1941.

**Search | OSU Library Electronic Publishing Center**

Produced by the Oklahoma State University Library
URL: http://digital.library.okstate.edu/kappler/

Comments to: lib-dig@okstate.edu