# THE UNITED STATES DISTRICT COURT

# DISTRICT OF UTAH

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION, a federally recognized Indian tribe, <br><br>     Plaintiff, <br><br> v. <br><br> GREGORY D. MCKEE; T & L LIVESTOCK, INC.; MCKEE FARMS, INC.; and G M FERTILIZER, INC., <br><br>     Defendants. | **REPORT AND RECOMMENDATION** <br><br><br>   **Case No. 2:23-cv-00257-HCN-JCB** <br><br> **District Judge Howard C. Nielson, Jr.** <br><br> **Magistrate Judge Jared C. Bennett** |

District Judge Howard C. Nielson, Jr. referred this case to Magistrate Judge Jared C. Bennett under 28 U.S.C. § 636(b)(1)(B).[1] The Ute Indian Tribe of the Uintah and Ouray Reservation ("the Tribe") moved for summary judgment on all three causes of action in its operative complaint[2] against individual defendant Gregory D. McKee ("Mr. McKee") and corporate defendants T&L Livestock, Inc.; McKee Farms, Inc.; and GM Fertilizer, Inc. (these three entities are collectively "Corporate Defendants" while all Defendants collectively will be referred to as "Defendants").[3] Defendants did not oppose the Tribe's Motion for Summary Judgment. Although the court accepts all appropriately supported facts in the Tribe's motion as

---

[1] ECF No. 38.

[2] ECF No. 25.

[3] ECF No. 32.

established and undisputed under Fed. R. Civ. P. 56(e)(2), the court must independently assess whether the Tribe is entitled to judgment as a matter of law on its three causes of action for which it seeks summary judgment.[4] Following the statement of undisputed facts, the court recommends that the Tribe's Motion for Summary Judgment be granted in part and denied in part. First, the Tribe is entitled to a declaratory judgment and a permanent injunction precluding Defendants' use of water from Lateral 9 of the Deep Creek Canal to irrigate Tracts 1 and 2 of their land, but the Tribe is not entitled to relief regarding use of Lateral 9 on Tract 3 because the United States is an indispensable party that cannot be joined in this litigation. Second, the Tribe cannot obtain damages for lost alfalfa production in its *parens patriae* capacity because such claims belong to individual allottees. Finally, the Tribe's nuisance claim fails as a matter of law.

### UNDISPUTED FACTS AND PROCEDURAL BACKGROUND

The Tribe is federally recognized with its home on the Uintah and Ouray Indian Reservation in northeastern Utah.[5] Under the Ute Treaties of 1849, 1863, and 1868, the Ute Indians reserved the surface and ground waters appurtenant to their Reservation.[6]

In 1923, the United States District Court for the District of Utah entered decrees in *United States and Secretary of the Interior as Trustee of the Indians v. Cedarview Irrigation Co.*, which: (i) adjudicated the Tribe's Indian reserved water rights in the tributary streams and rivers,

---

[4] Fed. R. Civ. P. 56(e)(3).

[5] ECF No. 32-4 at 20, ¶ 1.

[6] *Id.* at 23, ¶ 14.

and (ii) permanently enjoined the Tribe's non-Indian neighbors from interfering[7] with the Tribe's decreed water rights.[8]

The United States established the Uintah Indian Irrigation Project ("UIIP") to provide irrigation water to Ute Tribal lands.[9] Deep Creek Canal is a conveyance channel for the UIIP, and the waters conveyed through the Deep Creek Canal were adjudicated to the Tribe under the 1923 Cedarview Decree.[10] Of particular interest to this litigation is Lateral 9 in the UIIP system. Lateral 9 delivers water from the Deep Creek Canal and traverses the property where Defendants reside.[11]

For the past 32 years, T&L Livestock, Inc. has been a registered Utah corporation, and Mr. McKee is its sole or majority owner and Registered Agent.[12] Similarly, both McKee Farms, Inc. and GM Fertilizer, Inc. have been registered as Utah Corporations for the past 23 years, and Mr. McKee is both entities' sole or majority owner and Registered Agent.[13] Mr. McKee is the decision-maker who operates all Corporate Defendants.[14]

---

[7] Although Utah courts have not been consistent in their use of the terms "interference" and "impairment" regarding water rights, the Utah Supreme Court has clarified that "the term 'impairment' . . . refer[s] to statutory claims brought during the change application process and the term 'interference' . . . refer[s] to common-law claims brought after the change application process." *Rocky Ford Irrigation Co. v. Kents Lake Reservoir Co.*, 469 P.3d 1003, 1014 (Utah 2020).

[8] ECF No. 32-4 at 25, ¶ 19. A copy of the *Cedarview* Decree is at ECF No. 32-4 at 77-88.

[9] *Id.* at 27, ¶ 29.

[10] *Id.*

[11] ECF No. 32-1 at 86.

[12] *Id.* at 7, 14 (Request for Admission ("RFA") No. 1), 65 (RFA No. 24).

[13] *Id.* at 33 (RFA No. 21), 37, 44 (RFA No. 1), 65 (RFA No. 24).

[14] *Id.* at 14 (RFA No. 2), 34 (RFA No. 22), 44 (RFA No. 2), 65 (RFA No. 25).

Defendants reside on a tract of fee patent land described as 121.14 acres, consisting of Lot Two, SW/4 NE/4, and NW/4 SE/4 of Section Two in Township 1 South, Range 1 East Uinta Special Meridian (USM), Utah ("McKee Property").[15] The McKee Property is neither an allotment owned by the Tribe nor held in trust for the Tribe by the United States.[16]

For purposes of resolving the Tribe's Motion for Summary Judgment, the McKee Property can be divided into three tracts as shown on the following map.[17]



---

[15] ECF No. 32-4 at 26, ¶ 23; ECF No. 32-1 at 51-53.

[16] ECF No. 32-2 at 19:20-20:2; ECF No. 32-3 at 231-232.

[17] ECF No. 32-1 at 85.

Tract 1 includes approximately 41 acres of irrigated pasture in the W½ of the NE¼ of Section 2.[18] Mr. McKee irrigates this area using water from Deep Creek Canal through two ditches that branch off from Lateral 9.[19] Tract 2 includes approximately 42 acres and encompasses the feedlot in SW¼ NE¼ and NW¼ SE¼ of Section 2 and the residence in the SE corner of NW¼ NE¼ of Section 2.[20] Although the Tribe's expert concluded that water for Tract 2 is supplied to both the residence and feedlot from the Tridell-Lapoint regional culinary water system,[21] an unanswered Request for Admission—which is, therefore, deemed admitted—provides that Mr. McKee diverted water from Lateral 9 for Tract 2.[22]

None of the Defendants has either a water right for Deep Creek's Lateral 9 or a carriage agreement with the Tribe allowing Mr. McKee to convey his water from some other water right through Lateral 9 for Tracts 1 and 2.[23] Instead, Mr. McKee possesses a water right in the nearby Goodrich Gulch, but the point of diversion is neither the Deep Creek Canal nor Lateral 9. The point of diversion that the Utah State Engineer has approved for the Goodrich Gulch water right is supposed to be from a wooden flume that passes *across* the Deep Creek Canal.[24]

---

[18] ECF No. 32-1 at 84.

[19] *Id.*

[20] *Id.*

[21] ECF No. 32-1 at 84.

[22] *Id.* at 31 (RFA No. 11). Although the expert and the deemed-admitted Request for Admission appear to contradict one another as to Tract 2, that apparent contradiction is not material to summary judgment because, as explained below, neither Mr. McKee nor the Corporate Defendants have any right to divert water from Lateral 9 to irrigate Tract 2.

[23] ECF No. 32-1 at 60 (RFA No. 1), 69-71; ECF No. 32-3 at 129:19-25. *See also* 32-1 at 60 (RFA No. 2); *Id.* at 46 (RFA No. 9).

[24] ECF No. 32-1 at 31 (RFA Nos. 8, 9), 46 (RFA Nos. 10, 11), 60-61 (RFA No. 3), 61 (RFA No. 4), 73-78.

Nevertheless, Mr. McKee is using Lateral 9 to irrigate Tracts 1 and 2 even though he is aware that he lacks a water right to do so.[25] Prior to this litigation, Mr. McKee attempted to sell the feedlot, but when the buyer notified Mr. McKee that he lacked any valid water rights on Tracts 1 and 2, Mr. McKee responded that he "do[es]n't care."[26]

Tract 3, depicted on the above-referenced map, includes approximately 38 acres of irrigated pasture to the south and east of the cattle feedlot that Defendants operate on the McKee Property. Similar to the first two Tracts, Tract 3 also receives water from Deep Creek Canal through Lateral 9.[27] However, unlike Tracts 1 and 2, Mr. McKee relies on two agreements with the United States to use UIIP water from Lateral 9 to irrigate Tract 3.[28] To address whether the United States recognized these agreements and whether it was an indispensable party to this litigation, the court requested briefing from the United States.[29] The United States of America, in an amicus capacity, informed the court that it recognizes these agreements with Mr. McKee's predecessor-in-interest to use water from the UIIP.[30] The Tribe has twice sued the United States to invalidate these and similar agreements to use UIIP water on non-tribal land, but has thus far

---

[25] ECF No. 32-1 at 31 (RFA No. 11).

[26] ECF No. 32-2 at 70:10-78:7.

[27] ECF No. 32-1 at 84.

[28] *Id.* at 31-32 (RFA No. 12), 63 (RFA No. 13); ECF No. 32-4 at 167-174.

[29] ECF No. 41.

[30] ECF No. 46.

been unsuccessful in obtaining relief canceling those agreements including those on which Mr. McKee relies.[31] Mr. McKee has paid and still pays a monthly fee to use UIIP water for Tract 3.[32]

Because the McKee Property sits at the upper reaches of the system of laterals feeding off the Deep Creek Canal,[33] if water is misappropriated at the top of the canal, it affects water users down the system.[34] Thus, if Mr. McKee uses water to which he has no right—especially in a

---

[31] *Id.* at 13-16 (referencing *Ute Tribe v. United States*, No. 1:18-cv-00547-CJN (D.D.C.) *dismissed and part then transferred in part* to D. Utah as No. 2:21-cv-00573-JNP-DAO; and *Ute Tribe v. United States*, No. 18-359L (Fed. Ct. Cl.)). The Tribe makes a hearsay objection to the Declaration of Superintendent Antonio Pingree ("Superintendent Pingree") in Support of *Amicus* Brief of the United States, ECF No. 46-1, regarding Superintendent Pingree's representation that there are "approximately 252 agreements" similar to that with Mr. McKee in which 238 of those supply UIIP water to non-tribal lands. ECF No. 50 at 19 (objecting to ECF No. 46-1 at 3). "Hearsay" is an out-of-court *statement* that "a party offers in evidence to prove the truth of the matter asserted in the statement," Fed. R. Evid. 801(c)(2) (emphasis added), and "cannot be considered on a motion for summary judgment" unless an exception applies. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994). First, the Tribe fails to identify on which "statement" Superintendent Pingree is relying to make his declaration. "A writing or spoken utterance cannot be a 'statement' under the hearsay rule unless it is made by a 'declarant,' as required by Fed. R. Evid. 801(b), which provides '[a] "declarant" is a person who makes a statement.'" *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 564 (D. Md. 2007). The number of agreements in agency files is hardly an assertion made by a "declarant." The mere existence of an agreement or many agreements cannot plausibly be a "declarant" and, therefore, does not constitute a "statement" or "hearsay" under Rule 801. Second, the court receives the Superintendent's statement not for its literal truth. Whether the number of agreements like Mr. McKee's is actually greater or fewer than the numbers reported in Superintendent Pingree's declaration is of no moment to any issue in this action. The Superintendent's statement—along with the Tribe's two lawsuits about those agreements—merely alerts the court that other agreements like Mr. McKee's exist between the UIIP and water users of non-Tribal lands. *Id.* at 565 ("Thus, even if the evidence is an assertion, made by a declarant, it still is not hearsay unless offered to prove the truth of what is asserted."). Therefore, even if the court considers the existence of these additional agreements as "statements" for Rule 801 purposes, Superintendent Pingree's declaration revealing the number of such agreements is not submitted to prove the "truth of the matter asserted." Accordingly, there is no hearsay problem here, and the Tribe's evidentiary objection is overruled.

[32] ECF No. 32-1 at 96, 98.

[33] ECF No. 32-2 at 79:13-15.

[34] *Id.* at 79:16-19.

drought year—Tribal members further down the system do not get the water they need.[35] As of 2014, the Tribal members were damaged in the amount of $136,218.00 in lost productivity resulting from Mr. McKee's misappropriation of waters.[36] No evidence in the record suggests that the Tribe itself grows alfalfa for sale or that the Tribal members on Tribal land grow alfalfa for the Tribe to sell. The record appears to show that a lack of water from Lateral 9 affects the agricultural operations of individual Tribal members on Tribal allotments.[37] Although the Tribe may charge an allottee reasonable administrative fees, Tribal allotments are provided to individual Tribal members for their personal use and profit.[38]

The feedlot located on the McKee Property has the capacity to hold 4,000 animals per year, and 900 head of cattle, or more, are kept annually at the feedlot.[39] During a portion of the time from February 3, 1993 to present, the feedlot located on the McKee Property held a total of 10,000 or more head of cattle.[40] McKee has neither applied for nor received a Utah Pollutant Discharge Elimination System ("UPDES") General Permit for a Concentrated Animal Feeding Operation for the feedlot that is operated on the McKee Property.[41] Additionally, T & L Livestock, Inc. has neither applied for nor received a UPDES General Permit; a comprehensive nutrient management plan; or any type of permit, variance, or permission from the Tribe to allow

---

[35] *Id.* at 188:8-12.

[36] ECF No. 32-1 at 139 (Table 4).

[37] ECF No. 32-2 at 109-11, 188:8-12.

[38] 25 U.S.C. § 348.

[39] ECF No. 32-1 at 63 (RFA No. 16). *See also id.* at 15 (RFA No. 5).

[40] *Id.* at 64 (RFA No. 18). *See also id.* at 15 (RFA No. 7).

[41] *Id.* at 64 (RFA No. 19). *See also id.* at 151; ECF No. 32-2 at 135:14-24.

or excuse any form of pollution, contamination, or encroachment from the McKee Property through or onto the Tribe's property.[42]

From its inception to present, G.M. Fertilizer, Inc. never obtained any government-issued environmental permit for the operation of G.M. Fertilizer, Inc.[43] G.M Fertilizer, Inc. lacks any government-issued discharge permits to allow the discharge of chemicals and other pollutants on the McKee Property.[44]

Pollution contamination, runoff, hazardous material, disease, or other encroachment originating from the McKee Property flows through or onto adjacent Ute Indian trust lands.[45] Defendants have not taken measures to contain pollution, contamination, or encroachment from the McKee Property through or onto Ute Indian trust lands.[46]

Carcasses of the diseased animals that died at the feedlot located on the McKee Property are buried on the McKee Property.[47] Some animals that died at the feedlot located on the McKee Property died of disease.[48] Diseases in the cattle spread through their excrement, which excrement gets washed into the Tribe's irrigation ditches and which McKee spreads on the

---

[42] ECF No. 32-1 at 64 (RFA No. 21). *See also id.* at 16 (RFA No. 12), 45 (RFA No. 7).

[43] *Id.* at 45 (RFA No. 4).

[44] *Id.* (RFA No. 5).

[45] *Id.* (RFA No. 6). *See also id.* at 16 (RFA No. 11).

[46] *Id.* at 45 (RFA No. 8). *See also id.* at 16 (RFA No. 13).

[47] *Id.* at 15 (RFA No. 8). *See also* ECF No. 32-2 at 142:15-143:18.

[48] ECF No. 32-1 at 15 (RFA No. 9).

Tribe's land he leases from BIA.[49] A rough estimate indicates that over 1,200 head of cattle have died and been buried at the feedlot.[50]

Given the foregoing issues with Defendants, the Tribe filed a lawsuit in Tribal Court in 2012.[51] Mr. McKee moved to dismiss that lawsuit, but then refused to participate in that action after the Tribal Court denied Mr. McKee's motion.[52] After the Tribe's successful litigation effort in Tribal Court, the Tribe sought to enforce its judgment against Mr. McKee in this court, which denied relief given the Tribal Court's lack of jurisdiction over Mr. McKee.[53]

Shortly thereafter, the Tribe filed this action.[54] In its operative complaint, the Tribe brings three causes of action representing its own proprietary and *parens patriae* interests of its members.[55] First, the Tribe seeks declaratory and injunctive relief for Mr. McKee's appropriation of water from Deep Creek to his lands.[56] Second, the Tribe seeks damages on its behalf and on behalf of its members for McKee's misappropriation of water from Deep Creek.[57] Finally, the Tribe seeks damages and injunctive relief under a private nuisance theory against Defendants' operations on the McKee Property.[58]

---

[49] ECF No. 32-2 at 143:19-144:18.

[50] *Id.* at 140:8-15. *See also id.* at 143:3-7.

[51] *Ute Indian Tribe of Uintah and Ouray Rsrv. v. McKee*, 32 F.4th 1003, 1005 (10th Cir. 2022).

[52] *Id.* at 1006.

[53] *Id.*

[54] ECF No. 1.

[55] ECF No. 25.

[56] *Id.* at 14-15.

[57] *Id.* at 15.

[58] *Id.* at 16-17.

In this litigation, Defendants have failed to respond to the Tribe's requests for document production, interrogatories, requests for admission, requests to inspect land, deposition notices, and the Tribe's Motion for Summary Judgment. Although under Fed. R. Civ. P. 56(e)(2), the court accepts as undisputed the uncontested material facts that have adequate record support, the court cannot grant summary judgment to the Tribe unless the Tribe is "entitled to it" as a matter of law.[59] Therefore, the court must review whether the Tribe's claim can succeed as a matter of law. After setting forth the relevant standard of review, the court determines that the Tribe: (I) is entitled to partial declaratory relief and an injunction as to its water rights, (II) cannot obtain damages from lost alfalfa from Mr. McKee's misappropriation of water, and (III) cannot establish its nuisance claim as a matter of law.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "A genuine issue of fact exists only where 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[60] "Thus, the relevant inquiry is 'whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"[61]

In evaluating a motion for summary judgment, the court "view[s] the facts in the light most favorable to the nonmovant and draw[s] all reasonable inferences in the nonmovant's

---

[59] Fed. R. Civ. P. 56(e)(3).

[60] *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[61] *Id.* (quoting *Anderson*, 477 U.S. at 251-52).

11

favor."[62] "'The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.'"[63] If the movant does not bear the burden of proof at trial as to the claims for which it seeks summary judgment, then the movant "may make its prima facie demonstration by pointing out to the court a lack of evidence on an essential element of the nonmovant's claim."[64]

"If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant."[65] To satisfy his burden, "the nonmovant must identify facts 'by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein.'"[66] "These facts must establish, at a minimum, an inference of the presence of each element essential to the case."[67] If a party fails to properly address another party's assertion of fact, the court may consider the fact undisputed for purposes of the motion.[68]

---

[62] *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015).

[63] *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (quoting *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007)).

[64] *Libertarian Party of N.M.*, 506 F.3d at 1309 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)); *see also Savant Homes, Inc.*, 809 F.3d at 1137.

[65] *Libertarian Party of N.M.*, 506 F.3d at 1309.

[66] *Savant Homes, Inc.*, 809 F.3d at 1137 (quoting *Libertarian Party of N.M.*, 506 F.3d at 1309).

[67] *Id.* at 1137-38 (quotations and citations omitted).

[68] Fed. R. Civ. P. 56(e)(3).

**ANALYSIS**

I.   **The Tribe is Entitled to Summary Judgment as to Defendants' Use of Water from Lateral 9 to Irrigate Tracts 1 and 2 but is Not Entitled to Summary Judgment Precluding Use of Water From Lateral 9 to Irrigate Tract 3 on the McKee Property.**

This court should partially grant the Tribe's Motion for Summary Judgment as to its first cause of action because Defendants lack any legal right to use water from Lateral 9 to irrigate Tracts 1 and 2. However, the court should deny the Tribe's Motion for Summary Judgment and dismiss its claims as to the use of water from Lateral 9 to irrigate Tract 3 because the United States is an indispensable party. Each issue is discussed in order below.

A.   Defendants Have No Right to Use Water from Lateral 9 to Irrigate Tracts 1 and 2, Which Entitles the Tribe to Summary Judgment, Declaratory Relief, and a Permanent Injunction Precluding Such Use.

Defendants are stealing water from Lateral 9 of Deep Creek to irrigate Tracts 1 and 2, which entitles the Tribe to summary judgment, declaratory relief, and a permanent injunction. In the analysis below, the court first discusses why summary judgment is appropriate, followed by a discussion of why declaratory relief and a permanent injunction are the appropriate remedies.

1.   The Tribe is Entitled to Summary Judgment for Its Theft of Water Claims Against Defendants' Use of Water from Lateral 9 to Irrigate Tracts 1 and 2.

The Tribe has clearly established that Defendants are stealing water from Lateral 9 to irrigate Tracts 1 and 2 on the McKee Property. Conversion of water occurs when the defendant "intentionally, willfully or otherwise unlawfully hypothecate[s] plaintiffs' water."[69] There is no dispute or doubt that the water that flows through Deep Creek and Lateral 9 belongs to the United States and is held in trust for the Tribe. The Tribe has a reserved water right under the

---

[69] *Jennings v. Graham*, 390 P.2d 123, 125 (Utah 1964).

13

*Winters* doctrine along with water rights long recognized by the State of Utah. To use those water rights, the United States created the UIIP for the irrigation of chiefly Tribal lands. The water in Deep Creek and Lateral 9 is part of the UIIP water distribution system. The water from the UIIP system is tied to use on specific areas of land.[70] Defendants do not have permission from either the United States or the UIIP to use water from Deep Creek on Tracts 1 and 2. Moreover, neither Mr. McKee nor the Corporate Defendants has a carriage agreement with UIIP that would allow them to use Lateral 9 to transport their water from the Goodrich Gulch, which is the only water right that Mr. McKee has available to him. Mr. McKee also has never sought a change application with the Utah State Engineer to change the point of diversion for his water right in the Goodrich Gulch to Lateral 9. This omission is significant because water rights can only be diverted from the point of diversion that the Utah State Engineer has approved.[71]

Instead of taking any action to legally use water from Lateral 9 to irrigate Tracts 1 and 2, Mr. McKee is simply using water to which he has no rights. This is no accident or innocent mistake. Mr. McKee was put on notice that the water he was using to irrigate Tracts 1 and 2 was not lawfully permitted, but Mr. McKee said that he did not care. Thus, by using water from Lateral 9 to irrigate Tracts 1 and 2, Defendants are stealing water that belongs to the United States and held in trust for the Tribe.

---

[70] ECF No. 32-4 at 166-174.

[71] *East Bench Irr. Co. v. Utah,* 300 P.2d 603, 605-06 (Utah 1956) ("The statutes require [State Engineer] approval of such an application before any right to make such an appropriation or such change can be acquired.").

2. <u>The Tribe is Entitled to Declaratory and Permanent Injunctive Relief.</u>

Because Defendants are stealing the Tribe's water to irrigate Tracts 1 and 2, the Tribe is entitled to both declaratory and permanent injunctive relief. Below, the court first analyzes relief under the Declaratory Judgment Act ("DJA"),[72] and then discusses the reasons for permanently enjoining Defendants' continued use of water from Lateral 9 to irrigate Tracts 1 and 2.

### a. *The Tribe is Entitled to Declaratory Relief Under the Factors of the DJA.*

The Tribe is entitled to a declaration that Defendants are stealing the Tribe's water from Deep Creek and Lateral 9 to irrigate Tracts 1 and 2. The DJA provides in relevant part:

> In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.[73]

To determine whether an actual controversy exists, the United States Supreme Court said, "Basically, the question in each case is whether . . . there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."[74]

---

[72] 28 U.S.C. § 2201.

[73] 28 U.S.C. § 2201(a).

[74] *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

15

The remedy of a declaratory judgment is supposed to "define the legal rights and obligations of the parties in anticipation of some future conduct, not simply to proclaim liability from a past act."[75] The Tenth Circuit has counseled that a district court should consider the following five factors when deciding whether to provide a remedy under the DJA:

> [1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race to res judicata; [4] whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective.[76]

These factors are addressed summarily below.

The controversy between the Tribe and Defendants includes whether Defendants are taking a valuable, finite resource that does not belong to them to the detriment of the Tribe's proprietary and sovereign interests. Settling this controversy with a declaratory judgment will put Defendants on notice from a court with proper jurisdiction over Defendants that their use of water on Tracts 1 and 2 from Deep Creek and Lateral 9 is thievery of the Tribe's water resources and needs to stop. Issuing this declaration is not mere procedural fencing but a necessary judicial pronouncement to define the parties' respective rights going forward. This declaratory judgment will not interfere with state courts because tribal interests are uniquely federal.[77] Although the

---

[75] *Anderson Living Tr. v. ConocoPhillips Co., L.L.C.*, 952 F. Supp. 2d 979, 1034 (D.N.M. 2013) (citations and quotations omitted).

[76] *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994).

[77] U.S. CONST. art. I § 8, cl. 3; *Ute Indian Tribe v. Utah*, 521 F. Supp. 1072, 1085 (D. Utah 1981), *aff'd in part, rev'd in part on other grounds*, 716 F.2d 1298 (10th Cir. 1983), *on rehg*, 773 F.2d 1087 (10th Cir. 1985) ("It is recognized as fundamental that Congress has primary authority over and bears overall responsibility for Indian affairs.").

court will impose injunctive and declaratory relief, declaratory relief can be "cumulative and not exclusive or extraordinary."[78] Considering the requisite DJA factors, the court should declare that Defendants' use of water from Deep Creek and Lateral 9 to irrigate Tracts 1 and 2 is unauthorized and, therefore, constitutes theft of the Tribe's water resources.

### b. The Tribe is Entitled to Permanent Injunctive Relief.

In addition to a declaratory judgment, the Tribe is entitled to permanent injunctive relief that should preclude Defendants from diverting water from Lateral 9 or Deep Creek for use on Tracts 1 and 2.

> For a party to obtain a permanent injunction, it must prove: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest.[79]

The discussion above demonstrates that the Tribe has obtained actual success on the merits of its conversion claim regarding Defendants' unlawful use of water from Lateral 9 and Deep Creek to irrigate Tracts 1 and 2. Therefore, only elements 2-4 are addressed in order below.

Not enjoining Defendants' theft of the Tribe's water resources will cause irreparable harm. To establish irreparable harm, the Tribe must show that "a significant risk of harm" exists that cannot be remedied through monetary damages.[80] Irreparable harm occurs when a defendant's actions prevents a property owner from being able to "participate in the everyday

---

[78] Fed. R. Civ. P. 57 advisory committee's note to 1937 amendment.

[79] *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007) (quotations and citation omitted).

[80] *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003).

operations" of its own property.[81] Indeed, "monetary relief fails to provide adequate compensation for an interest in real property, which by its very nature is considered unique."[82] Because of the unique nature of property, "[t]he deprivation of an interest in real property constitutes irreparable harm."[83] Also, "[t]he Tenth Circuit has 'repeatedly stated that . . . an invasion of tribal sovereignty can constitute irreparable injury.'"[84]

In the arid West generally—and in the very arid climate of the Uintah Basin in which the Tribe's Reservation is found—water is an extremely valuable real property right, the deprivation of which creates harms beyond what monetary damages can provide.[85] This is especially true where, as here, the UIIP irrigation system was provided by the United States to the Tribe to primarily benefit Tribal lands and Tribal sovereignty. Defendants' theft of the Tribe's water is irreparable both as a real property right and because of the affront it poses to Tribal sovereignty.

Next, the injury to the Tribe far outweighs the self-inflicted injury to Defendants. Self-inflicted harm that occurs once the benefit from a defendant's wrongdoing ends does not count in

---

[81] *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210-11 (10th Cir. 2009) (finding irreparable harm where plaintiff deprived of use of real property).

[82] *O'Hagan v. United States*, 86 F.3d 776, 783 (8th Cir. 1996).

[83] *Opulent Life Church v. City of Holy Springs, Miss.*, 697 F.3d 279, 297 (5th Cir. 2012); *see also Bennet v. Dunn*, 504 F. Supp. 981, 986 (D. Nev. 1980) ("Property is always unique under general principles of the law of equity and its possible loss or destruction usually constitutes irreparable harm.").

[84] *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1005 (10th Cir. 2015).

[85] *Salt Lake City Corp. v. Cahoon & Maxfield Irrigation Co.*, 879 P.2d 248, 252 n.8 (Utah 1994) ("As a matter of clarification, we fully appreciate the real property nature of water rights . . . .").

the court's balancing calculus.[86] Defendants' theft of the Tribe's water injures other users of UIIP waters by limiting the amount of water available to them, to say nothing of interfering with the Tribe's sovereign authority to distribute water. Although true that Defendants will suffer harm from no longer being able to freely take UIIP water to irrigate Tracts 1 and 2, that harm is self-inflicted because they never should have been able to receive the benefits of irrigating those tracts from Lateral 9 in the first place. Thus, the balance of the harms favors a permanent injunction in favor of the Tribe that would preclude Defendants from using UIIP water in Deep Creek and Lateral 9 from irrigating Tracts 1 and 2.

Finally, the public interest favors a permanent injunction in favor of the Tribe. Theft of water allows for the imposition of both civil and criminal liability.[87] Additionally, Congress intended that the Tribal allottees and assignees who use UIIP water to profit from their labors,[88] and they cannot do so without water. The public interest does not favor theft of another's property or the deprivation of their honest labor. Therefore, the court should permanently enjoin Defendants from using Deep Creek or Lateral 9 to irrigate Tracts 1 and 2 on the McKee Property and should retain authority to enforce this injunction if Defendants fail to comply.

---

[86] *See, e.g.*, *Novus Franchising, Inc. v. AZ Glassworks, LLC*, No. 12-1771 (MJD/TNL), 2013 WL 1110838, *7 (D. Minn. March 18, 2013) (finding that balance of harms favored injunction because harm to defendant was "self-inflicted").

[87] Utah Code Ann. § 73-1-15(3) provides that if the act is a crime under the laws governing water, it is also a civil action. Utah Code Ann. § 76-10-202 makes it a crime to knowingly or intentionally, in violation of the right of another, to "turn or use the water, or any part thereof, of any canal, ditch, pipeline, or reservoir, except at a time when the use of the water has been duly distributed to the person . . . ." *See also Jennings v. Graham*, 390 P.2d 123, 125 (Utah 1964) (stating elements for civil cause of action for theft of water).

[88] 25 U.S.C. § 348.

B.  The Tribe's Claims as to Conversion of Water for Tract 3 Should Be Dismissed Because the United States is an Indispensable Party That Cannot Be Joined.

The court should deny summary judgment for the Tribe's water conversion claims against Defendants as to Tract 3 and should dismiss them because the United States is an indispensable party to this litigation and cannot be joined. Under Fed. R. Civ. 19(b), the court can consider *sua sponte* whether a party is indispensable.[89] Determining whether a party is indispensable requires the court to consider two parts of Fed. R. Civ. P. 19: (1) whether the party is required under Rule 19(a); and, if so, (2) whether joinder is not feasible under Rule 19(b).[90] Both issues are discussed below and clearly demonstrate that the United States is a required party for which joinder is not feasible, which requires the court to dismiss the Tribe's water conversion claims as to Tract 3.

1.  The United States Is a Required Party to the Tribe's Claims Regarding the Irrigation of Tract 3 Using UIIP Water.

Under Fed. R. Civ. P. 19(a) the United States is a required party. Rule 19(a) provides in relevant part:

> A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.[91]

---

[89] *State Farm Mut. Auto Ins. Co. v. Mid-Continent Cas. Co.*, 518 F.2d 292, 294 (10th Cir. 1975) (stating that court can raise issue about indispensable party under Rule 19(b) *sua sponte*).

[90] *Id.*

[91] Fed. R. Civ. P. 19(a).

The United States is required to be joined under both Rule 19(a)(1)(A) and (B).[92]

First, if the United States is absent, this court cannot accord complete relief between the Tribe and Defendants. "It is a fundamental principle of the law that an instrument may not be cancelled by a [c]ourt unless the parties to the instrument are before the [c]ourt."[93] The Tribe asks this court to cancel the two agreements that Mr. McKee has with the United States to use UIIP water on Tract 3 because the Tribe did not consent to the agreement purportedly in violation of law, and the McKee Property is not within the lands to be irrigated under the UIIP.[94] These

---

[92] The United States is subject to service. Fed. R. Civ. P. 4(i).

[93] *Navajo Tribe of Indians v. New Mexico*, 809 F.2d 1455, 1471 (10th Cir. 1987) (citations and quotations omitted).

[94] ECF No. 32 at 26. Additionally, the Tribe argues that because the deeds on which Mr. McKee relies for title to the McKee Property does not mention the water rights for Tract 3, Mr. McKee does not have any. *Id.* That is simply incorrect. The agreements that the Tribe seeks to invalidate specifically transfer "a water right" as opposed to stock in an irrigation company to Mr. McKee's predecessors in interest. ECF No. 32-4 at 167, 172. In fact, the agreements recognize the water right of Mr. McKee's predecessors in interest as "appurtenant to the land." ECF No. 32-4 at 167. Under Utah law, an appurtenant water right passes automatically, without specific reference in the conveyance, unless the grantor takes one of three actions:

> A water right appurtenant to land shall pass to the grantee of the land unless the grantor:
>
> (i) specifically reserves the water right or any part of the water right in the land conveyance document;
>
> (ii) conveys a part of the water right in the land conveyance document; or
>
> (iii) conveys the water right in a separate conveyance document prior to or contemporaneously with the execution of the land conveyance document.

Utah Code Ann. § 73–1–11(1). "Therefore, if a grantor takes none of the specified actions, 'a perfected water right will pass as an appurtenance without specifically mentioning the vested water right' in the conveyance document." *Ruth B. Hardy Revocable Tr. v. Eagle Mountain City*, 295 P.3d 188, 190 (Utah Ct. App. 2012) (quoting *Loosle v. First Fed. Sav. & Loan Ass'n of Logan*, 858 P.2d 999, 1003 (Utah 1993)). Because the agreements on which Mr. McKee relies for

21

agreements between the United States and Mr. McKee cannot be invalidated without the United States participating in the litigation.[95]

Second, although no more is needed to establish that the United States is required to be joined, failing to join the United States in this litigation would also prevent it from protecting its sovereign interests in its agreements and leave Mr. McKee with potentially inconsistent obligations. If this court were to invalidate an agreement that the United States used its sovereign authority over the Tribe to enter into with Mr. McKee's predecessors in interest, the United States would be deprived of exercising its sovereign authority without an opportunity to defend it. This would also create inconsistent obligations for Mr. McKee and others. As to Mr. McKee, the UIIP has billed him for years for the water he uses on Tract 3. If, as the Tribe argues, the agreements Mr. McKee has are invalid as to him but not as to the United States, then Mr. McKee could continue to be billed for water he cannot use. That is nonsensical. Additionally, the agreements similar to Mr. McKee's that the United States has with others would be thrown into uncertainty, creating additional sovereignty issues against the United States and the property

---

title convey a water right, which has undisputedly been applied to the land, it is appurtenant and, therefore, need not be mentioned in deeds to pass title. *Cortella v. Salt Lake City*, 72 P.2d 630, 635 (Utah 1937) ("[W]here a water right has been used to irrigate a certain tract for several years and such water is necessary to the beneficial enjoyment of such land and is not represented by stock in any corporation, such water right becomes an appurtenance to said land and is a part of the real estate and passes therewith."). Therefore, the only way to stop Mr. McKee's use of UIIP water for Tract 3 is to cancel the agreements he has with the United States. And, to do that, the United States must be a party.

[95] The Tribe certainly recognizes the need for the United States' participation in litigation that seeks to invalidate these agreements because the Tribe has previously sued the United States on this very issue. *Ute Tribe v. United States*, No. 1:18-cv-00547-CJN (D.D.C.), *dismissed and part then transferred in part* to No. 2:21-cv-00573-JNP-DAO (D. Utah); *Ute Tribe v. United States*, No. 18-359L (Fed. Cl.).

interest problems for the other permittees to the UIIP system that are similar to Mr. McKee.

Thus, under either prong of Rule 19(a)(1), the United States is required to be joined.

> ### 2. The United States Cannot Be Joined, and Dismissal Should Occur in Equity and Good Conscience.

Because the United States is required to be joined but cannot be, the considerations under

Fed. R. Civ. P. 19(b) favor dismissal of the Tribe's water conversion claims as to Tract 3. Fed. R.

Civ. P. 19(b) provides:

> If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include: (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

The United States cannot be joined to this action because there is no waiver of sovereign

immunity, which means that this court would lack subject matter jurisdiction over these claims in

which the United States would be a party defendant.[96] Therefore, the court must determine

whether, "in equity and good conscience," it could proceed with the water conversion claims

against Defendants as to Tract 3 without the United States based on the enumerated factors in

Rule 19(b). The court discusses each factor below.

---

[96] *Iowa Tribe of Kan. & Neb. v. Salazar*, 607 F.3d 1225, 1232 (10th Cir. 2010) ("Courts lack subject matter jurisdiction over a claim against the United States for which sovereign immunity has not been waived.").

First, as the Tribe's argument recognizes, holding that Defendants are unlawfully converting the Tribe's water rights requires invalidating the agreements between Mr. McKee and the United States. Not having the United States present to defend its sovereign power to enter into the agreements is clearly prejudicial to the United States because "an instrument may not be cancelled by a [c]ourt unless the parties to the instrument are before the [c]ourt," and that "fundamental principle of law" is especially true where, as here, the validity of a property agreement is involved.[97] Additionally, given that the authority of the United States to enter into the agreements with Mr. McKee's predecessors in interest is a key defense for Defendants, not allowing the United States to participate in this litigation would prejudice them.

Second, the court cannot mitigate the prejudice by proceeding without the United States. Either the agreements are valid, or they are not. Despite the Tribe's creative arguments to the contrary, there is no serious, sensical way to simultaneously invalidate the agreements as to Mr. McKee while holding that the agreements are still valid as to the United States. A contrary holding would also open the door to numerous lawsuits in which the Tribe could sue individual water users with similar agreements to Mr. McKee's and obtain relief that they have heretofore been unable to obtain by suing the United States. Proceeding as the Tribe suggests increases prejudice; it does not diminish it.

Third, judgment as to the validity of its agreements could not be made in the United States' absence. The court simply declines the Tribe's invitation to ignore what the Tenth Circuit

---

[97] *Navajo Tribe*, 809 F.2d at 1472.

24

endorsed as "a fundamental principle of law" by invalidating the United States' agreements with Mr. McKee without the United States' participation.[98]

Finally, the Tribe has a remedy to address this very issue with the United States. The Tribe has filed lawsuits against the United States seeking to invalidate these agreements.[99] As of the writing of this Report and Recommendation, the Tribe's breach of trust claims regarding water right management is ongoing in the Federal Court of Claims, specifically concerning the United States' "management of existing water infrastructure," including the UIIP.[100] Therefore, equity and good conscience militate in favor of dismissing the Tribe's water conversion claims as to Tract 3 because the United States is an indispensable party.

The Tenth Circuit's analysis in *Navajo Tribe of Indians v. New Mexico*,[101] provides further support for this court's recommended disposition of the Tribe's claims as to Tract 3. In that case, the Navajo Tribe filed an action against New Mexico, but to resolve those claims, the court would have to invalidate several presidential Executive Orders and land patents issued thereunder.[102] The district court held that the United States was an indispensable party under Fed.

---

[98] *Id.*

[99] *Ute Tribe v. United States*, No. 1:18-cv-00547-CJN (D.D.C.), *dismissed and part then transferred in part* to No. 2:21-cv-00573-JNP-DAO (D. Utah); *Ute Tribe v. United States*, No. 18-359L (Fed. Cl.).

[100] *See, e.g.*, *Ute Tribe v. United States*, 99 F.4th 1353, 1358 (Fed. Cir. 2024) (reversing Federal Court of Claims dismissal of Tribe's breach of trust claims "with respect to management of existing water infrastructure" and remanding for further proceedings).

[101] 809 F.2d 1455 (10th Cir. 1987).

[102] *Id.* at 1462.

R. Civ. P. 19(b) and dismissed the claims.[103] The Tenth Circuit affirmed the dismissal under Rule 19(b) because:

> (1) the claims against the non-federal parties rested on documents of title or possession derived from the United States; (2) [] the Tribe seeks to cancel all such instruments; (3) [] this court has affirmed the principle that all parties to an instrument must be present, else it may not be canceled; (4) [] more specifically, validity of a deed or patent issued by the Federal Government cannot be questioned in a suit by a third party against the grantee . . . .[104]

Therefore, dismissal under Rule 19(b) was proper.

The circumstances presented in *Navajo Tribe* are present in this case. First, Mr. McKee's right to use water for Tract 3 rests on an agreement with the United States. Second, the Tribe seeks to invalidate those agreements. Third, as mentioned above, a "fundamental principle of law" is that a court should not invalidate an agreement without the parties to the agreement appearing before the court. Finally, the use of a water right cannot be questioned by a suit against a third party. Thus, the Tenth Circuit's analysis in *Navajo Tribe* applies with equal force here.

Nevertheless, the Tribe contends that the Tenth Circuit's decision in *Choctaw and Chickasaw Nations v. Seitz*[105] provides a better reasoned analysis to deny dismissal under Rule 19(b). To the contrary, *Choctaw and Chickasaw Nations* illustrates why Rule 19(b) dismissal is appropriate here. The Tribes in *Choctaw and Chickasaw Nations* sought to establish title to lands "that were adjudged [by the United States Supreme Court] to be a part of Oklahoma" by suing individual landowners who had obtained their property as a result of the Supreme Court's prior

---

[103] *Id.* at 1462-63.

[104] *Id.* at 1472.

[105] 193 F.2d 456 (10th Cir. 1951).

decision.[106] The individual landowner-defendants in *Choctaw and Chickasaw Nations* moved to

dismiss for failure to join the United States, which caused the Tribes to amend their complaint to

join the United States.[107] The United States moved to dismiss the claims against it for want of a

waiver of sovereign immunity, and the district court dismissed the claims against the United

States.[108] The individual landowner-defendants persisted in their argument that the United States

was an indispensable party, and the district court agreed by dismissing the case under Fed. R.

Civ. P. 19(b).[109]

The Tenth Circuit reversed because the United States was not an indispensable party.[110]

The court reasoned that although the United States could choose to intervene in the action, the

validity of its statutes, treaties, agreements, or patents was not at issue in the case.[111] Instead, as

the Tenth Circuit later observed about the *Choctaw and Chickasaw* case, the interests of the Tribe

and the United States were aligned.[112] Therefore, Rule 19(b) dismissal was not warranted.

Unlike *Choctaw and Chickasaw Nations*, the respective interests of the Tribe and the

United States here are directly opposed and have served as the basis for the Tribe to sue the

United States in two other civil actions. Indeed, for the Tribe to obtain the relief it seeks against

Defendants on Tract 3, the Tribe must invalidate the agreements between the United States and

---

[106] *Id.* at 457.

[107] *Id.* at 457-58.

[108] *Id.* at 458.

[109] *Id.*

[110] *Id.* at 461.

[111] *Id.* at 458.

[112] *Navajo Tribe,* 809 F.2d at 1473.

Mr. McKee's predecessors in interest on which Defendants have been relying and paying for years. That direct challenge to the validity of agreements involving a property interest between the United States and any other party requires the United States' participation.[113] Accordingly, the United States is an indispensable party that cannot be joined, which requires dismissal of the Tribe's water conversion claims as to Tract 3 on the McKee Property.

**II.    The Tribe Lacks Standing Under the Parens Patriae Doctrine to Obtain Damages Arising from Defendants' Prior Theft of Water.**

Under the *parens patriae* doctrine, the Tribe lacks standing to seek damages for the loss of the ability to grow and sell alfalfa due to Defendants' theft of water. Jurisdictional issues, such as Article III standing, can be raised *sua sponte*.[114] Article III authorizes a federal court to hear cases in which there is a "case or controversy."[115] One of the criteria a court uses to determine if a case or controversy exists in an action is whether the plaintiff has "standing" to bring the lawsuit.[116] Article III standing requires the plaintiff to show that it has "suffered an injury in fact" caused by the Defendant that is remediable by court order.[117] The Tribe must demonstrate standing for "each form of relief" that it seeks.[118] The asserted injury for standing purposes must

---

[113] *Id.* at 1472.

[114] *See, e.g.*, *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1126 (10th Cir. 2013) ("And whenever standing is unclear, we must consider it *sua sponte* to ensure there is an Article III case or controversy before us.").

[115] U.S. CONST. art. III.

[116] *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

[117] *Id.*

[118] *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (citations and quotations omitted)); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("[A] plaintiff must demonstrate standing separately for each form of relief sought.").

belong to the plaintiff and not to third parties.[119] Speaking in terms of standing for sovereign governmental entities like the Tribe, it can show an injury in fact through its own proprietary,[120] sovereign,[121] or quasi-sovereign interests (i.e., *parens patriae*).[122]

Although the Tribe has undoubtedly shown that it has suffered an injury to its sovereign and proprietary interests regarding its water resources because of Defendants' actions on Tracts 1 and 2—which warrants declaratory and injunctive relief—the Tribe's damage claim in this action is not based on a damage calculation that the Tribe itself suffered from these injuries. Instead, the Tribe asserts a *parens patriae* interest to obtain damages for lost alfalfa cultivation that its Tribal *members* have suffered. The problem is that lost alfalfa cultivation and revenue to Tribal members is not a form of damages that belongs to the Tribe in its *parens patriae* capacity.

When addressing the Tribe's damage claim, the court must determine "whether the Tribe is truly bringing claims against defendants in its quasi-sovereign capacity."[123] The Tribe's "quasi-sovereign interest must be clear enough for the [c]ourt to ascertain whether the Tribe is attempting to assert the private claims of its citizens,"[124] which is not the case here.

By illustration, consider *Quapaw Tribe of Oklahoma v. Blue Tee Corp.*[125] There, the Quapaw Tribe filed a lawsuit against several mineral development companies for public

---

[119] *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

[120] *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982).

[121] *Id.*

[122] *Id.* at 600-01.

[123] *Quapaw Tribe of Okla. v. Blue Tee Corp.*, 653 F. Supp. 2d 1166, 1178 (N.D. Okla. 2009).

[124] *Id.* at 1178.

[125] 653 F. Supp. 2d 1166.

nuisance, private nuisance, trespass, strict liability, and negligence.[126] The Quapaw Tribe asserted a damage claim for "past loss-of-use natural resources," among other damages.[127] In determining its damages, the Tribe asserted that the defendants' conduct precluded it from growing hay.[128] The Tribe calculated its lost hay revenues using the estimated hay production between 1919 and 2005.[129] The defendant mining companies moved to dismiss the Quapaw Tribe's claims because "the Tribe lack[ed] standing to bring claims belonging to the individual landowners."[130]

The district court agreed that the Quapaw Tribe lacked standing to obtain lost hay damages, among others, because those claims belonged to the individual allottees, not the Quapaw Tribe itself.[131] The court reasoned that "[t]he Tenth Circuit has made clear that a governmental entity does not have standing to 'assert the rights of private individuals.'"[132] Therefore, "[t]he Tribe has the burden to demonstrate that its damages are limited to those incurred in its quasi-sovereign capacity and that it is not attempting to recover for harm to purely private interests."[133] Indeed, "a necessary part of a natural resource trustee's case is to clearly

---

[126] *Id.* at 1174-75.

[127] *Id.* at 1175.

[128] *Id.* at 1176.

[129] *Id.*

[130] *Id.* at 1177.

[131] *Id.* at 1183.

[132] *Id.* at 1179 (citing *Satsky v. Paramount Commc'ns., Inc.*, 7 F.3d 1464, 1469 (10th Cir. 1993).

[133] *Id.* at 1180.

delineate what damages the natural resources trustee may recover in a *parens patriae* suit and what damages belong to private citizens."[134]

Based on these standards, the district court considered the Tribe's request for damages for lost hay production.[135] The court reasoned that "[e]ven if the Tribe engaged in communal agricultural activities before allotment, the land became the property of individual Tribal members through the allotment process and the Tribe has acknowledged that economic gain from beneficial use of the land flowed to the actual landowner."[136] Because lost hay cultivation and the revenue therefrom was a damage claim that could be asserted by the individual allottees, the Tribe could not seek those damages in a *parens patriae* capacity.[137]

The analysis of *Quapaw Tribe* is persuasive. Here, the Tribe makes no attempt to distinguish between the damages that it claims pursuant to its quasi-sovereign interests and those that would belong to individual allottees. In fact, the expert report that the Tribe submits in support of its damage claims summarily conflates the damage claim by attributing it both to the Tribe and the allottees.[138] However, all the evidence on which the Tribe relies to support its damage claims comes from the testimony of individual allottees about how they do not have water to grow crops because of Defendants' theft of water.[139] The Tribe has not presented any

---

[134] *Id.* at 1181.

[135] *Id.* at 1183.

[136] *Id.*

[137] *Id.*

[138] ECF No. 32-1 at 132-140.

[139] ECF No. 32 at 29 (citing ECF No. 32-2 at 109:1-111:8; 188:8-12, which provides the testimony of allottees discussing the impacts of Defendants' unlawful use of water from Lateral 9).

evidence, and the court cannot find any elsewhere in the record, showing that the Tribe would have grown alfalfa using water from Lateral 9 or that Defendants' theft of water for Tracts 1 and 2 caused the Tribe's lost alfalfa-growing opportunities. The Tribe has also not submitted any evidence supporting damages other than the loss of the ability to grow alfalfa hay, and this loss belongs to individual allottees, not to the Tribe. Consequently, as in *Quapaw Tribe*, the Tribe has not provided any evidence that it has suffered damages in its *parens patriae* capacity, which means that it lacks standing to obtain damages for lost alfalfa production. And given that lost alfalfa production is the only damage claim that the Tribe has made, the court cannot award damages for Defendants' theft of water on Tracts 1 and 2.

III.  **The Tribe's Nuisance Claim Fails Because the Tribe Has Produced No Evidence of Unreasonable Harm to Tribal Lands.**

The Tribe's nuisance claim fails for want of evidence that Defendants' use of the McKee Property has unreasonably interfered with the Tribe's use and enjoyment of its property. The Tribe asserts a private nuisance claim,[140] which requires the Tribe to prove: "(1) a substantial invasion in the private use and enjoyment of land; (2) caused by Defendants or for which Defendants are responsible; and (3) the invasion is either (a) intentional and unreasonable or (b) unintentional and otherwise actionable."[141] "Unlike public nuisance claims, private nuisance claims do not require that the defendant's actions be unlawful."[142] Instead, "nuisance has reference to the interests invaded, to the damage or harm inflicted, and not to any particular kind

---

[140] ECF No. 32 at 30.

[141] *Whaley v. Park City Mun. Corp.*, 190 P.3d 1, 9 (Utah Ct. App. 2008).

[142] *Id.*

of action or omission that would lead to the invasion . . . ."[143] Mere "fear[] arising from the contamination . . . is not sufficient as a matter of law to support a nuisance claim.[144] Thus, the Tribe must show "unreasonable injury rather than . . . unreasonable conduct" to prevail on its nuisance claim.[145]

Although the Tribe's Motion for Summary Judgment correctly cites the elements of private nuisance and the standards articulated above, the Tribe's nuisance argument takes an interesting turn. The Tribe contends that despite the language above stating the private nuisance's focus is on unreasonable *injury* to the plaintiff's land instead of the *legality* of the defendant's conduct, the Tribe argues that if it can show that Defendants have violated a statute, it has proven nuisance per se. This argument is incorrect as a matter of law.

The best evidence of what nuisance per se means in Utah is the case on which the Tribe relies: *Branch v. Western Petroleum, Inc.*[146] In *Branch*, the defendant's oil and gas operations contaminated the plaintiff's culinary water wells.[147] The plaintiffs brought negligence and strict liability claims against the defendant, and the trial court awarded damages based on strict liability.[148] The defendant appealed, contending that negligence was the only viable theory on which the judgment could be sustained.[149] Notably, nuisance was not a cause of action before, at,

---

[143] *Id.* (citations and quotations omitted).

[144] *Walker Drug Co., Inc. v. La Sal Oil Co.*, 972 P.2d 1238, 1244 (Utah 1998).

[145] *Whaley*, 190 P.3d at 9.

[146] 657 P.2d 267 (Utah 1982).

[147] *Id.* at 270.

[148] *Id.*

[149] *Id.*

or after trial in *Branch*.[150] In addressing whether negligence or strict liability was the proper basis for the trial court judgment, the Utah Supreme Court considered the various legal approaches in both England and the United States that courts have employed to address "liability for the pollution of subterranean waters by industrial wastes."[151] In this survey of various court decisions, the Utah Supreme Court noted that nuisance was a common theory to address industrial contamination of groundwater.[152] The Utah Supreme Court noted that in nuisance actions, the "essential element of an actionable nuisance is that persons have suffered harm or are threatened with injuries that they ought not have to bear."[153] The court further observed that "[i]t is of no consequence that a business which causes a nuisance is a lawful business."[154] The court then held that "an alternative doctrine" on which the trial court's judgment *could* rest was "nuisance per se," which the court noted was "in reality just another term for strict liability."[155] The court defined "nuisance per se" as "conditions giving rise to a nuisance are *also* a violation of a statutory provision."[156]

Given the painstaking efforts the Utah Supreme Court made in *Branch* to show that the legality of the defendants' actions is not the stuff of nuisance but the impact on the plaintiff's land, the Utah Supreme Court's definition of "nuisance per se" cannot mean, as the Tribe

---

[150] *Id.* at 272.

[151] *Id.*

[152] *Id.* at 274.

[153] *Id.*

[154] *Id.*

[155] *Id.* at 276.

[156] *Id.* (emphasis added).

contends, that all a plaintiff must do to succeed is to show that the defendant's actions are unlawful. Instead, nuisance per se gives rise to strict liability only if the plaintiff first proves a nuisance in the traditional sense and then shows that the action causing the nuisance is unlawful. Otherwise, any violation of law, no matter how small and innocuous, would give rise to a private nuisance per se cause of action. Indeed, given the Utah Supreme Court's recognition that nuisance per se is another way of saying "strict liability," Utah's highest court would not countenance such a low bar to find strict liability.[157] Instead, as the Utah Supreme Court said,

---

[157] For example, to impose strict liability on a landowner, the Utah Supreme Court requires a plaintiff to prove harm arising from the defendant's "abnormally dangerous activity." *Walker Drug Co.*, 902 P.2d at 1233. In determining whether an activity is "abnormally dangerous," the Utah Supreme Court considers the following factors:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
>
> (b) likelihood that the harm that results from it will be great;
>
> (c) inability to eliminate the risk by the exercise of reasonable care;
>
> (d) extent to which the activity is not a matter of common usage;
>
> (e) inappropriateness of the activity to the place where it is carried on; and
>
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

*Id.* Given that "nuisance per se" is "just another term for strict liability," it necessarily must include much more than merely proving that the defendant violated some law. This legal reality is detrimental to the Tribe's arguments to the contrary. Moreover, applying these factors to Defendants' conduct for their farming, feedlot, and fertilizer operations shows that Defendants are not engaging in an abnormally dangerous activity for purposes of strict liability because any of the Tribe's complaints about how Defendants operate are remedied by Defendants exercising reasonable care. If it were not so, every farmer, rancher, and manure seller in the rural Uintah Basin would be subject to strict liability, which shows that Defendants' operations are a matter of common usage in their area. Additionally, the Tribe does not show how Defendants' operations have harmed its land, much less a "high degree of risk of some harm," or that the harm will be "great" from Defendants' operations. Thus, establishing "nuisance per se" is not as simple as the Tribe contends it is here.

nuisance per se is available only "[w]hen the conditions giving rise to a nuisance are *also* a violation of a statutory prohibition."[158]

Under the proper reading of *Branch*, the Tribe has not established a nuisance much less a nuisance per se. Although the Tribe submits a great deal of evidence about the illegality of Defendants' feedlot and fertilizer operations and some unseemly activities Defendants engage in on the McKee Property, the Tribe does not present *any* evidence about how Defendants' operations have interfered with the Tribe's use of its land. At best, the Tribe expresses fear about what some of Defendants' activities on their property *might* do, but mere fear of contamination is not enough to sustain a nuisance claim as a matter of law.[159] The lack of evidence causes the court to ask, does the stench from Defendants' feedlot preclude homeowners from using and enjoying their homes?[160] Is the Tribe's water so contaminated that it is no longer safe for irrigation or stock watering?[161] Is the soil on Tribal land so contaminated from Defendants' activities that it creates adverse health effects for flora, fauna, or humans?[162] Presently, there is no evidence that any of this is occurring on Tribal land as a result of Defendants' operations. Indeed, under a theory of nuisance, "[i]t is of no consequence that a business which causes a

---

[158] *Branch*, 657 P. 2d at 276 (emphasis added).

[159] *Walker Drug Co.*, 972 P.2d at 1244.

[160] *See, e.g.*, *Stephens v. Pillen*, 681 N.W.2d 59, 67 (Neb. Ct. App. 2004) (sustaining nuisance claim because stench from hog farm precluded homeowners from going outside or opening their windows).

[161] *Branch*, 657 P.2d at 270.

[162] *In re Wildewood Litig.*, 52 F.3d 499, 503 (4th Cir. 1995) (holding under South Carolina law that contaminants in water were not a nuisance because they did not rise to the level of a toxicological concern).

nuisance is a lawful business."[163] The Tribe's dearth of evidence as to how its use and enjoyment of its land has been impacted by Defendants' use of the McKee Property precludes summary judgment on its nuisance claims.[164]

### CONCLUSION AND RECOMMENDATION

For the reasons discussed above, the court HEREBY RECOMMENDS that the Tribe's Motion for Summary Judgment[165] be GRANTED IN PART AND DENIED IN PART. The court recommends the following disposition of the Tribe's claims in its operative complaint:

1. As to the first cause of action, the court recommends: (1) granting the Tribe summary judgment as to its water conversion claims for Tracts 1 and 2 on the McKee property, issuing a declaratory judgment in the Tribe's favor, and permanently enjoining Defendants from using water from Lateral 9 and Deep Creek to irrigate those tracts; and (2) As to Tract 3, the court recommends denying the Tribe's motion and dismissing the Tribe's claims under Fed. R. Civ. P. 19(b).

2. As to its second cause of action, the court recommends denying the Tribe's Motion for Summary Judgment because the Tribe has not established damages in its proprietary or sovereign capacity for conversion of water, and the Tribe lacks standing to claim damages on behalf of its allottees. Instead, under Fed. R. Civ. P. 56(f)(1), summary judgment should be granted to the non-movants.

---

[163] *Branch*, 657 P.2d at 274.

[164] Because the Tribe has not established a right to damages for either its water conversion or nuisance claims, the court does not address whether the Tribe can pierce the corporate veil of the Corporate Defendants to pursue Mr. McKee personally for damages.

[165] ECF No. 32.

3. Finally, the Tribe's Motion for Summary Judgment on its third cause of action should be denied because the Tribe has failed to present sufficient evidence showing that Defendants' activities on the McKee Property have unreasonably interfered with the Tribe's use and enjoyment of its property. Consequently, summary judgment should be granted to the non-movant under Fed. R. Civ. P. 56(f)(1).[166]

4. Given that no damages should be awarded to the Tribe, the issue of whether the Tribe can pierce the corporate veil for the Corporate Defendants is moot.

### NOTICE TO PARTIES

Copies of this Report and Recommendation are being sent to all parties, who are hereby notified of their right to object.[167] The parties must file any objections to this Report and Recommendation within 14 days after being served with a copy of it.[168] Failure to object may constitute waiver of objections upon subsequent review.

DATED this 8th day of July 2025.

BY THE COURT:

JARED C. BENNETT
United States Magistrate Judge

---

[166] Granting summary judgment for the non-moving party on these two issues is appropriate because the Tribe's Motion for Summary Judgment was unopposed, and even with the Tribe's best, undisputed facts, it could not establish the elements for damages for water conversion or nuisance. Summary judgment for the non-moving party is, therefore, appropriate. *See generally, Lin v. Shanghai City Corp.*, 950 F.3d 46, 49 (2d Cir. 2020) (holding that court deciding summary judgment *sua sponte* was appropriate where party "had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried, and that the party for whom summary judgment is rendered is entitled thereto as a matter of law").

[167] 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).

[168] 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).